```
 1   UNITED STATES DISTRICT COURT

 2   NORTHERN DISTRICT OF NEW YORK

 3   - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

 4   JAMES W. McCULLEY,

 5                        Plaintiff,

 6      -versus-                          05-CV-811

 7                        (EVIDENTIARY HEARING Cont'd)

 8   NYS DEPARTMENT OF ENVIRONMENTAL

 9   CONSERVATION, et al.,

10                        Defendants.

11   - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

12

13

14

15           TRANSCRIPT OF PROCEEDINGS held in and for the

16   United States District Court, Northern District of New York,

17   at the James T. Foley United States Courthouse, 445 Broadway,

18   Albany, New York 12207, on FRIDAY, FEBRUARY 3, 2006, before

19   the HON. DAVID R. HOMER, United States District Court

20   Magistrate Judge.

21

22

23

24

25
```

```
 1

 2   APPEARANCES:

 3   FOR THE PLAINTIFF:

 4   SMITH, DWYER LAW FIRM

 5   BY:  MATTHEW D. NORFOLK, ESQ.

 6

 7

 8   FOR THE DEFENDANTS:

 9   HON. ELIOT SPITZER, New York State Attorney General

10   BY:  DAVID A. MUNRO, Assistant Attorney General

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

250

```
 1
 2          I N D E X   T O   W I T N E S S E S :
 3
 4   PLAINTIFFS:              DIRECT  CROSS  REDIRECT  RECROSS
 5   BRUCE B. REED              254    268     269      ---
 6   KENNETH C. JUBIN           272    299     ---      ---
 7   JOSEPH J. LaPIERRE         305    332     340      ---
 8   CHRISTOPHER A. LACOMBE     345    371     396      ---
 9                   - - - - -
10
11   DEFENDANTS:
12   KENNETH R. HAMM            419    431     ---      ---
13   ROBERT K. DAVIES           442    454     ---      ---
14                   - - - - -
15
16
17
18
19
20
21
22
23
24
25
```

251

```
 1            I N D E X   T O   E X H I B I T S:

 2    PLAINTIFF:                              IDENT:      IN EVID:

 3      62  -   Letter, 11/5/04               366         366

 4      63  -   Letter, 12/22/04              360         360

 5      65  -   Appearance Ticket Printout    404         405

 6      73  -   Town Board Meeting Minutes    266         266

 7      85  -   Appearance Ticket Printout    401         401

 8      90  -   DEC Map                       285         286

 9      93  -   Photograph                    259

10      99  -   1971 Resolution               302         302

11                        - - - - -

12

13    DEFENDANTS:

14     1-6  -   Photographs                   332         333

15       7  -   1972 Master Plan, Excerpt     386         386

16       8  -   1979 Master Plan, Excerpt     386         386

17       9  -   1987 Master Plan, Excerpt     386         386

18      10  -   2001 Master Plan, Excerpt     386         386

19      11  -   Complete 2001 Master Plan     393         393

20                        - - - - -

21

22

23

24

25
```

```
 1                    (Court commenced at 9:04 AM.)

 2                    THE CLERK:  The date is February 3, 2006.

 3     The time is 9:00 AM.  The matter is James A. McCulley versus

 4     New York State Department of Environmental Conservation, et

 5     al., docket 05-CV-811.  Can we have appearances, please?

 6                    MR. NORFOLK:  Good morning.  Before I call my

 7     first witness, Judge --

 8                    THE COURT:  Have to have your appearance,

 9     first, please.

10                    MR. NORFOLK:  Okay.  I'm sorry, I apologize.

11     Plaintiff's attorney Matthew Norfolk, with, to my right,

12     James W. McCulley.

13                    MR. MUNRO:  David Munro, Assistant Attorney

14     General, for the defendants.

15                    THE COURT:  I'm sorry, Mr. Norfolk, you

16     wanted to say something?

17                    MR. NORFOLK:  Oh, just again, before I call

18     my first witness, if there's any witnesses in the courtroom,

19     I'd ask them -- I'd ask the Court to ask them to be removed.

20                    THE COURT:  Mr. Munro, anybody here?

21                    MR. MUNRO:  Yeah.  Stuart Buchanan is in the

22     back, he is a named defendant, he is the Regional Director

23     for the DEC office up in Raybrook.

24                    MR. NORFOLK:  Okay.

25                    THE COURT:  Call your next witness, please.
```

1                    MR. NORFOLK:  Mr. Bruce Reed.

2                    (Pause in proceedings.)

3                    THE CLERK:  Mr. Reed, if you'll step right up

4    here, as best as you can with the obstacles.  It's Bruce?

5                    THE WITNESS:  Yes.

6                    THE CLERK:  And your middle initial?

7                    THE WITNESS:  B.

8                    THE CLERK:  And it's Reed?

9                    THE WITNESS:  Reed, R-E-E-D.

10                   THE CLERK:  Raise your right hand.

11                   (Witness duly sworn.)

12                   THE CLERK:  Bruce B. Reed, R-E-E-D.

13                   THE COURT:  Good morning.

14                   THE WITNESS:  Good morning.

15                              - - - - -

16

17

18

19

20

21

22

23

24

25

```
 1                 B R U C E    B.    R E E D,
 2   having been called as a witness, being duly sworn,
 3   testified as follows:
 4   DIRECT EXAMINATION
 5   BY MR. NORFOLK:
 6        Q.   Good morning, Mr. Reed.
 7        A.   Hi.
 8        Q.   I am gonna ask you a few questions about your
 9   experiences as a Town Supervisor -- Town -- Superintendent
10   for Highways for the Town of Keene.  How long have you held
11   that position?
12        A.   Eleven years.
13        Q.   Before becoming a highway superintendent, did you
14   work for the Town of Keene in any other capacity?
15        A.   Yes.  I was employed with the highway department.
16        Q.   And did you have a title before being a
17   superintendent?
18        A.   HEO, heavy equipment operator.
19        Q.   And what were the duties and responsibilities as a
20   heavy equipment operator for the Town of Keene?
21        A.   I run the grader and bulldozer.  Reconstructing
22   roads, maintainin' the roads.
23        Q.   And it's in your capacity as a heavy operator --
24   heavy equipment operator, you work mainly on roads and
25   highways or do you work on other parts of the town?
```

1        A.    Other parts (unintelligible.)  Well, we worked in

2   parks, the trails, whatever needed to be done.

3        Q.    How long were you an HEO?

4        A.    I started in 1980, and in '94, I took over as

5   highway superintendent, so...

6        Q.    Okay.  Are you familiar with the Old Mountain

7   Road?

8        A.    Yes, I am.

9        Q.    Is the Old Mountain Road a road in the Town of

10  Keene?

11       A.    Yes.

12       Q.    Could you describe to the Court, as best you can,

13  geographically where the Old Mountain Road is in the Town of

14  Keene, where it maybe begins and ends?

15       A.    Begins now at the end of Alstead Hill Road.

16       Q.    Okay.  And where does it travel to?

17       A.    In the Lake Placid region.

18             THE COURT:  I'm sorry, can you spell -- is it

19  Elster?

20             THE WITNESS:  Alstead Hill, A L S T E A D.

21             THE COURT:  Alstead Hill Road, okay.  Thank

22  you.

23  BY MR. NORFOLK:

24       Q.    You say it travels to Lake Placid?

25       A.    Yes, far as I know.

1      Q.   Does the part that's in the Town of Keene,

2  where -- of the Old Mountain Road, where does it end?

3      A.   Where does it end?  I can't simply pinpoint it,

4  but it's on the other side of Chimney Hill.

5      Q.   How about this?  Does the part of Old Mountain

6  Road that's in Keene, does that go to the North Elba town

7  border?

8      A.   Yes.

9      Q.   Okay.  And then from there, the Old Mountain Road

10  continues in the Town of North Elba?

11      A.   Into the state road, Route 73.

12      Q.   Okay.  Okay.  That's the (unintelligible.)

13          In your capacity as an HEO, heavy equipment

14  operator, have you ever done maintenance work yourself on

15  the Old Mountain Road in Keene?

16      A.   Yes.

17      Q.   And when I ask these questions about the Old

18  Mountain Road, I'm obviously referrin' to that part of the

19  road in Keene.  I know it makes no sense to you because you

20  work in North Elba, correct?

21      A.   Correct.

22      Q.   As an HEO, can you tell me what type of work you

23  did on the Old Mountain Road?

24      A.   Cut trees, cut brush, rotted culverts.  We built a

25  bridge.

1        Q.    Now, as an HEO, can you give me -- was it once --

2   one time one year or is it many times several years?  How

3   did the work go?

4        A.    Many times.

5        Q.    Okay.  When do you recall first doing the

6   maintenance on the Old Mountain Road?

7        A.    I believe it was in 1985.

8        Q.    Okay.  And that was you personally --

9        A.    Yes.

10       Q.    -- that did that?  Now, was that in your capacity

11   as an HEO?

12       A.    Yes.

13       Q.    For the Town of Keene?

14       A.    Yes.

15       Q.    Did you have fellow employees there?

16       A.    Yes.

17       Q.    Did it range one or two or 10, 20?  How was that?

18       A.    Full squad.  Six or seven, I believe, at the time.

19       Q.    And that would be every time you did do work on

20   the Old Mountain Road, talkin' about in the '80s, you'd have

21   typically a squad with you doin' the work?

22       A.    Yes.

23       Q.    Did you bring bulldozers down on the Old Mountain

24   Road at that time?

25       A.    No.

1        Q.   Okay.  How did you get back in there?

2        A.   With a weapons carrier, an old Army weapons

3   carrier we had.

4        Q.   Can you explain to the Court what a weapons

5   carrier is?

6        A.   Well, it's old Army surplus vehicle that we

7   purchased through the Federal Government.

8        Q.   Like a big four by four?

9        A.   Yeah.

10        Q.   Jeep like?

11        A.   Yep.

12        Q.   Big knobby tires?

13        A.   Yes.

14               (Pause in proceedings.)

15        Q.   You mentioned culverts that you have put -- you

16   had put in in the '80s?  Can you tell me what the

17   materials -- what the culverts were made of, what type of

18   material?

19        A.   Galvanized steel.

20        Q.   Okay.  Galvanized steel.

21               MR. NORFOLK:  I'd like to -- excuse me a

22   minute, Mr. Reed.  I have here Plaintiff's Exhibit 94, 93

23   and 122, which is Number 35 on your exhibits list.

24               Do you have any objection to having

25   these in?

 1                      MR. MUNRO:  Well, he is gonna tell us what

 2    they are and what the dates are, right?

 3                      MR. NORFOLK:  I'm gonna ask him about this

 4    one, okay.

 5                      MR. MUNRO:  I won't object to anything he can

 6    describe.

 7                      MR. NORFOLK:  Okay.  All right.  May I

 8    approach the witness?

 9                      THE COURT:  Yes.

10    BY MR. NORFOLK:

11        Q.    I'm gonna give you Plaintiff's Exhibit 93 --

12                      THE COURT:  Which is?

13        Q.    -- which is a --

14                      THE COURT:  Which is what number?

15                      MR. NORFOLK:  35, I believe.

16                      THE COURT:  93, okay.

17                      MR. NORFOLK:  35 on the exhibits list.

18                      THE COURT:  Okay.

19    BY MR. NORFOLK:

20        Q.    Ask you to look at that.  Can you tell me what the

21    Plaintiff's Exhibit 93 is, appears to be?

22        A.    It appears to be a culvert underneath a road.

23        Q.    Okay.  Does it appear to be a photo, a copy of a

24    photo, a printout?

25        A.    Yes.

1     Q.   Okay.  Does that fairly and accurately depict a

2   picture of a culvert on the Old Mountain Road?

3               MR. MUNRO:  Objection.  Can we get a time

4   period here?

5               MR. NORFOLK:  Actually that was gonna be my

6   next question, but --

7     Q.   In 2003, does that fairly and accurately depict a

8   culvert on the Old Mountain Road?

9     A.   2003?

10    Q.   In the summer of 2003.

11    A.   Could be.  I'd -- I haven't been up there since

12  2003, but I know we put culverts in.

13    Q.   Does that appear to you to be a photograph -- true

14  and accurate picture of a culvert that was provided by the

15  Town of Keene?

16    A.   Yes.

17              MR. NORFOLK:  I ask that be admitted into

18  evidence.

19              MR. MUNRO:  Objection, your Honor.  I don't

20  know who took this photo.

21    A.   I believe --

22              THE COURT:  Hold on.  Not talkin' to you.

23              THE WITNESS:  All right.

24              THE COURT:  Sustained.  No foundation.

25  BY MR. NORFOLK:

1      Q.   Now, in -- let's move to the '90s.  Were you still

2   an HEO?

3      A.   Yes.

4      Q.   Okay.  Did you, in the course of your employment

5   as HEO, do any maintenance work on the Old Mountain Road in

6   Keene?

7      A.   Yes.

8      Q.   Can you -- when?  When did you do it?

9      A.   In the 1990s.  '91.

10      Q.   Okay.  Any in '92?

11      A.   Possibly, yes.

12      Q.   Okay.

13      A.   There was a time period that we done work a little

14   bit each time.

15      Q.   Each year in the '90s?

16      A.   Yeah, '91, '92, I would say.

17      Q.   Okay.  Can you give the Court a brief summary of

18   what kind of work you would do in the '90s on the Old

19   Mountain Road?

20      A.   Yeah, we'd cut brush, and I think we also did

21   bridge work at that same location.

22      Q.   What kind of bridge work?

23      A.   Well, replacement of planks.

24      Q.   Planks?

25      A.   Yeah.  The bridge settled, so we would jack it up,

1    put stuff underneath it.

2        Q.   What kind of bridge was this?

3        A.   It was a wooden deck with steel beams underneath.

4        Q.   Steel beams?

5        A.   I believe so.

6        Q.   Okay.  When you say cut brush, did you cut brush

7    with tweezers -- not tweezers, not tweezers, but with

8    clippers or something else?

9        A.   Chain saw.

10        Q.   Chain saw.  Okay.  Did you have to cut any trees

11   down?

12        A.   Yes.

13        Q.   And how about remove any rocks or boulders that

14   may have gotten in the way, do you recall?

15        A.   Not at that time.

16        Q.   Okay.  When did -- what year did you become the

17   highway superintendent?

18        A.   '94.

19        Q.   '94.  Okay.  Let's go to '94.  As highway

20   superintendent, do you recall doin' any work on the Old

21   Mountain Road?

22        A.   No.

23        Q.   Okay.  How about '95?

24        A.   No.

25        Q.   '96, did you do some work?

1        A.    Yes, I did.

2        Q.    Okay.  Could you explain -- when in '96, if you

3   know?

4        A.    November 3rd.

5        Q.    You remember that.  Now, how is it that you

6   remember that?

7        A.    Because I have it in my daily minder.

8        Q.    My daily reminder.  Okay.  Well, let's try to go

9   on your own memory, and if there is a need for that, perhaps

10  we can have you refer to it, okay?  Let's try to go on your

11  own recollection.

12                  November 3, '96?

13       A.    I believe so.

14       Q.    Okay.  What did you do on November 3, '96?

15       A.    I brought one of my workers up with me, we hauled

16  up a bulldozer on a trailer and we brought chain saws up and

17  my worker cut brush, 'cause I was on the bulldozer repairin'

18  the road.

19       Q.    Okay.  You hauled a bulldozer up on a trailer?

20       A.    Yes.

21       Q.    What was towing the trailer?

22       A.    Dump truck.

23       Q.    Can you give us the size of the dump truck?  Was

24  it  -- not well-versed in that, two ton, three ton, the size

25  of it?

1      A.   Over eighty-two thousand pounds.

2      Q.   Dump truck?

3      A.   Yes.

4      Q.   How many wheels does the dump truck have on it?

5      A.   Six.

6      Q.   So that's four on a rear axle --

7      A.   Yes.

8      Q.   -- and two?

9      A.   Right.

10     Q.   Okay.  Now, the bulldozer, what kind of bulldozer

11   was it?

12     A.   John Deere 450.

13     Q.   And you cleared, what did you say, you cleared

14   trees and shrubs, or what did you do?

15     A.   Durin' the floods of '96, '95 and '96, there was

16   those floods, I went up and it was all gutted out, and went

17   up and repaired it.

18     Q.   Okay.  Do you recall bein' at a meeting, a town

19   board meeting, I think it was, in 2000 -- June of 2005 where

20   a discussion of the Old Mountain Road and whether it should

21   be abandoned or closed came up?

22     A.   Yes.

23     Q.   Okay.  Do you recall when that was in June?

24     A.   Not right offhand.  It would have to be the second

25   Tuesday of the month.

1        Q.   All right.  I think that was June 14th, that --

2   all right.

3              So the topic of the Old Mountain Road and

4   whether it should be closed or abandoned came up at this

5   town meeting, correct?

6        A.   Correct.

7        Q.   Can you tell me if there's any resolutions passed

8   for closing or abandoning or qualifying abandoning the Old

9   Mountain Road in the Town of Keene?

10       A.   There was a resolution.

11       Q.   And can you tell me what the resolution was?

12       A.   Qualified abandonment.

13       Q.   It was -- the Town Board agreed to qualify

14   abandoned the Old Mountain Road in the Town of Keene?

15       A.   Yes.

16       Q.   Now, this was in June of 2005?

17       A.   Correct.

18       Q.   Not even a year ago, correct?

19       A.   Correct.

20       Q.   Okay.

21              MR. NORFOLK:  I'm going to offer in

22   evidence -- I would like to present Exhibit 73, which is

23   Number 9 on the Plaintiff's Exhibit list.

24              (Pause in proceedings.)

25              THE COURT:  Has that been offered in

1    evidence?

2                    MR. NORFOLK:  I am gonna offer it.  I don't

3    know if there's an objection or you want me to lay a

4    foundation or whatever.

5                    THE COURT:  Any objection?

6                    MR. MUNRO:  No objection, your Honor.

7                    MR. NORFOLK:  All right.

8                    THE COURT:  Plaintiff's Exhibit 73 is

9    received in evidence.

10                   (Plaintiff's Exhibit 73 received.)

11   BY MR. NORFOLK:

12       Q.   Mr. Reed, I am gonna give you what's exhibit --

13   marked as Plaintiff's Exhibit 73.  Can you take your time

14   and take a look at it?  Flip through it and then I want to

15   ask you a few questions.

16       A.   (Witness complies.)

17                   THE COURT:  You recognize that as the

18   minutes, Mr. Reed?

19                   THE WITNESS:  Yes.

20                   THE COURT:  Do you want to direct his

21   attention to a particular section?

22                   MR. NORFOLK:  Yes, I do.

23   BY MR. NORFOLK:

24       Q.   Are -- yes, I do.  I want to direct you to -- it's

25   on -- marked as page 0049 of Plaintiff's Exhibit 73.  At the

1    bottom here, it says resolution number 142-05.  Can I ask

2    you to read that outloud and then I'm gonna follow up with a

3    question?

4         A.   "The Board adopted resolution number 142-05.  The

5    resolution is (unintelligible.)

6         Q.   Okay.  Now, --

7              MR. MUNRO:  Your Honor, he's already

8    testified to that, even before reading from the document.

9    We have even stipulated to the admissibility of the

10   document, just to move this along here.

11             MR. NORFOLK:  Judge, if I may?  The next part

12   I want him to read is -- it's one sentence, I am gonna

13   follow up a question on it.

14        Q.   Right here.

15        A.   (Unintelligible.)  Said yes.

16        Q.   Okay.  My question to you is:  Did the Town Board

17   ask for your permission as the highway superintendent to go

18   along with this qualified abandonment resolution?

19        A.   Yes.

20        Q.   And why was that?  Why did they ask you for your

21   permission or acceptance of going along with this qualified

22   abandonment?

23        A.   Because I have to make the -- the resolution is to

24   be made by the Town Board to close the road, but I'm the one

25   that they -- I'm the one that closes the road or --

1       Q.   And did they ask you to confirm that you would

2   not do anymore maintenance on the Old Mountain Road for the

3   Town of Keene?

4       A.   Yes.

5       Q.   Okay.  As highway superintendent, what is your

6   understanding, after having this meeting, what qualified

7   abandonment meant for the Town of Keene with respect to the

8   Old Mountain Road?

9       A.   I feel that that's -- that we don't do anymore

10  work on it but we still own it.

11      Q.   Okay.  You're a highway superintendent.  You have

12  been there 10 years, did you say?

13      A.   Eleven.

14      Q.   Eleven years.  Can a town close a road that

15  doesn't have ownership of -- it doesn't have ownership of?

16      A.   No.

17      Q.   Right.

18              MR. NORFOLK:  No more further questions.  I

19  reserve to redirect.  Thank you, Mr. Reed.

20              THE COURT:  Mr. Munro, any questions?

21              MR. MUNRO:  Just a few questions, your Honor.

22  CROSS-EXAMINATION

23  BY MR. MUNRO:

24      Q.   Mr. Reed, I am gonna ask you a few questions about

25  the Old Mountain Road, and let me define it so we're both

1    talking about the same thing.  I'm talking about the road

2    that runs from North Elba, okay, not the nine-tenths of the

3    road that is paved, but where the paving ends and there's a

4    turn-around, starting there and running towards Keene, and

5    ending at the Rockin' River Resort, that three-and-a-half

6    miles, okay?  That's what I'm talking about.  How much money

7    is currently in the budget for the Town of Keene for

8    maintenance of that three-and-a-half mile section?

9              MR. NORFOLK:  I am gonna object.

10              THE COURT:  Overruled.

11       A.    I don't really (unintelligible) by monies for this

12    road.  There's a lump sum that the Town Board allows me

13    (unintelligible) all town roads.  I can't really give you a

14    number on that.

15       Q.    Okay.  You testified that the town did some

16    maintenance work in 1996.  Has it done any since then?

17       A.    No, it has not.

18              MR. MUNRO:  No further questions.

19              MR. NORFOLK:  I just have a few.

20    REDIRECT-EXAMINATION

21    BY MR. NORFOLK:

22       Q.    As highway superintendent, is your understanding

23    that if a town road is being maintained, doesn't -- a town

24    road is considered maintained, it doesn't matter who's

25    maintaining it?

1        A.    Yes.

2        Q.    So, to your knowledge, has the Adirondack Ski

3  Touring Council maintain the Old Mountain Road since '96?

4        A.    Somebody has.

5        Q.    Okay.  One more question, and that is:  You were

6  asked by Mr. Munro whether there was any monies in the

7  budget in 2005.  Would you expect any money to be in the

8  budget if you qualified abandoned a road?

9        A.    No.

10                 MR. NORFOLK:  No further questions.

11                 THE COURT:  Anything further, Mr. Munro?

12                 MR. MUNRO:  No, your Honor.

13                 THE COURT:  Thank you, Mr. Reed, you may step

14  down.

15                 MR. NORFOLK:  Thank you, Mr. Reed.  Thanks

16  and have a safe trip back.

17                 THE WITNESS:  Okay, thank you.

18                 (Witness was excused.)

19                 THE COURT:  Call your next witness.

20                 MR. NORFOLK:  Yes, Judge.  I'm gonna call Ken

21  Jubin.  I gotta find the questionnaire.  Here it is.

22                 (Pause in proceedings.)

23                 THE CLERK:  Just stand right in front of me

24  and I'm gonna swear you in.  Can I have your name, please?

25                 THE WITNESS:  Ken Jubin.

1                    THE CLERK:  Is it Ken?

2                    THE WITNESS:  Kenneth.

3                    THE CLERK:  And spell your last name.

4                    THE WITNESS:  J-U-B-I-N, as in Nancy.

5                    THE CLERK:  And your middle initial?

6                    THE WITNESS:  C.

7                    THE CLERK:  Please raise your right hand.

8                    (Witness duly sworn.)

9                    THE CLERK:  This is Kenneth C. Jubin,

10   J-U-B-I-N.

11                              - - - - -

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              K E N N E T H    C.     J U B I N,

 2   having been called as a witness, being duly sworn,

 3   testified as follows:

 4   DIRECT EXAMINATION

 5   BY MR. NORFOLK:

 6        Q.   Hello, Mr. Jubin.  I'm Matt Norfolk, I'm Jim

 7   McCulley's plaintiff -- Jim McCulley's attorney.  We've met

 8   before, obviously.  How are you doin' this morning?

 9        A.   Fine, thank you.

10        Q.   Good.  I'd ask that you tell the Court where your

11   residence is presently.

12        A.   At the Jack Rabbit Inn, which is in Lake Placid,

13   New York.

14        Q.   Do you own any other properties besides the Jack

15   Rabbit Inn?

16        A.   I do.  I have properties on the Old Mountain Road.

17        Q.   Okay.  Old Mountain Road in the Town of Keene or

18   in the Town of North Elba?

19        A.   In the Town of North Elba.

20        Q.   Okay.  How long have you lived at the -- you call

21   it the Jack Rabbit Inn?

22        A.   Since July or August of 19 -- 1997.

23        Q.   Are you the owner of the Jack Rabbit Inn?

24        A.   I am.

25        Q.   And what is the Jack Rabbit Inn?
```

1        A.   Jack Rabbit Inn -- I own the Jack Rabbit Inn.   I

2    own the Jack Rabbit Inn and the Jack Rabbit Hostile.   Jack

3    Rabbit Inn is a small motel, and the Jack Rabbit Hostile is

4    a hostile, bunk bed accommodations.

5        Q.   What kind of clients do you typically get at the

6    Jack Rabbit Inn?

7        A.   Pretty much outdoor enthusiasts.   We get hikers,

8    skiers, snow shoers, ice climbers.   Sometimes we get just

9    general tourists comin' to Lake Placid and --

10       Q.   Aren't a number of your customers there, at the

11   Jack Rabbit Inn, 'cause the old mountain -- the Jack Rabbit

12   Trail nearby?

13       A.   We do have.   That's why we named the Jack Rabbit

14   Inn the Jack Rabbit Inn, 'cause of its proximity to the Jack

15   Rabbit Ski Trail, which pretty much goes right by the Jack

16   Rabbit Inn.

17       Q.   You're here under a subpoena, correct?

18       A.   Correct.   And I want to be here, thank you.

19       Q.   Thanks for showin' up.   Besides owning and

20   operating the Jack Rabbit Inn, do you have any other

21   employment or positions?

22       A.   I am -- I am the Chairman of the Joint Village of

23   Lake Placid/Town of North Elba Zoning Board of Appeals.   I

24   am also a board member of the Adirondack Ski Touring

25   Council.   That's pretty much my professional -- my

1    professional interests.

2        Q.    So you know Tony Goodwin then?  Is he the

3    president, I think --

4        A.    Yes.

5        Q.    -- of the Adirondack Ski Touring Council?

6        A.    Correct.

7        Q.    The same association you're a part of?

8        A.    Correct.

9        Q.    Okay.  Now, in relation to the -- I'm gonna call

10   it the Old Mountain Road.  Where is the Jack Rabbit Inn?

11       A.    The Jack Rabbit Inn is approximately 1.8 miles

12   west of the Old Mountain route -- Old Mountain Road on

13   Route 73 towards Lake Placid.

14       Q.    Okay.  And you said you had other properties?

15       A.    I own, as well as my family own, other properties

16   along the Old Mountain Road.

17       Q.    In the Town of North Elba or the Town of Keene?

18       A.    In the Town of North Elba.

19       Q.    Now, is that -- where in the Town of North Elba on

20   the Old Mountain Road do you have these lots that you own?

21       A.    Approximately about half to three-quarters of a

22   mile up the Old Mountain Road are our properties.

23       Q.    Now, from Route 73, Old Mountain Road, first point

24   nine miles, is that a plowed road?

25       A.    Yes, it is.

1        Q.    Who plows it, do you know?

2        A.    The Town of North Elba.

3        Q.    Okay.  Is if a paved road, that portion?

4        A.    It is not.

5        Q.    It's a dirt road, correct?

6        A.    It's a gravel road.

7        Q.    Gravel road.  About how often would you say, if

8    any, do you go up and walk the Old Mountain Road?

9        A.    I drive it, I walk it, I ski it.  Regularly.  I

10   have -- I have a camper up there, my brother has property up

11   there, he stays up there regularly.  I work on my property.

12   I -- I would say it varies, but probably four or five times

13   a week.

14       Q.    And how long have you been doing this, going up

15   and checkin' out the Old Mountain Road?

16       A.    I have since I've owned the property up there.  I

17   mean, I love it up there.  It's my retreat.  It's where I go

18   to get away from my life at the motel.

19       Q.    Life at the motel is not too bad?

20       A.    Well, it depends, if you like working 16 or 18

21   hours a day.

22       Q.    Now, you said since you've owned the property, has

23   it been in your family your entire life or no, something

24   else?

25       A.    Actually, my grandfather and my father owned

1  property on the Old Mountain Road since the early 1960s.

2      Q.   Okay.

3      A.   And my father has gifted some lots to his children

4  and me being one of his children.  And also my father and I

5  purchased some property on the Old Mountain Road to -- I

6  purchased it and he purchased it to give us protection along

7  the front of our properties so that nothing could be

8  developed.

9      Q.   When you say you walk it and a couple other things

10  before, four or five times a week, do you mean just the

11  point nine gravel road or past the turn-around into the --

12  into the woods there?

13      A.   The Town of North Elba is responsible for

14  maintaining that road, and sometimes they don't -- they do

15  not maintain it as frequently, or as up to a standard as

16  many other roads should be, and it has become unsafe.  And

17  therefore, my attorney has filed a notice of defects on that

18  road.  So, I go up there regularly --

19              THE COURT:  Mr. Jubin, when you refer to

20  "that road," in this case, there are sections of the road we

21  are referring to.  The first part is the first point nine,

22  the gravel part.

23              THE WITNESS:  Okay.

24              THE COURT:  And then what continues past the

25  turn-around towards the Town of Keene.  What are you talking

1  about?

2            THE WITNESS:  I'm talking about the first

3  nine-tenths of a mile and then sometimes I go to the end of

4  the point nine miles and I document it with pictures and I

5  also frequent --

6            THE COURT:  Document what with pictures?

7            THE WITNESS:  The road.

8            THE COURT:  What part of the road?

9            THE WITNESS:  All parts of the road.

10  Probably -- sometimes up to the first beaver pond section --

11            THE COURT:  Okay.

12            THE WITNESS:  -- of the road and, you know,

13  the two sections.  So, I document both sections, more --

14  more regularly the first section, the point nine miles.

15            THE COURT:  I just ask both of you to be

16  precise as to what part of the road you're talking about.

17            MR. MUNRO:  And your Honor, if the witness

18  could also clarify where he owns property on the road.

19            THE COURT:  Well, you will have a chance to

20  cross-examine him, Mr. Munro.

21            MR. MUNRO:  Okay.

22            MR. NORFOLK:

23      Q.   And I think we have been mentioning the

24  turn-around.  Do you know what we mean when we say

25  turn-around of the Old Mountain Road?

1         A.    Well, there's the turn-around in the beginning

2    near Route 73 and there's a turn-around at the -- there's a

3    little parking area at the beginning of Route 73 and there's

4    a turn-around at the end.  So, if you're talking about --

5         Q.    I guess at the end.

6         A.    At the end of the point nine is the turn-around

7    you're talking about?

8         Q.    Correct.  That's the area I was referring to.

9         A.    Okay.

10        Q.    But past the turn-around going into what some

11   refer to as the Jack Rabbit Trail, you've done some

12   documentation there?

13        A.    Correct.

14        Q.    And you inspect it regularly?

15        A.    Correct.

16        Q.    And the reason being because of the notice of

17   defect with respect to the point --

18        A.    We served a notice of defect that includes the

19   whole road in the Town of North Elba --

20        Q.    Okay.

21        A.    -- right up to the Town of Keene line.  The point

22   nine is a section of that.  Beyond that section, there's

23   probably another, I would say, third to half a mile, maybe

24   even a little more, in the Town of North Elba which the

25   Town of North Elba still claims to own.

1        Q.   It's safe to say you're pretty familiar with the

2   Old Mountain Road?

3        A.   That's safe to say.

4        Q.   If I were to show you Plaintiff's Exhibit 96, if I

5   were to show this to you, can you point out to the Court,

6   perhaps mark where, if anywhere, the Old Mountain Road

7   (unintelligible) may be?

8        A.   (Unintelligible.)  Do I use a pointer or what do I

9   use?  What do you want --

10       Q.   Hold that first.  I will possibly have you circle

11  (unintelligible.)

12       A.   Okay.  It's this black line right here, that's

13  round like right there, and that's -- all these yellow is

14  rural use, which is, you know, designated for home

15  development and so forth.

16       Q.   Is that where your lots are?

17       A.   Correct.

18       Q.   Do any of your lots go into the blue area?

19       A.   No.

20       Q.   I am going to ask, Mr. Jubin, the circle which you

21  pointed to is the Old Mountain Road or a portion thereof?

22       A.   Well, I -- well, it actually --

23       Q.   We will get to that next.  Circle that.

24       A.   I'll circle what's here.

25       Q.   Right.

1        A.    Okay.

2        Q.    Now, is there any parcel of the Old Mountain Road

3    that are not on this Adirondack Park Agency map?

4        A.    Well, I guess that's the question here today.  It

5    actually, from what I -- from what I understand, the Old

6    Mountain Road goes to this town line right there

7    (indicating) --

8        Q.    Okay.

9        A.    -- which is a dotted line.  It says Keene here on

10   the right, North Elba on the left and I assume this is the

11   town line, so...

12       Q.    Well, you've looked at a map before.  It's pretty

13   easy to interpret this map, correct?

14       A.    Correct.

15       Q.    Okay.  Now, could you draw -- we are not gonna

16   hold this to ya, you know, to be a perfect line of where

17   it's gonna be, but can you, in your best attempt, draw where

18   you believe the Old Mountain Road would go and end through

19   North Elba to Keene, if you know?

20       A.    Well, it ends up down on this line over here

21   (indicating).

22       Q.    That line there?

23       A.    That line is an extension of the Alstead Hill Road

24   where Rockin' River is, and I believe -- so I'm gonna draw a

25   line on the end here.

1      Q.   Okay.

2      A.   That would go -- the Old Mountain Road would go to

3    the Rockin' River.  It's obviously twists and turns and so

4    forth.

5      Q.   Okay.  But that's general direction of the Old

6    Mountain Road?

7      A.   General direction.

8      Q.   So, how did you know that the black line there was

9    a road?

10      A.   I'm familiar with the land.  This has obviously

11    been a contentious subject.  I've grown up in the area.  I

12    ski the road from my property down to Rockin' River

13    regularly, so I know where I'm going.

14      Q.   Can you -- can you point where the Bartlett Road

15    is?

16      A.   Bartlett Road comes off of Alstead Hill Road where

17    it meets this junction (unintelligible.) black smears here,

18    but basically what I understand was the Bartlett Road is and

19    maybe it's called something else, but my recollection, it

20    goes to -- goes to Upper Jay.  It starts here, basically

21    where the Alstead Hill Road goes up towards the Old Mountain

22    Road, and then there's an intersection that goes off to

23    Upper Jay.

24            MR. NORFOLK:  Note for the record that the

25    witness is pointing to the section of the black lines going

1    through Sentinel Range as it was circled earlier by Witness

2    Hodgson.

3    BY MR. NORFOLK:

4        Q.   Now, one more general question.  Other than this

5    area, could you point out a road on this map, other than

6    ones perhaps in red, can you point out another road on this

7    map?

8        A.   Well, there are lots of 'em.  This is -- this is

9    the Adirondack Lodge Road.

10       Q.   How do you know that's a road?

11       A.   Because I'm a half a mile from it.  I own the Jack

12   Rabbit Inn, a half mile from it, and I know where my

13   property is.  I mean, it's a road.  Everybody knows that's

14   the Adirondack Lodge Road.

15       Q.   But there's no legend for you to see that the

16   black line is a road.

17       A.   Well, I mean all you have to -- there's only one

18   road that goes into the wilderness area along that section

19   of road, so...

20       Q.   And if I asked you, you could probably point out

21   more roads that are designated on here as black lines,

22   correct?

23       A.   Correct.

24       Q.   Okay.  Did you ever attend a town board meeting,

25   North Elba Town Board meeting in 2002, which discussed

1   whether the Old Mountain Road is a road or a snowmobile

2   trail?

3       A.   After reviewing through my materials prior to this

4   trial, I can accurately say yes.

5       Q.   You reviewed materials before coming here?

6       A.   Correct.

7       Q.   Was that at my direction?

8       A.   Absolutely not.

9       Q.   And do you -- after reviewing the materials --

10  remember being at this meeting?

11      A.   Yes, I believe a few of us attended this meeting.

12  There were several meetings, so which -- I mean --

13      Q.   Well, let me ask you this.

14      A.   When was that?

15      Q.   Do you recall bein' at a meeting where Town of

16  North Elba Supervisor on the record stated that the Old

17  Mountain Road --

18      A.   I remember being at.

19      Q.   -- was a snowmobile trail and not a town highway?

20      A.   Yes, I do remember that.  There were several

21  meetings during the time frame that you talked about, and at

22  one time, at one meeting, Supervisor Seney would say that

23  it's a snowmobile trail.  At the next meeting, she would say

24  that it isn't.  So, I mean, it's became quite ridiculous

25  actually.

1      Q.   Okay.  Did you ever get a copy of those minutes of

2   the meeting where she did say it was -- the Old Mountain

3   Road was a town road?

4      A.   Yes, I have minutes --

5      Q.   Okay.

6      A.   -- statin' that it is a town road and not -- all

7   the portions -- I mean, she has publicly came out and said

8   that all the road in the Town of North Elba has never been

9   abandoned, it's always been a town road.

10      Q.   Okay.  Do you know Tom Martin?

11      A.   I do.

12      Q.   Who is he?

13      A.   He is a regional forester for the DEC.

14      Q.   In 2002, did you forward these minutes of the

15   meeting in the Town of North Elba that we just talked about,

16   where the town board and the town supervisor stated it was a

17   town road, did you forward these minutes of the meeting to

18   Tom Martin?

19      A.   I'm not sure if I did or not.

20      Q.   Okay.

21      A.   I've discussed the Old Mountain Road with

22   Mr. Martin in or about that time.

23      Q.   Through your research and I guess paying close

24   attention to the Old Mountain Road and its history, are you

25   pretty -- feel confident that you could point out lots,

1    building lots on a map, if I were to show you it, with

2    respect to the Old Mountain Road in North Elba?

3         A.   Yes.

4              MR. NORFOLK:  Your Honor, I'm going to offer

5    Plaintiff's --

6         A.   I know everybody that owns property up there, so I

7    guess --

8         Q.   Okay.  That's fine.  Thanks, Mr. Jubin?

9              MR. NORFOLK:  I'm gonna offer into evidence

10   Plaintiff's Exhibit Number 90, which is Number 1 on the

11   exhibits list.  Now, I just want you to give a little

12   explanation.  This is a DEC wall map.  It comes with four

13   parts, okay?  I have here the original, number two part of

14   the DEC map, and I can get out number four that shows the

15   DEC -- says it's a DEC map, okay?  I can't submit this in,

16   'cause my partner would kill me.  But what I'm lookin' at

17   here is to offer a copy of this, and it's only part two of a

18   four part map, which I have, I could show you if you have

19   any issues of authen- --

20              THE COURT:  Mr. Munro?

21              MR. MUNRO:  Well, I don't know what he's

22   offering it for.  I mean, I'll stipulate it's a DEC map,

23   but --

24              MR. NORFOLK:  Okay.

25              MR. MUNRO:  What am I supposed to be looking

 1   at?

 2                    THE COURT:  Does it include the Old Mountain

 3   Road?

 4                    MR. NORFOLK:  Yes, it includes -- this

 5   section includes the Town of North Elba, Town of Keene,

 6   which has the area of the Old Mountain Road.

 7                    THE COURT:  Any objection?

 8                    MR. MUNRO:  No, your Honor.

 9                    THE COURT:  Plaintiff's Exhibit 90 is

10   received in evidence.

11                    (Plaintiff's Exhibit 90 received.)

12   BY MR. NORFOLK:

13        Q.   I give you a copy of this map, okay, this DEC map,

14   issued by the DEC, map issued by the DEC.  Can you tell me

15   what these --

16                    THE COURT:  Hold on.  Wait for Mr. Munro.

17                    MR. NORFOLK:  I'm sorry.

18        Q.   Take your time.  As I said -- take your time.

19   It's hard to look at.

20        A.   I know this map.

21        Q.   Okay.

22        A.   I'm familiar -- I have to look at the lots and so

23   forth, but (unintelligible.)

24        Q.   Does this -- look at it.  See these little boxes,

25   these squares with numbers in the middle of 'em?

```
 1        A.    Yes.

 2        Q.    What are those, if you know?

 3        A.    Those are great lot numbers.

 4        Q.    Okay.  Great lot numbers.  Now, can you highlight

 5   the Old Mountain Road, from Route 73 to Keene, if it's there

 6   (unintelligible.)

 7        A.    (Unintelligible).

 8        Q.    All right.

 9        A.    (Unintelligible).

10              MR. NORFOLK:  If it's easier to look on a

11   map, the original map, then we could transfer it to the

12   copy.  I would do that if that's acceptable.

13              THE COURT:  Why don't you wait and see what

14   the witness is gonna do.

15        A.    Okay.  So you want me to do from 73 down to Keene,

16   down to where?

17        Q.    Alstead Hill?

18        A.    Alstead Hill.  (Witness complies.)

19        Q.    Okay.  Now, can you tell the Court what lots you

20   have just designated that we have just outlined that the Old

21   Mountain Road goes through?

22        A.    Well --

23        Q.    Starting from North Elba to the Alstead Hill Road,

24   please?

25        A.    This map is a little -- it includes great lot --
```

1    starts at great lot I believe 132, goes through great lot

2    140, great lots 146 and 147, and great lot 153 and the --

3    that would be the Richards survey, I believe the Richards

4    surveyor set the cone survey.  One of these two surveys, I

5    think it's the Richards survey.

6         Q.   But is that in the Town of North Elba, those lots

7    you just mentioned?

8         A.   Those lots, and then as I --

9         Q.   That's good.  You don't have to go farther.  I'm

10   sorry, I withdraw that.  There's no reason to go through the

11   town.  Okay.  Thank you.

12              Now, if I may ask you about an event in '05.

13   Were you present when Mr. McCulley drove his pickup truck on

14   the Old Mountain Road in May of -- May 22nd?

15        A.   Is that the time he was ticketed?

16        Q.   The time he was ticketed by Forest Ranger

17   LaPierre, correct?

18        A.   Yes.

19        Q.   You were there?

20        A.   Yes.

21        Q.   You observed Mr. McCulley operate his truck, his

22   pickup truck, on the Old Mountain Road past what we have

23   been referrin' to as the turn-around?

24        A.   Actually, I came on the scene after he had driven

25   his vehicle beyond the turn-around.

1      Q.    And was his vehicle beyond the turn-around when

2   you were there?

3      A.    It might have been just beyond the turn-around,

4   meaning probably maybe 20 or 30 feet.

5      Q.    Okay.

6      A.    The event had already transpired.

7      Q.    Okay.  Can you tell me, tell the Court, if you

8   know, what lot, great lot, is that turn-around in?

9      A.    That is -- that is in -- let's see here.  The

10  great lot -- the turn-around is, according to this map, is

11  in great lot 146.

12     Q.    According to this map, which is a DEC map,

13  correct?

14     A.    Correct.

15     Q.    Now -- so Jim McCulley had to have driven his

16  pickup truck through lot 146, correct?

17     A.    Correct.  I witnessed it through 146 --

18     Q.    Okay.

19     A.    -- if that's what you're getting at.

20     Q.    Yeah.  Now, how far from the turn-around to the

21  next boundry for the next great lot, which I think is 153?

22     A.    There is -- the next adjacent lot, along the Old

23  Mountain Road, is great lot 153 which is the easterly

24  boundary of the town -- of the road that the Town of North

25  Elba is in.

1        Q.   Lots 146 and 153, they're not part of that point

2   nine gravel road of the Old Mountain Road in the Town of

3   North Elba, correct?

4        A.   No, that's not correct.

5        Q.   Well, explain it to me.

6        A.   Okay.

7        Q.   I know what you're talking about.  Explain it to

8   me.

9        A.   Okay.  In great lot 146, there's private owner --

10   there's private owner -- ownership is private lands.

11        Q.   Okay.

12        A.   And so, part of that point nine is in great lot

13   146.

14        Q.   And then there's a part of the Old Mountain Road

15   which is not the gravel point nine, that's 146 also?

16        A.   Correct.

17        Q.   I understand.

18        A.   Correct.

19        Q.   Thank you for clarifying.

20             (Pause in proceedings.)

21        Q.   Are you familiar with the Essex County decision

22   that reversed Mr. McCulley's conviction for operating a

23   snowmobile on the Old Mountain Road?

24        A.   I am.

25        Q.   Have you read that decision?

1      A.   I have.

2      Q.   Okay.  Have you talked to anyone from the DEC

3 about that decision?

4      A.   I probably talked to Stuart Buchanan about the

5 decision.

6      Q.   When was that?

7      A.   That was in the -- like January or February-ish, I

8 believe, of 2000 -- oh, God, let me see, when was that?

9 That must have been 2005.

10      Q.   Well, that would be quite possible, wouldn't it,

11 Mr. Jubin?  The decision --

12      A.   Once the decision came out.

13      Q.   In March of 2005.

14      A.   Is when the decision came out?

15      Q.   Yes.

16      A.   Okay.  Well, then shortly after the decision came

17 out then.

18      Q.   You spoke with, who did you say?

19      A.   Stuart Buchanan.

20      Q.   Okay.  Who is Stuart Buchanan?

21      A.   He's in charge of the DEC in Raybrook.

22      Q.   Okay.  And what, if anything, did you state or

23 tell Mr. Buchanan?

24      A.   Well, it was on or about this time that I came

25 across a Supreme Court case that stated that the Old

1    Mountain Road was created by legislative acts in 1810, 1812,

2    1814 and 1816.  And rather than have my attorneys transfer

3    all this information over to him and have a bunch of

4    misinformation, I decided to call Mr. Buchanan up to try and

5    resolute my problems with the apparent problems of the DEC.

6              And so, I explained to him this case that I

7    had, I believed, and where it showed that the DEC did not

8    have any authority to regulate the roads and the highway

9    superintendent is the one who's responsible for

10   maintaining -- for allowing utility lines to go on the road.

11   And so, along that same line, he said he would look at that

12   case and I said, well, along with that, along with the

13   McCulley case, because the County Court just said -- the

14   County Court Judge just said that this road was a road

15   created by these legislative acts, with public funds, in

16   1810, 1812, 1814 and 16 that the DEC must now recognize that

17   this road is a road created by legislative acts, by

18   statutes, rather than user road as the DEC has been

19   maintaining for the past three or four years, four or five

20   years, as far as I can recall.

21        Q.   Okay.  What did Stu Buchanan -- how did Stu

22   Buchanan respond, if he did at all?

23        A.   He responded by saying that the DEC is not

24   recognizing the McCulley case and that the DEC is still

25   under the advisement or impression or I can't recall exactly

1    what word he used, that it was still a user road and

2    Attorney Christopher LaCombe has advised us such and he said

3    Chris is a fine attorney and that's what their advice is and

4    that's what they're sticking to.

5         Q.   Okay.

6         A.   Basically that's their position.

7         Q.   The 1950s case, do you know the name of it?

8         A.   It's the People versus The Paul Smith's Light and

9    Power Company.

10        Q.   If I were to say Paul Smith's Electric Light and

11   Power Railroad Company, would that be a --

12        A.   That would probably be more accurate.

13        Q.   What County Court was that in?  Or what Supreme

14   Court was that in in the State of New York, if you recall?

15        A.   That was in Supreme Court, County of Essex.  It

16   happened to be a court case that was on part of the road

17   that we're talking about here today, part of the Northwest

18   Bay Hoppington Road (phonetic).

19        Q.   That was my next question.  That talked about the

20   Northwest Bay Hoppington Road.  We're discussing here the

21   Old Mountain Road?

22        A.   They're synonymous, they're one in the same.  The

23   Northwest Bay Hoppington Road is the Old Mountain Road.  And

24   as a historical note, no one can refute that.

25        Q.   Okay.

1     A.   So, here we have a case on the Northwest Bay

2  Hoppington Road, in 1915, separate, 100 percent separate

3  than the County Court Judge who had just ruled on this

4  Northwest Bay Hoppington Road and they both say the same

5  thing.  So, my mind is, well, if they both say the same

6  thing, we have these two independent judges saying this, why

7  doesn't the DEC recognize this?  It's -- I can't believe it.

8  But anyway...

9     Q.   Did you provide the Department of Environmental

10  Conservation a copy of this people of the State of New York

11  against Paul Smith's Electric Light and Power and Railroad

12  Company?

13     A.   I did.  I asked the -- Mr. Buchanan asked

14  Mr. LaCombe to get a hold of my attorney, which he did, and

15  my attorney faxed Mr. LaCombe the decision.  And I actually

16  called up Mr. Buchanan a week later, I was tryin' to arrange

17  a meeting to resolve our issue, and I asked him if he had a

18  chance to review or read it and he said he hadn't had a

19  chance, he said he skimmed over it, but he hadn't had a

20  chance to read it at that time, but he had it.

21                    (Pause in proceedings.)

22  BY MR. NORFOLK:

23     Q.   Getting back to May 22, 2005, the day Mr. McCulley

24  drove his pickup truck on the Old Mountain Road --

25     A.   Okay.

```
 1        Q.   -- okay?  That week prior, had you been up on the
 2   Old Mountain Road in that very area where he drove the
 3   truck?
 4        A.   I was up there pretty regularly that week.  Word
 5   on the street was that Mr. McCulley was gonna drive his
 6   truck down the Old Mountain Road that week.
 7                 THE COURT:  Must be a lot of words on the
 8   streets of this area.
 9                 (Unintelligible.)
10                 THE WITNESS:  We only have one street, it
11   seems --
12                 (Laughter.)
13        Q.   So --
14                 THE WITNESS:  The Old Mountain Road.
15        Q.   So, did you happen to observe the Old Mountain
16   Road and its edges from the turn-around area, heading in
17   towards the -- towards Keene, into the woods, if you will?
18        A.   I was -- I was up there pretty regularly.  If it
19   wasn't daily, it was every other day, and I --
20        Q.   Okay.
21        A.   I was up there -- I think he was supposed to drive
22   his vehicle down the day before, never happened or whatever,
23   I believe I was up there that day.
24        Q.   Okay.  The day before you were up there, did you
25   see any forest preserve signs on either side of the Old
```

1   Mountain Road, either at the turn-around, or in towards

2   Keene on either side of the Old Mountain Road?

3       A.   Well, they had been down for -- since the McCulley

4   decision was -- since the DEC decided not to appeal the

5   McCulley decision, roughly thereafter.  They had been down

6   for most of the time.

7       Q.   And you know that how?

8       A.   Because I travel the road regularly.

9       Q.   Okay.  And you observed that condition?

10      A.   Correct.

11      Q.   Okay.  Now, did you see on the day before

12  Mr. McCulley was ticketed any signs that stated motorized

13  vehicle use is prohibited, motor vehicles are not allowed on

14  the Old Mountain Road, which heads into the woods towards

15  Keene?

16      A.   Well, I know what you're getting at, and I --

17               THE COURT:  Just answer the question.

18      A.   I don't believe I did.

19      Q.   Okay.  Now, let's go to the next day, May 22nd.

20  You were there, Jim was there, correct?

21      A.   Correct.

22      Q.   Did you observe any signs on either side of the

23  Old Mountain Road, forest preserve signs, any other type of

24  signs, if you recall?

25               MR. MUNRO:  Can you clarify where we are on

1    the road at this point?

2                    MR. NORFOLK:   In the vicinity where

3    Mr. McCulley had just operated his truck and there's the

4    turn-around area.

5        A.   We were all standing there and just beyond --

6    probably beyond the turn-around area is where these --

7    probably about maybe 200 feet, maybe 300 feet, somewhere in

8    that neighborhood, of where these signs go up and come down

9    that he's talking about.

10       Q.   Okay.

11       A.   So, that's where we are.

12       Q.   Were they there that day?

13       A.   They were there that day.

14       Q.   You didn't put 'em up, did ya?

15       A.   I did not.

16       Q.   Do you know if Jim put 'em up?

17       A.   No, Jim did not put them up.

18       Q.   Do you recall the condition of these signs?  Can

19   you give us a description?

20       A.   I didn't go and inspect the signs.  I -- I didn't

21   inspect the signs.

22       Q.   Okay.

23       A.   I -- you know, they are obviously bright and shiny

24   new.  I didn't walk up to them, but...

25       Q.   But when you saw 'em, were you surprised?

1          A.   I don't know, because if -- I mean, this is kind

2     of -- I'm in kind of a bad spot here.  I mean, Mr. LaPierre,

3     I don't know if he just put them up or put them up that

4     morning, whatever, but he asked us not to -- you know, to

5     leave the signs up, and Joe is a well respected forest

6     ranger in our community and I hate testifying against him.

7     So -- but his word is, you know, he asked that the signs

8     stay up and so, I mean, as a man telling us men there,

9     whoever he was talking to, that's what he wanted and I'm

10    sure the signs are probably still there.

11         Q.   Are you aware that the Town of Keene qualified

12    abandoned the Old Mountain Road in their geographical

13    boundaries?

14         A.   I am.

15              MR. NORFOLK:  Judge, if I could have 10

16    seconds.

17              THE COURT:  Yes.  You saw no signs on

18    May 21st?

19              THE WITNESS:  Is that -- what is the --

20              THE COURT:  That's the day on which

21    Mr. McCulley was charged with driving --

22              THE WITNESS:  I saw signs on that day.

23              THE COURT:  You did see signs on the 21st.

24              THE WITNESS:  Correct.

25              THE COURT:  Okay.  I was --

1                    THE WITNESS:  I didn't see signs on the day

2     prior.

3                    THE COURT:  Thank you.

4                    THE WITNESS:  Or might have been the day --

5     day or two prior.  It's pretty darn close.

6                    (Pause in proceedings.)

7                    MR. NORFOLK:  I apologize for -- I mixed up

8     the dates, 21st and 22nd.  But I apologize for that.

9                    Reserve redirect.  Thank you, Mr. Jubin.

10                   THE COURT:  Thank you.  Mr. Munro.

11                   MR. MUNRO:  Just a few questions, your Honor.

12    CROSS-EXAMINATION

13    BY MR. MUNRO:

14        Q.   Mr. Jubin, you said you own property along Old

15    Mountain Road?

16        A.   Correct.

17        Q.   Is it along the nine tenths of a mile that is

18    gravel?

19        A.   Correct.

20        Q.   That's right.  Have you ever driven a motor

21    vehicle towards Keene beyond the turn-around into what has

22    been described as the woods yourself?

23        A.   What do you consider a motor vehicle?

24        Q.   An automobile?

25        A.   No.

1      Q.    You testified that it's your understanding that

2   the Town of North Elba still believes that it owns the Old

3   Mountain Road.  What's the basis for that?

4      A.    The basis for that is that the road was created by

5   these legislative acts.

6      Q.    No.  I want to know their understanding, not

7   yours.

8      A.    All right.  But I'm gonna get to --

9            THE COURT:  I think he's answering -- you can

10  answer the question.

11     A.    What has happened with that road is there are

12  sections of that road, the maintenance and improvements and

13  so forth have been evolved on to the towns, which they

14  passed.  Town is always, forever and ever, has records here,

15  1853 appropriation for maintenance of that road.  So, the

16  town has always maintained that road and never abandoned it

17  and there's been no resolution for abandonment.  There was a

18  1904 or '06 resolution to improve the road, at which time

19  they were considering abandoning it but did not.  And ever

20  since I've known, no one has ever -- there's not been a

21  resolution that I'm aware of, or -- for abandonment.

22     Q.    When did the town last -- of North Elba last

23  maintain the road?  And again, I'm talking about starting at

24  the turn-around and heading into the woods towards Keene, to

25  your knowledge?

1          A.   I believe probably in the -- probably in the

2     eighties.  I would -- Ken Sprock (phonetic) was the highway

3     superintendent after. -- he's got a memory like an iron

4     trap, so I'm sure he can tell ya.

5                    MR. MUNRO:  No further questions.

6                    THE COURT:  Any redirect?

7                    MR. NORFOLK:  No, your Honor.

8                    THE COURT:  You may step down.  Thank you.

9                    THE WITNESS:  Thank you.

10                   (Witness was excused.)

11                   MR. NORFOLK:  Judge, before I call my next

12    witness, yesterday I brought up the issue of asking for

13    judicial notice of a Town of North Elba public notice,

14    ordinance, resolution.  I don't know if I gave the Court a

15    copy.

16                   THE COURT:  You did not.  But have you given

17    Mr. Munro a copy?

18                   MR. NORFOLK:  Yes, I have.

19                   THE COURT:  What's your position, Mr. Munro?

20                   MR. MUNRO:  This is a resolution that I saw

21    signed by the clerk.

22                   MR. NORFOLK:  Yes.  February 12, 1971.

23    Snowmobile ordinance of the Town of North Elba.

24                   THE COURT:  Is that marked as an exhibit?

25                   MR. NORFOLK:  I had it marked as an exhibit,

1 your Honor, but it's not an exhibit (unintelligible).

2                         THE COURT:  What's the exhibit number?

3                         MR. NORFOLK:  99.

4                         THE COURT:  And that again is a resolution?

5                         MR. NORFOLK:  Public notice of town

6 ordinance.  And it's a resolution, yes.

7                         THE COURT:  Town ordinance.  For which town?

8                         MR. NORFOLK:  Town of North Elba.

9 Plaintiff's Exhibit 99.

10                         THE COURT:  And what's the date?

11                         MR. NORFOLK:  February 12, 1971.

12                         THE COURT:  That's all right.  Any objection

13 to its admission?

14                         MR. MUNRO:  No, your Honor.

15                         THE COURT:  All right.  Plaintiff's Exhibit

16 99 is received in evidence.

17                         (Plaintiff's Exhibit 99 received.)

18                         MR. NORFOLK:  And if I could just raise one

19 more issue of something I have been meaning to offer into

20 evidence, which is not on my exhibits list, but it's a

21 notice of hearing, a state administrative proceeding, which

22 I attached to my motion papers --

23                         MR. MUNRO:  Fine.

24                         MR. NORFOLK:  -- as an exhibit.  And I ask to

25 have this --

```
 1                    THE COURT:  It's already a matter of record,

 2      isn't it?

 3                    MR. NORFOLK:  Yeah, that's what I thought,

 4      too.  I mean, it's part of my opposition -- my order to show

 5      cause for a preliminary injunction.

 6                    THE COURT:  It's attached to what, Exhibit D

 7      to your complaint, I think.

 8                    MR. NORFOLK:  Yes, that's true, too.

 9                    THE COURT:  Okay.  It's already a matter of

10      record.

11                    MR. NORFOLK:  Okay.  Great.  Just...

12                    THE COURT:  Call your next witness, please.

13                    MR. NORFOLK:  Okay.  I don't know who it is.

14      LaPierre?

15                    MR. MUNRO:  Judge, could we get a five-minute

16      recess before the next witness?

17                    THE COURT:  Yes.  We stand in recess for five

18      minutes.

19                    (Short recess taken at 10:08 AM.)

20                    (Court reconvened at 10:14 PM.)

21                    THE COURT:  Call your next witness, please.

22                    MR. NORFOLK:  Mr. Joseph LaPierre.

23                    THE CLERK:  You know the drill now.

24                    THE WITNESS:  Yes, ma'am.

25                    (Pause in proceedings.)
```

```
 1                    THE CLERK:  This is Joseph J LaPierre,
 2   L-A-P-I-E-R-R-E.
 3                    THE WITNESS:  Good morning, your Honor.
 4                    THE COURT:  Good morning.
 5                         - - - - -
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1              J O S E P H   J.     L A P I E R R E,

 2   having been called as a witness, being duly sworn,

 3   testified as follows:

 4   DIRECT EXAMINATION

 5   BY MR. NORFOLK:

 6        Q.   Good morning, Ranger LaPierre.

 7        A.   How are you?

 8        Q.   Good thanks.  How are you?  Shall I call you

 9   Ranger LaPierre or Mr. LaPierre?

10        A.   However you're most comfortable.

11        Q.   I'll do Ranger LaPierre.  Ranger LaPierre, could

12   you please tell the Court where you live?

13        A.   Lake Placid, New York.

14        Q.   And how long have you lived there?

15        A.   In my capacity as a ranger?

16        Q.   No, in general, in your capacity as a person?

17        A.   Well, I'm a native, I was born there.

18        Q.   Okay.  You've lived in Lake Placid your whole

19   life, or the area?

20        A.   No.  Moved when I was 14, moved back when I was

21   33.  So, 20 some years in total.

22        Q.   Okay.  Now, can you tell me your highest level of

23   education?

24        A.   I have a Bachelor's degree.

25        Q.   And where did you get the Bachelor's degree?
```

1        A.    State University of New York at Plattsburgh.

2        Q.    Did you go to ranger school?

3        A.    Negative.  No, sorry.

4        Q.    There's no requirement for a ranger school?

5        A.    No.  The ranger school, at Wanakena, is a program

6    affiliated with SUNY.  To become a New York State forest

7    ranger, you have certain educational requirements you need

8    to meet, they can be met in other curriculum, other

9    institutions as well, not just the ranger school.

10       Q.    And you made the curriculum at your college?

11       A.    My degree from Plattsburgh met the requirements to

12   take the exam, yes.

13       Q.    Okay.  Okay.  How long have you been working for

14   the department?

15       A.    It'll be 16 years this summer.

16       Q.    Okay.  So, when was the first year then?

17       A.    Well, nine years were as a fish and wildlife

18   technician.

19       Q.    Oh.

20       A.    And then the forest ranger would be nearly seven

21   years.

22       Q.    Where were you fish and wildlife technician?

23       A.    It was in Region 5.  Part time in the Raybrook

24   office, part time in the Warrensburg office.

25       Q.    And what were the scope of your responsibilities

1    and duties as fish and -- say it again?

2         A.   Fish and wildlife technician.

3         Q.   As a fish and wildlife technician?

4         A.   Essentially conducting fisheries, population

5    surveys, wildlife population surveys, collecting scientific

6    data and doing analysis.  All of Region 5.

7         Q.   Okay.  Did you ever work outside Region 5?

8         A.   Occasionally, yes.

9         Q.   And what would that be?

10        A.   Oh, we were sent on special assignments in my

11   capacity as a technician to Vermont to do, (unintelligible)

12   control, to Seneca Lake to do (Unintelligible) control.

13        Q.   And what year did you become a ranger?

14        A.   1999.

15        Q.   Okay.  And what made you want to become a ranger

16   and leave your then current position?

17        A.   I had a few acquaintances who were forest rangers.

18   I often volunteered and assisted them with search and rescue

19   missions.  The potential for advancement with -- in my

20   current position was quite low.

21        Q.   Do you consider being a ranger an advancement?

22        A.   Yes.

23        Q.   Okay.  I did you ever apply for -- or ever apply

24   to take the test to become a State Trooper?

25        A.   No.

1    Q.   Or any other police agencies?

2    A.   Yes.

3    Q.   Which ones, please?

4    A.   I was on the list for Warren County Sheriff and

5    the New York State Environmental Conservation Police.

6    Q.   Okay.  Have you ever got -- did you ever got

7    offered a position to be a DEC conservation officer?

8    A.   Yes.

9    Q.   And did you turn it down?

10   A.   Yes.

11   Q.   Could you tell the Court your responsibilities as

12   a forest ranger, responsibilities, duties as a forest ranger

13   for the department?

14   A.   Sure.  In general, we are responsible for

15   conducting and overseeing search and rescue missions,

16   wildland, forest fires and prevention, and care, custody and

17   control of state land.

18   Q.   Part of that care, custody and control of state

19   land, does that include enforcement of the laws?

20   A.   Yes, as well as wildland fire prevention.

21   Q.   Right.  Does that include, perhaps, issuing ECATs

22   or tickets?

23   A.   Tickets, yes.

24   Q.   Can you tell me what an ECAT is?

25   A.   Certainly.  An ECAT -- it's an acronym for

1    Environmental Conservation Appearance Ticket.  It is a

2    simplified information.

3         Q.   Like any -- like any kind of simplified

4    information under the criminal penal code?

5         A.   Criminal Procedure Law, correct.

6         Q.   But this involves environmental law violations or

7    regulation violations?

8         A.   That's correct.

9         Q.   Okay.

10        A.   We get into Criminal Procedure Law, when you're

11   dealing with ECATs, you know, Vehicle & Traffic Law, they're

12   called TSLEDs, traffic safety law enforcement something.

13   When you issue a TSLED, which is the traffic safety, there

14   is a minimum court fee that's tacked on to that, part of the

15   Vehicle & Traffic Law.  It's all very technical legalese.

16   Different violations for different sections of law require

17   different simplified informations.

18        Q.   When you write an ECAT, when you write a ticket,

19   'cause I guess you include -- when you write a ticket, are

20   you usually the -- generally the prosecuting officer of that

21   ticket?

22        A.   That depends.

23        Q.   And -- okay.  How does it depend?

24        A.   There -- once a ticket is issued, it is up to the

25   District Attorney for that area, it becomes his case

1    automatically.

2         Q.    In Essex County, does the District Attorney

3    normally prosecute noncriminal violations?

4         A.    Generally, no.

5         Q.    And then that would -- that responsibility and

6    duty would come back on you Mr. -- excuse me, Ranger

7    LaPierre?

8         A.    Either myself or someone from our regional

9    attorney's office.

10        Q.    Someone perhaps like Mr. LaCombe?

11        A.    Correct.

12        Q.    My memory is fading, I have a lot to think about.

13   I think you said you have been a ranger for nine years?

14        A.    Seven years.  June, seven years.  Six years, three

15   hundred and fifty-four days.  How's that?

16        Q.    How -- if you can recall, or estimate, best of

17   your knowledge, how many tickets have you issued for a

18   person allegedly operating either snowmobile or motorized

19   vehicle on forest preserve land?

20        A.    I couldn't give an estimate to be honest.

21        Q.    Okay.

22        A.    I mean, it's less than a hundred.

23        Q.    Okay.

24        A.    And probably more than one.  Okay?

25                   (Laughter.)

1      Q.   Okay.  Of those -- let's say it's a hundred over

2  the last seven years.  How many of them were prosecuted by

3  the Region 5 regional attorney?

4      A.   Actually, Matt, let me tell you, it's gonna be

5  significantly less than a hundred.  I'll bet you I haven't

6  written five, okay.

7      Q.   (Unintelligible.)

8      A.   I can't tell you, but I'm telling you I can't give

9  a precise number.

10      Q.   For which?

11      A.   For violations of motor vehicles on forest

12  preserve.

13      Q.   Or snowmobiles on forest preserves?

14      A.   That's correct.

15      Q.   Just to clarify, you've written maybe five total

16  in seven years?

17      A.   Yes.

18      Q.   Okay.

19      A.   As I -- I'm sorry.

20      Q.   No.  So, your answer is maybe five in seven years

21  total of a motorized vehicle or snowmobile operating on

22  forest preserve land?

23      A.   That's correct.

24      Q.   Of those five, how many have been prosecuted not

25  by you or the District Attorney's office but a regional

1   attorney?

2       A.   One.

3       Q.   And which one was that?

4       A.   Excuse me.  Let me retract that.  None.

5       Q.   None.  Did you write the ticket for Mr. McCulley?

6       A.   Which one?

7       Q.   The 2003 --

8       A.   Snowmobile on the forest preserve?

9       Q.   Right.

10      A.   No.

11      Q.   Okay.  Did you write the ticket for Mr. McCulley's

12  operation of a truck on the Old Mountain Road in 2005,

13  May 22, 2005?

14      A.   I did issue that ticket, yes.

15      Q.   And what has subsequently happened to that charge

16  that you wrote up the ticket for?

17      A.   I was told that the case was going to be handled

18  administratively, and beyond that, I'm not sure of its

19  status.

20      Q.   Who told you that?

21      A.   I was advised by the regional attorney's office.

22      Q.   And the regional attorney is Chris LaCombe?

23      A.   Yes.

24      Q.   Do you remember who specifically advised you of

25  that from his office?

1          A.    I cannot say with 100 percent certainty.

2          Q.    Okay.  Did they tell you any reason or basis why

3    they were going to prosecute this administratively?

4          A.    They didn't give me any specific reasons.

5          Q.    What were the general reasons?

6          A.    Apparently, discussion with the legal affairs

7    office in Albany, the folks in the legal affairs office in

8    Albany had come up with that suggestion, to do it that way.

9          Q.    Okay.  I have a similar question -- line of

10   questions for you.

11               With all of your tickets issued, not just the

12   violations of alleged motorized vehicle use for snowmobiles

13   on forest preserve, but all your tickets, how many of

14   them -- well, how many do you think you issued in seven

15   years?

16         A.    How many tickets total?

17         Q.    Tickets total.

18         A.    I couldn't venture to guess.

19         Q.    Hundreds?  Thousands?

20         A.    Not thousands, no.  Probably one to two hundred.

21         Q.    Okay.  How many of those two -- one to two hundred

22   tickets have been withdrawn and then prosecuted or enforced

23   in-house administratively?

24         A.    How many administrative cases have I had, is that

25   a better question?

1    Q.   Well, I think my question is.

2    A.   Okay.

3    Q.   Have the tickets that you've issued, of those 200,

4    how many were prosecuted administratively.  After you wrote

5    the ticket, enforcement proceedings was commenced as a

6    result of that ticket or of that event that the ticket was

7    written for?

8    A.   I have had six administrative cases.

9    Q.   Okay.  Can you tell me the nature of those cases,

10   the alleged violation?

11   A.   Certainly.  Two were for illegal disposal of solid

12   waste, unclassified misdemeanor.

13   Q.   Okay.

14   A.   Is that the information you want?

15   Q.   No.  That's great.

16   A.   Okay.  One was for -- the violation was cutting,

17   injuring, removing or defacing trees or vegetation on forest

18   preserve, that had multiple counts, those were all

19   violations.

20        And then I had three possession of alcohol

21   under age 21 on state land.

22   Q.   And those were done in an administrative --

23   A.   Yes.

24   Q.   Okay.

25        (Pause in proceedings.)

1        Q.    You testified today you didn't write the ticket

2    for the alleged violation of Mr. McCulley operating a

3    snowmobile in March of '03, correct?

4        A.    That's correct.

5        Q.    Who issued the ticket?  Who wrote the ticket?

6        A.    The original ECAT?

7        Q.    Yes.

8        A.    Ranger Costas.

9        Q.    And was that your partner or colleague or how is

10   that?

11       A.    Give you a little insight into the ranger world,

12   as Retired Ranger Hodgson stated yesterday, each ranger has

13   his own patrol district.  Since 2001 or 2002, the ranger

14   force has been growing, we've kind of had to redraw some

15   lines.  It used to be oriented by geopolitical boundaries

16   and up until a year or so ago, two years ago, your ranger

17   district was more oriented around unit areas, state land

18   unit areas, kinda dividing up the workload.  When Ranger

19   Costas became a ranger in my zone, he was assigned the

20   Sentinel Wilderness Area.

21       Q.    Okay.  And that would have been -- in 2003, he

22   still would have been assigned that area?

23       A.    Yes.

24       Q.    Okay.  All right.  Did you know that that ECAT

25   that was issued to Mr. McCulley by Ranger Costas was

1   withdrawn?

2        A.   Yes.  And I'll explain why.

3        Q.   That's fine.

4        A.   Well, I need to clarify.

5             THE COURT:  No.  You've answered the

6   question.

7             THE WITNESS:  Okay.

8        Q.   Thanks.  The --

9             (Pause in proceedings.)

10       Q.   Are you the one that served a criminal summons on

11  Mr. McCulley relating to his operating a snowmobile on the

12  Old Mountain Road in 2003?

13       A.   I can't say for sure.

14       Q.   Okay.  Now I want to jump ahead to 2004, okay?

15  Did you ever get a report or hear through the grapevine, as

16  some of the witnesses have been saying today, that

17  Mr. McCulley and two of his friends were hiking in the High

18  Peaks with cameras?

19       A.   I had heard that.

20       Q.   How did you hear about that?

21       A.   I can't honestly say how.  I don't know how.

22       Q.   When you heard about it, what, if anything, did

23  you do, meaning did you report it to the DEC?

24       A.   No.

25       Q.   And why didn't you?

1        A.    Because there was no need for concern that

2   Mr. Maliggi, Mr. Padue and Mr. McCulley were hiking the High

3   Peaks.  God bless their little hearts.

4        Q.    I agree.  Did you find nothing wrong with taking

5   pictures and measuring the widths of some trails?

6        A.    As far as I was concerned, I had no problem with

7   it.

8        Q.    Okay.  You're pretty well-versed, I would think,

9   in the laws and rules and regs that you're enforcing,

10  correct?

11       A.    I try.

12       Q.    Okay.  With seven years, you probably know them

13  quite well, correct?

14       A.    Yes.

15       Q.    Do you know of any rule or regulation which

16  prohibits, back in '04, prohibits people from hiking in the

17  High Peaks, taking pictures and doing some measurements of

18  the widths of trails?

19       A.    There are no regulations that prohibit people from

20  hiking, there are no regulations that prohibit photography

21  or taking pictures.  There is a regulation in the eastern

22  High Peaks wilderness, Title 6 NYCRR 190.13, that conducting

23  research or any scientific project -- I can't -- I'm not

24  giving you the exact verbiage, Matt.

25       Q.    That's fine.

1      A.   But anything in that regard requires a permit from

2  the department.

3      Q.   Okay.  Do you know when this hiking expedition

4  occurred by Mr. McCulley?

5      A.   No.

6      Q.   Would you say safe to say, correct me if I'm

7  wrong, of course, end of May in 2004?

8      A.   I believe that's what he testified to, yes.

9      Q.   Okay.  Okay.  That's right, you were here.

10          Did you happen to observe Mr. McCulley a few

11  days later in Lake Placid?

12     A.   I can't say how much later it was, but, yeah, I

13  spoke to Jim, he came and talked to me.

14     Q.   Okay.  Where was this?

15     A.   I didn't remember it to be the firehouse, but

16  that's what Mr. McCulley testified to.  And I have seen him

17  there on regular occasions, I conduct a fair amount of

18  business out of there.

19     Q.   Okay.  Just gonna remind you you're under oath.

20     A.   Sure.

21     Q.   Did you tell, did you advise Mr. McCulley that you

22  could arrest him for his actions in the High Peaks area?

23     A.   I could say in all good faith and under oath that

24  I probably mentioned to him that it was a violation to

25  conduct scientific research without a permit.  Did I

1   threaten with arrest?  No.

2        Q.   But you didn't believe, as you testified today,

3   correct me if I'm wrong, you didn't believe they were

4   violating any rules and regs, correct?

5        A.   As far as I was concerned, no.

6        Q.   Okay.  Thank you.

7        A.   It's often part of my job to advise -- I'm sorry,

8   go ahead.

9        Q.   No, I just ask --

10       A.   Go ahead.  We'll keep it quick today.

11       Q.   I'm tryin'.  Now, you know that in March, I think

12   it was specifically March 25, 2005, Judge Halloran, Essex

13   County Court, reversed -- on appeal reversed the conviction

14   of Mr. McCulley for operating a snowmobile on the Old

15   Mountain Road?

16       A.   Yes, I do.

17       Q.   Have you had a chance to review that decision?

18       A.   I was provided a copy and I read it.

19       Q.   Who were you provided a copy by?

20       A.   I believe when the department staff received it, I

21   was given a copy.

22       Q.   What's the -- who is the department staff?

23       A.   Someone in -- within the Region 5 office in

24   Raybrook.

25       Q.   And who personally gave you a copy?  Or was it in

1    your mailbox?

2         A.    It was in my mailbox, I believe.

3         Q.    Okay.  And was there any note stuck to it?

4         A.    I don't recall.  Maybe just a sticky note with my

5    name on it.

6         Q.    Okay.  And you took that to mean you must read

7    this?  Because I think you testified you were directed to

8    read it.

9         A.    I wasn't directed to read it.

10        Q.    Oh, okay.

11        A.    No.  It was provided to me.

12        Q.    Fair enough.  Okay.  Did you read that decision?

13        A.    I read it.

14        Q.    Okay.  After it was issued, this decision, did the

15   rangers have any meeting about this, discuss the decision?

16        A.    Not that I recall.

17        Q.    Okay.  Did you have any meetings with any

18   department staff to discuss this decision and the status of

19   the Old Mountain Road, Mr. McCulley, after this decision was

20   issued?

21        A.    Not that I recall.

22        Q.    Did anyone from the department ever inform you or

23   tell you that the department was going to ignore this

24   decision, not recognize this decision by the Essex County

25   Court?

1        A.    I can't say that I heard that.

2        Q.    Can you say that you heard it?

3        A.    No.  I don't recall hearing it.

4        Q.    Okay.  Let's jump ahead to May 11, 2005, okay?

5   Now, did you get a report of possibly someone operating an

6   earth-moving vehicle or a tractor at the Old Mountain Road?

7        A.    I -- I had heard that, but I can't say that that

8   was the date I heard about it.

9        Q.    Okay.  But you heard -- you got -- was this a

10  report or how did you hear about this alleged incident of

11  either a tractor or a earth-moving vehicle on the Old

12  Mountain Road?

13       A.    Prior to the spring of 2005, near the turn-around

14  at the end of Mountain Lane --

15       Q.    Yes.

16       A.    -- which is the town maintained portion of the

17  road, there were boulders.  And I had heard that the

18  boulders had been moved.

19       Q.    Okay.  And did you investigate whether this event

20  actually took place?

21       A.    The boulders were on private land.

22       Q.    Um-hum.

23       A.    And I didn't have a complaint from the land owner,

24  so I didn't have anything -- any reason to really pursue it.

25       Q.    Okay.  But do you recall speaking to --

1    questioning -- withdrawn.

2              Do you recall sometime in May questioning

3    Mr. McCulley about this incident?

4    A.   I recall pulling off of Sentinel Road, seeing

5    Mr. McCulley across from Land Lumber, and yeah, we spoke

6    about it, I asked him if he had heard anything or knew

7    anything about it.

8    Q.   Did you inform him that Tom Martin and the rest of

9    Raybrook think if anything happens on the Old Mountain Road,

10   Martin had somethin' to do with it?

11             THE COURT:  Martin had somethin' to do with

12   it?

13             MR. NORFOLK:  No.  Sorry.  You're right.

14   Q.   McCulley had somethin' to do with it?  Sorry.

15   A.   I can't honestly say that I remember mentioning

16   Mr. Martin's name.

17   Q.   Okay.

18   A.   All right?  All of my discussions prior to late

19   May of 2005 with Mr. McCulley have always been very cordial.

20   Q.   Okay.

21   A.   So, I --

22   Q.   I'm sorry.  The -- so your testimony is, correct

23   me if I'm wrong, you didn't mention Tom Martin's name, but

24   you stated to him the rest of Raybrook thinks if anything

25   happens on the Old Mountain Road, he may be responsible for

1   it, somethin' like that?

2        A.   No.   I think I may have said something along the

3   lines that, you know, if anyone knew anything that might be

4   going on there, I would ask Jim.

5        Q.   Okay.   Now, is it a big deal if someone brings a

6   bulldozer or removes boulders at the mouth of this

7   turn-around?   Isn't that a violation?

8        A.   No.   That's private land, unless the private land

9   owner wants to issue a complaint that they did so, but none

10  of us were ever contacted in that regard.

11       Q.   Okay.   Now, we are going to go ahead a few days, a

12  couple weeks.   End of -- end of May 2005.

13       A.   Sure.

14                (Pause in proceedings.)

15  BY MR. NORFOLK:

16       Q.   Did you receive a phone call from Mr. McCulley on

17  May 20th?

18       A.   May 20th?   I don't have a calendar in front of me

19  to remember what day of that week.   If that was --

20       Q.   I will just cut to the chase.

21       A.   Yeah.

22       Q.   Did you call Mr. McCulley first or did he call you

23  first on May 21st, May 20th?

24       A.   That was the weekend that everything --

25       Q.   Right.

1          A.    I was on pass day on that Saturday, a day off.

2          Q.    Please, just answer the question.  Yes or no, did

3     you call Mr. McCulley first or did he call you first that

4     weekend?

5          A.    I called and left Mr. McCulley a message.

6          Q.    Did Mr. McCulley return that phone call?

7          A.    Yes, he did.

8          Q.    When he returned that phone call, did you guys

9     actually speak on the phone?

10         A.    Yes.

11         Q.    Okay.  Did you ask Mr. McCulley if he was going to

12    ride his pickup truck on the Old Mountain Road?

13         A.    No.

14         Q.    During this conversation, did it come to your

15    knowledge that Mr. McCulley would be on the -- at the Old

16    Mountain Road the next day?

17         A.    The pretext of my conversation was is I had heard

18    from Ranger Costas that there were going to be a bulldozer,

19    and chain saws and motor vehicles going on the forest

20    preserve and I asked Jim if he knew anything about that.

21         Q.    Okay.  Let's go to the next day, May 22nd.  I

22    believe it was a Sunday, but I'm not sure.  Do you recall

23    what day it was?

24         A.    It was a Sunday.

25         Q.    What time did you arrive at the turn-around on the

1  Old Mountain Road that day?

2      A.   I don't recall specifically.  I would say sometime

3  around 9:15, 9:30.

4      Q.   Okay.  And what time did you expect Jim to be

5  there that day?

6      A.   He had told me that they would be there sometime

7  around ten.

8      Q.   Okay.  So what were you gonna do the first half

9  hour before?

10     A.   I took some photographs, I put up some new

11 posters.

12     Q.   What are posters?

13     A.   Posters are aluminum signs.

14     Q.   And what signs were those?

15     A.   The sign that was present on the yellow birch tree

16 on the left side of the road was one of our antiquated DEC

17 forest preserve signs.

18     Q.   And you put that up that day?

19     A.   No, that one has been up for -- probably Ranger

20 Hodgson put that one up a long time ago.  Our regional

21 policy is now, when we put up forest preserve signs, they

22 need to identify the unit area that they are, i.e.,

23 wilderness, wild forest (unintelligible).

24     Q.   Okay.  Did you put a -- you said you put up

25 posters.  Was one of those posters a sign that prohibited

1   motor vehicle use on the road?

2        A.   Those posters of the forest preserve only

3   identified it as a wilderness area.

4        Q.   No, I understand that.  My question was --

5        A.   There were --

6        Q.   My question was did you put up --

7        A.   I'm getting there.

8        Q.   Okay.

9        A.   Underneath the wilderness area posters, we have

10   a -- we call it the "no" sign, no aircraft, no snowmobiles.

11        Q.   Right.

12        A.   I put one of those back up.  There's been one

13   there historically.  And a long time ago I put up a motor

14   vehicle -- no motor vehicles or motor vehicles prohibited, I

15   can't give you the exact language, I had put one of those

16   up.  That was gone, so I also put a new one of those up.

17        Q.   I understand.  They weren't up, though, that day.

18   You put 'em back up, correct?

19        A.   The forest preserve poster was there.

20        Q.   Okay.

21        A.   The no sign and the no motor vehicles were gone.

22        Q.   And you put 'em up that day?

23        A.   I put those back up, yes.

24        Q.   Approximately a half hour before, knowing that

25   Mr. McCulley was going to come operate his vehicle on the

1   Old Mountain Road?

2        A.   Yes.

3        Q.   Okay.  Were you directed to put those signs up?

4        A.   No.  That's part of -- routine part of my job.

5        Q.   Okay.

6                  (Pause in proceedings.)

7        Q.   One more question.  With respect to the allegation

8   or the -- withdrawn.

9                  A -- we were talkin' about the boulders being

10  moved, okay?

11       A.   Um-hum.

12       Q.   Were there any incidents in the last year or two

13  about a tractor operating, turning around, not on the part

14  of the turn-around, but more on the Old Mountain Road, Jack

15  Rabbit Trail?

16       A.   I had heard that there was -- I had heard a report

17  that someone had taken a motor vehicle of that type down the

18  roadway, and when I went there, there was evidence of a

19  large wheeled -- large tired vehicle that had gone through

20  there.

21       Q.   Did you ask Mr. McCulley about that?

22       A.   I may have asked him if he knew of anybody that

23  had taken a tractor down there.

24       Q.   A tractor does more damage than a pickup truck,

25  correct?

1          A.    A motor vehicle is a motor vehicle according to

2    the Vehicle & Traffic Law.

3          Q.    That wasn't the question.  But couldn't a big

4    tractor do more damage to making ruts and -- possibly

5    because of the size -- do more damage to the forest preserve

6    than a pickup truck drivin' down the Old Mountain Road?

7          A.    Depends on the condition of the trail.

8          Q.    But it's a big deal if a pickup truck's on the

9    road, correct?

10         A.    It's a big deal if any motor vehicle is.

11         Q.    Exactly.  Exactly.  What kind of investigation did

12    you do when you found out there was evidence of a big

13    tractor goin' down Old Mountain Road?

14         A.    I checked around with a few local folks to see if

15    they had heard anything about it, through the grapevine.

16         Q.    And that's the end of it?  You couldn't find

17    anyone?  Okay.

18                I am gonna give you what's Plaintiff's

19    Exhibit 96.

20         A.    Sure.

21         Q.    Mr. LaPierre, you know what this is?

22         A.    Yes.

23         Q.    Do you use this often?

24         A.    Not very often.

25         Q.    No?

1       A.   No.

2       Q.   Do you refer to it, did you (unintelligible)?

3       A.   I've looked at it, but I don't use it.

4       Q.   Okay.  Do employees in Region 5 of DEC, are

5  they -- do they typically, forest ranger or forester, have

6  copies of this?

7       A.   I'm sure every ranger and every forester must have

8  a copy.

9       Q.   Okay.  Can you easily identify state routes, local

10  roads on this map?

11      A.   (Unintelligible).

12      Q.   For example (unintelligible) let's just go over

13  here.

14      A.   Sure.

15      Q.   There's a red line there.  Can you tell me if

16  that's -- do you know if that's a road or not?

17      A.   It has the interstate highway symbol, 87, so I

18  guess it would be the interstate Route 87.

19      Q.   I apologize for some of my obvious questions.

20      A.   No offense taken.

21      Q.   But -- okay.  Well, there's a red one here, it's

22  got the same type of sign, signage is different, I think

23  that means state route?

24      A.   Um-hum.

25      Q.   Okay.  73 is red.  What is that, do you think?

```
 1          A.    That's probably an indices of State Route 73.

 2          Q.    Okay.  All right.  How about a black line there,

 3    is that a road or river or what do you think that might be,

 4    this black line right there?  Just pointing to one I just

 5    happen to pick out.

 6          A.    Again, there's no legend to tell exactly what

 7    we're looking at and its not labeled.

 8          Q.    But you know the High Peaks area?

 9          A.    Yes, I do.

10          Q.    You know the Adirondack Lodge?

11          A.    Yeah.  Yes, I do.

12          Q.    You know -- you probably can point where Heart

13    Lake is?

14          A.    Yes.

15          Q.    Can you point that out?

16          A.    It's right here (indicating).

17          Q.    What's that black line that goes to it, do you

18    think you have an idea?

19          A.    I think that may be a depiction of where

20    Adirondack Lodge Lane is.

21          Q.    Right.  The road to the lodge, correct?

22          A.    Yes.

23          Q.    Okay.  My point is, the black line, and you know

24    it's a road, correct?

25          A.    Yes.
```

1      Q.    Okay.  Thanks.  Do you think regional foresters --

2   in your experience as being a ranger, do you think regional

3   foresters should know the parameters of a wilderness area, a

4   UMP?

5      A.    Define "parameters."  I'm --

6      Q.    Do you think they would know, they could state the

7   boundaries of Sentinel Range -- for example, Sentinel Range

8   Wilderness area.  Do you think a regional forester should

9   say, yeah, there's the wilderness area right there on the

10  map, I know what the boundaries are?

11     A.    He might be able to give some of the physical

12  boundaries, but very often we have boundry lines that are --

13  there's no definite boundary.

14     Q.    Would you expect a regional forester to know if a

15  town road's intersecting a wilderness area or not?  For

16  example, Sentinel Range Wilderness area?

17     A.    A regional forester?  I can't say for sure.

18     Q.    How about Forester Tom Martin?  Would you expect

19  him to know if a road, town road, intersected the Sentinel

20  Range Wilderness area?

21     A.    We have so many Unit Management Plans in progress

22  right now, I cannot speculate as to what Tom should or

23  should not know.

24     Q.    Would you expect him to know it, though?

25     A.    I would expect it to be my duty that if I was

```
 1    discussing it with him and he didn't, I would bring it to
 2    his intention.
 3         Q.   Okay.
 4              MR. NORFOLK:  I think that is all.  I reserve
 5    for redirect.  Thank you, Judge.  Thank you, Mr. LaPierre.
 6              THE COURT:  Mr. Munro.
 7              MR. MUNRO:  A few questions, your Honor.  Can
 8    I approach the witness with some photographs?
 9              THE COURT:  Yes.
10              MR. NORFOLK:  May I also, your Honor?
11              THE COURT:  Yes.  Well, they're
12    photographs -- not yet.  You don't need to approach with
13    him.
14              MR. NORFOLK:  Okay.
15              (Pause in proceedings.)
16    CROSS-EXAMINATION
17    BY MR. MUNRO:
18         Q.   I'm gonna call you Ranger Joe, if that's all
19    right?
20         A.   Wonderful.
21         Q.   Ranger Joe.  Could you take a look at those
22    photographs, and if everyone could please try and keep them
23    in order, they're marked on the back.
24         A.   (Witness complies.)
25         Q.   Are you done?
```

1        A.   Yes.

2        Q.   Did you take these photographs?

3        A.   I took those (indicating).   These are

4   enlargements, I believe.  I didn't take this exact photo.  I

5   took (unintelligible).

6        Q.   Okay.  When did you take the photos --

7                THE COURT:  Just for the record, what are the

8   exhibit numbers?

9                MR. MUNRO:  They're 1 through 6 are marked on

10  the back, your Honor.

11               THE COURT:  All right.

12               MR. MUNRO:  These are Exhibit 26 on our

13  exhibit list.  We listed them as one exhibit, but there are

14  six separate photographs.  These were previously provided to

15  plaintiff's counsel.

16               THE COURT:  Is there an objection?

17               MR. NORFOLK:  No, your Honor.

18               THE COURT:  Are they being offered?

19               MR. MUNRO:  Yes, your Honor.

20               THE COURT:  Defendant's Exhibits 1 through 6

21  are received in evidence.

22               (Defendant's Exhibits 1 through 6 received.)

23  BY MR. MUNRO:

24       Q.   Could you please tell the Court what the first

25  photograph depicts?

1          A.    The photograph marked on the back DEF Number 1,

2     this is a photo taken from the turn-around area at the end

3     of Mountain Lane, looking down the Jack Rabbit Trail, and

4     the Jack Rabbit Trail heading in the direction of Keene.

5          Q.    So we are in the Town of North Elba, correct?

6          A.    Yes.   That's correct.

7          Q.    Okay.   And let's take a look -- is that a fair and

8     accurate representation of looking at each of the routes

9     from the turn-around?

10         A.    We're looking right down the trail, you can see

11    the boulders and the footprint of where a boulder may -- was

12    at one time; you can see where it had been moved.

13         Q.    And you mentioned before that the boulders were on

14    private property, is that right?

15         A.    That's correct.

16         Q.    Can you tell us where private property ends and

17    state property begins on this first photo?

18         A.    The state land boundry line, you can see off in

19    the distance, you can just make out the forest preserve

20    poster on the tree.

21         Q.    Let's look at the second photo.   And what does

22    this photo depict?

23         A.    This is a photo again of the Jack Rabbit Trail, in

24    proximity of the forest preserve line.

25         Q.    And the --

1                    THE COURT:  What does that mean,

2     Mr. LaPierre?  What does that mean?

3                    THE WITNESS:  State land boundry line.

4                    THE COURT:  Where on the road is this?

5                    THE WITNESS:  On the -- in the left-hand side

6     of the photo, you can see the forest preserve posters and

7     the other posters.

8                    THE COURT:  How far from the turn-around is

9     this?

10                    THE WITNESS:  We're talking maybe a couple of

11     hundred yards.  This poster on the tree, in Number 2, is the

12     same poster you can see off in the -- way off in the

13     background --

14                    THE COURT:  Thank you.

15                    THE WITNESS:  -- in Number 1.

16     BY MR. MUNRO:

17          Q.    And what is the date these photographs were taken?

18          A.    This would have been the morning I was to meet

19     Mr. McCulley, I believe it was the 22nd of May, as he

20     testified.

21          Q.    Okay.  So, looking at the second photograph where

22     you see, I think it's a yellow poster, that's where state

23     wilderness land begins, is that correct?

24          A.    The line -- if I recall correctly, that tree that

25     they are nailed on is blazed with the survey marks.  So the

1    line comes across the roadway in that general area.

2         Q.    So, looking into that photo, everything beyond

3    that is state land?

4         A.    That's correct.

5         Q.    Let's take a look at the third photo.  What are we

6    looking at here?

7         A.    This photo is a close-up of the posters seen in

8    Exhibits 1 and 2.  If you look at the poster that says

9    forest preserve wilderness area, behind there is an older

10   metal poster that just had state -- it said forest preserve.

11   Our regional policy now is to make sure forest preserve

12   boundaries are marked with posters reflecting their unit

13   area.  Hence, I put up the wilderness area posters over the

14   existing poster that was there.

15        Q.    And when did you put up the top poster that says

16   forest preserve wilderness area?

17        A.    I put that up that morning when I was there.

18        Q.    And the two posters below it, the one that says no

19   motorized equipment, et cetera, and no bicycles, when were

20   they put up?

21        A.    Originally, I had put up posters very much like

22   those, can't say they were exact.  I mean, those posters I

23   put up a few years ago.  When I was there that day, they

24   were no longer up, so I put new ones up.

25        Q.    In your experience, do posters like this sometimes

1    disappear or get taken down?

2         A.    Absolutely.

3         Q.    And is part of your job to --

4         A.    Put 'em back up.

5         Q.    -- put 'em back up?

6               Let's look at photo Number 4.  What are we

7    looking at here?

8         A.    Photograph Number 4, the reason I took this is

9    while I was there, trying to define where the state land

10   boundry crossed the Jack Rabbit Trail, going from one blazed

11   mark tree to another blazed mark tree, for definition in

12   taking photographs, in preparation, you can see two pieces

13   of birch log that I've laid in the trail.  I used those to

14   demark where the line crosses the trail.  So, anything

15   beyond those birch logs is forest preserve land, wilderness

16   area.

17        Q.    And when did you lay those logs there?

18        A.    I did that that morning.

19        Q.    Did you do that before Mr. McCulley arrived?

20        A.    Yes.

21        Q.    Let's look at photo Number 5.  What does this

22   depict?

23        A.    This would be the opposite side of the trail,

24   showing where the forest preserve line crosses, and if you

25   look through the balsams, you can see another forest

1    preserve sign nailed on the tree, appears to be yellow

2    birch, in the woods.

3              THE WITNESS:  Your Honor, it's right through

4    the trees right there (indicating).

5         Q.   So, in other words, you're on the state land side?

6         A.   No.  I'm on the private land of the Town of North

7    Elba side, looking on to forest preserve.

8         Q.   Okay.  And then let's look at the last photo,

9    Number 6.

10        A.   Sure.

11        Q.   What's that depict?

12        A.   After Mr. McCulley arrived, he turned his vehicle

13   around and, as you can see, the position of his vehicle, he

14   backed down the roadway.  If you look closely off each side

15   of the trail, you can still see the birch logs.  I did not

16   leave them in the trail.  I didn't want to have any hazards

17   in the trail, so I moved them off to the side.  But they're

18   still there for a reference of where the forest preserve

19   line crosses.

20              The reason I wanted to mention that, you

21   know, Mr. McCulley backed his vehicle in there is so there

22   wasn't any implying that he went in and turned around and

23   came back out.  His vehicle is facing coming back out toward

24   the turn-around.

25        Q.   Did Mr. McCulley, at any point, ask you where the

1   state land boundry was?

2       A.   I don't recall.

3       Q.   Is it your understanding that he knew that he was

4   on state land with his pickup truck?

5       A.   I believe it is.

6       Q.   Let me just ask you a few more questions.  You

7   mentioned that in 2005, that the ticket that you issued

8   Mr. McCulley for driving his pickup truck on the Jack Rabbit

9   Trail, that that ticket was withdrawn, is that correct?

10      A.   For driving his motor vehicle on forest preserve,

11  that ticket was withdrawn from the North Elba Town Court.

12      Q.   Okay.  And who made that decision to withdraw the

13  ticket?

14      A.   That was made by our regional attorney's office in

15  discussion with the region -- the Albany legal office, I

16  believe.

17      Q.   And I believe you testified that subsequent to

18  that, an administrative enforcement proceeding was initiated

19  against Mr. McCulley, is that correct?

20      A.   To the best of my knowledge, yes.

21      Q.   And did you make that decision to enforce

22  administratively against Mr. McCulley?

23      A.   No, I did not.

24      Q.   Were you involved in that decision?

25      A.   No, I wasn't.

1      Q.    Were you consulted at all as to whether that

2  enforcement Avenue was an appropriate way to go?

3      A.    I was advised that that was the way the department

4  was going to pursue the case.

5      Q.    Okay.

6            MR. MUNRO:   No further questions.   Thank you.

7            MR. NORFOLK:   I just have a few.

8  REDIRECT-EXAMINATION

9  BY MR. NORFOLK:

10     Q.    You testified earlier, Forest Ranger LaPierre,

11  that since '02 or three, the rangers had specific regions

12  within the -- specifics units within the ranger --

13     A.    A ranger district, patrol areas.

14     Q.    Ranger districts.   In May of 2000 -- in May of

15  2005, what were -- where were you assigned?

16     A.    I was still with the Town of North Elba, is

17  essentially -- encompassed my ranger district.

18     Q.    Does that include the Old Mountain Road where we

19  were?

20     A.    The portions of the Town of North Elba, the unit

21  areas that I was the ranger responsible for, are portions of

22  the western part of the eastern High Peaks Wilderness, the

23  eastern portion of the western High Peaks Wilderness, the

24  McKenzie Wilderness and the Saranac Lake Wild Forest.

25     Q.    So, forgive me, I don't know all those.   Was the

1   Old Mountain Road part of your unit?

2       A.   The Old Mountain Road is in the Sentinel Range

3   unit.

4       Q.   So it's not part of your unit to be responsible

5   for?

6       A.   It's part of my zone and when the adjacent ranger

7   is not working, for coverage, we cover the adjacent areas.

8       Q.   You said earlier you put a sign up at sometime way

9   back, correct?

10      A.   Yes.

11      Q.   But that wasn't your area?

12      A.   I cannot remember the exact date and it may have

13  been prior to 2002 or whenever Ranger Costas came and we

14  changed our little geopolitical subdivisions.  I don't

15  recall specifically.

16      Q.   May I approach and just grab these for a second?

17      A.   Absolutely.

18      Q.   For clarification, Defendant's Exhibit Number 3,

19  you put these signs up the morning that Mr. McCulley

20  operated on his truck, yes or no?

21      A.   I put the wilderness area poster over the old

22  forest preserve poster.

23      Q.   Okay.

24      A.   I put -- replaced the no sign.

25      Q.   Was there a sign there?

1        A.   The sign was missing when I arrived.

2        Q.   Okay.

3        A.   So I put this one up, and I also put the mountain

4   bike prohibition sign up.

5        Q.   The sign underneath this forest preserve sign,

6   doesn't it say -- did it state no motorized equipment, no

7   motorized vehicles, no motorized boats, no aircraft, no

8   snowmobiles?

9        A.   No, it said forest preserve.

10       Q.   Okay.  So, then, naturally it didn't say no

11  bicycles with a sign, correct?

12       A.   That's correct.

13                 MR. NORFOLK:  No further questions.  Thank

14  you.

15                 THE COURT:  Anything else, Mr. Munro?

16                 MR. MUNRO:  No, your Honor.

17                 MR. NORFOLK:  Thanks.

18                 THE WITNESS:  You're welcome.

19                 THE COURT:  Excuse me, Ranger LaPierre.

20                 THE WITNESS:  Yes.

21                 THE COURT:  You said you were provided with a

22  copy of the McCulley decision from the Essex County Court

23  sometime after?

24                 THE WITNESS:  Judge Halloran's decision.

25                 THE COURT:  Yes.  After that, did you

1   personally take any steps to remove signs from the road?

2                   THE WITNESS:  No, I did not.

3                   THE COURT:  Are you aware of any DEC employee

4   who did take any such steps to remove signs from the road

5   after the McCulley decision?

6                   THE WITNESS:  I am not aware of that.

7                   THE COURT:  All right.  Thank you.  You may

8   step down.

9                   (Witness was excused.)

10                  MR. NORFOLK:  Your Honor, I hate to delay

11  (unintelligible) recess?  I really do.

12                  THE COURT:  We'll wait for you.

13                  MR. NORFOLK:  Okay.

14                  (Pause in proceedings.)

15                  THE COURT:  Mr. Norfolk, are you ready?

16                  MR. NORFOLK:  Yes, Judge.

17                  THE COURT:  Call your next witness, please.

18                  MR. NORFOLK:  Christopher Lacombe.

19                  THE CLERK:  Is it Christopher?

20                  THE WITNESS:  Yeah.

21                  THE CLERK:  And spell your last name.

22                  THE WITNESS:  L-A --

23                  THE CLERK:  L-A.

24                  THE WITNESS:  Small C-O-M-B-E.

25                  THE CLERK:  And your middle initial?

```
 1                    THE WITNESS:  A.

 2                    THE CLERK:  Will you raise your right hand?

 3                    (Witness duly sworn.)

 4                    THE CLERK:  This is Christopher A. Lacombe,

 5     L-A-C-O-M-B-E.

 6                              - - - - -

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          C H R I S T O P H E R    A.     L A C O M B E,

2     having been called as a witness, being duly sworn,

3     testified as follows:

4     DIRECT EXAMINATION

5     BY MR. NORFOLK:

6          Q.   Good morning, Mr. Lacombe.

7          A.   Good morning.

8          Q.   Could you tell the Court where you reside?

9          A.   I reside in Peru, New York.

10         Q.   Where is Peru, New York?

11         A.   Peru, New York, is about 10 miles south of

12    Plattsburgh and it's about 50 miles or so from Raybrook/Lake

13    Placid area.

14         Q.   So you commute every day?

15         A.   Correct.

16         Q.   Ask you tell the Court your position presently

17    with the department?

18         A.   I'm the regional attorney for New York State

19    Department Region 5, which is -- which encompasses or

20    comprises an eight-county area.

21         Q.   And how long have you been an attorney, regional 5

22    attorney?

23         A.   I've been in the position since November of 1996,

24    so it's been a little over nine years.

25         Q.   And before you were a regional attorney, did you

1  hold any positions with the department?

2      A.   No.

3      Q.   Okay.  Before becoming an attorney for the

4  department, where were you employed, if anywhere?

5      A.   I graduated from law school in 1986, from Western

6  New England School of Law.  I became licensed to practice

7  law in the State of New York, Massachusetts and Connecticut.

8  I was a JAG officer in the United States Navy from 1986,

9  '87, to 1990.  And from 1990 to 1996, I was in private

10 practice in the Plattsburgh area.

11     Q.   Okay.  So, since your employment with the

12 department, you've always been a regional attorney?

13     A.   Correct.

14     Q.   For Region 5?

15     A.   Correct.

16     Q.   Are you aware that Mr. McCulley operated a

17 snowmobile on the Old Mountain Road on March 20, 2003?

18     A.   That's correct.

19     Q.   And are you aware that an ECAT was issued by

20 Forest Ranger Costas?

21     A.   That's correct.

22     Q.   At some point, was that ECAT rescinded by the DEC?

23     A.   Yes, it was.  There -- at the time after the ECAT

24 was issued, it was understood that the ranger had not

25 actually observed the violation.  So, therefore, looking at

1    the requirements of Criminal Procedure Law, it was

2    determined that what was appropriate was to use a long form

3    information as opposed to, which required the issuance of a

4    summons for the Town Justice Court.

5         Q.   Okay.  Do you recall if the criminal summons was

6    ever served?

7         A.   The criminal summons, I believe, was served in

8    late June of 2003.

9         Q.   Okay.  Late June 2003.  Was there any motion

10   practice in the -- withdrawn.

11              Where was the summons -- criminal summons

12   filed?

13        A.   The criminal summons was filed in the Town of --

14   was issued, actually, by the Town of Keene.  It was based

15   upon the long form information that had been filed with the

16   Town of Keene.

17        Q.   Okay.  Have you had a chance to look at

18   Mr. McCulley's voluntary statement with respect to that

19   violation?

20        A.   I have at some time, yes.

21        Q.   Necessary to probably prosecute the case, correct?

22        A.   That's correct.

23        Q.   Do you recall in that statement whether or not

24   Mr. McCulley stated under oath he operated a snowmobile in

25   the Town of North Elba and the Town of Keene?

1          A.    I would have to look at that document.

2          Q.    Okay.  Better yet, why don't I give you this then.

3     This is Plaintiff's Exhibit Number 38, notice of intention

4     to offer statement, which is -- you know what it is, bein'

5     an attorney, what a seven ten thirty is.  It's the

6     defendant's statement.

7                    THE COURT:  Is that in evidence?

8                    MR. NORFOLK:  Yes.  Yes, your Honor.

9          Q.    The seven ten thirty is the first page and behind

10    it is the voluntary statement, correct?

11         A.    That would appear to be the case, yes.

12         Q.    Okay.  So, looking at that, does that refresh your

13    recollection of Mr. McCulley's statement?

14         A.    I believe.  The statement is not very good on this

15    copy.

16         Q.    Okay.

17         A.    Yes, it refreshes my recollection.

18         Q.    Okay.  Did Mr. McCulley state that he operated a

19    snowmobile in the Town of North Elba on the Old Mountain

20    Road?

21         A.    It does say "I drove on the Old Mountain Road,

22    North Elba.  At the end of the road is a parking lot."  And

23    then it goes on to say he drove in as far -- let's see.  "I

24    went in as far as the big beaver pond, then turned around

25    and came back out."

1  Q. Okay.  That's his statement.  If you flip to the

2 seven ten thirty that was issued, signed by Forest Ranger

3 LaPierre, correct?

4  A. Correct.

5  Q. That statement -- withdrawn.  You -- the seven ten

6 thirty statement, what is it?  What's a seven ten thirty

7 statement, in general?

8  A. Generally speaking, the prosecution in a case is

9 required to provide notice to the defendant and to the Court

10 as to any statements that the defendant made which will be

11 used by the People in the prosecution of that matter, the

12 charge against him.

13  Q. Okay.  And that seven ten thirty statement says

14 that Jim McCulley stated he operated a snowmobile in the

15 Town of North Elba, correct?

16  A. It states -- the seven ten thirty statement says

17 you drove your -- I'm reading a portion of it.  "You drove

18 your snowmobile on the Old Mountain Road, North Elba, into

19 Keene and back again."

20  Q. But that's -- yes, that's correct?  You may

21 answer.

22  A. Yeah.  It says North Elba, yeah.

23  Q. Who made the decision to file the action, whether

24 it's the ECAT, criminal summons, an information, in the

25 Town of Keene as opposed to the Town of North Elba?

1      A.   I believe that it would have been -- it was Ranger

2  Costas who issued the ticket and I -- in discussions, it was

3  my understanding that the beaver pond that he went to, okay,

4  it was my understanding that that beaver pond was -- it was

5  clearly located in the Town of Keene.  So, in other words,

6  it was an offense that took place --

7                 THE COURT:  No.  The question was who made

8  the decision?

9                 THE WITNESS:  Who made that decision?  That

10  decision, frankly, would have been made by the -- by the

11  forest ranger.

12  BY MR. NORFOLK:

13      Q.   Okay.  And my next question is what was the basis

14  for that decision?

15      A.   The basis for the decision was that he drove to

16  the beaver pond and the beaver pond was located in the

17  Town of Keene.

18      Q.   Okay.  But he operated the snowmobile in the

19  Town of North Elba, too, correct?

20      A.   Presumably, yeah.  Yes.

21      Q.   What's the difference between operating a

22  snowmobile in the Town of North Elba as operating in the

23  Town of Keene for purposes of the alleged violation?

24      A.   It happened to be that the ticket was written in

25  the Town of Keene -- or the Town of Keene Court, but it

1    appear the violation, I guess, that occurred really

2    occurred -- those circumstances occurred in both

3    jurisdictions.

4        Q.   Okay.  All right.  Now, was there any motion

5    practice in this proceeding?  I think I may have asked that.

6    I don't recall.  Was there any motion practice in this

7    proceeding?

8        A.   There were repeated requests by myself to have the

9    Court issue summons.

10       Q.   Okay.  Sir, are you considering that motion --

11       A.   Well, it was an informal letter.

12       Q.   Right.  But a motion usually has to do with notice

13   of motion, following procedures under the CPL, correct?

14       A.   I hadn't gotten to that point.

15       Q.   Okay.

16       A.   So the answer is did I do a notice of motion and

17   motion and supporting affidavit or affirmation?  No.

18       Q.   Okay.  When was the trial?  I assume there was a

19   trial.

20       A.   The trial was in -- my recollection was it was in

21   late August or early September of 2003.  That's my

22   recollection on that matter.

23       Q.   Okay.  Now, the summer of 2003, June of 2003?  I'm

24   not sure (unintelligible)?

25       A.   Might have been -- it was during the summer.  My

1    recollection was late summer sometime, but...

2         Q.   Okay.  Okay.  You argued to the Town of Keene it

3    was a user road, correct?

4         A.   It was a highway by use?

5         Q.   Highway by use.

6         A.   Yeah.  Yes, I did.

7         Q.   Okay.  Highway by use is not a highway created by

8    statute, correct?

9         A.   I would say that's probably correct, yes.

10        Q.   You were victorious at the trial, meaning

11   Mr. McCulley got a conviction, correct?

12        A.   Correct.

13        Q.   How long did that trial last?

14        A.   That trial was approximately three hours long.

15        Q.   Okay.  When did you get a decision from the Town

16   Court of Keene on that, on that matter?

17        A.   I would say probably about a month after the trial

18   was over.

19        Q.   Okay.  And just yes, no, Mr. McCulley appealed it?

20        A.   That's correct.

21        Q.   Now --

22                  (Pause in proceedings.)

23        Q.   When were the appeal briefs, the Appellate briefs

24   submitted to the County Court?

25        A.   I did not do the appeal in this matter.

1      Q.   I understand that.  Do you know when they were

2  submitted?

3      A.   Frankly, I don't know.  As I sit here right now, I

4  don't know what those dates were.

5      Q.   Okay.

6               MR. MUNRO:  Judge, I am wondering if we can

7  skip through some of the chronology and get to the

8  substance.  I mean --

9               THE COURT:  Well, I am not gonna tell him how

10  to do his direct, but...

11              MR. MUNRO:  Okay.

12  BY MR. NORFOLK:

13      Q.   Now, in 2005, Mr. McCulley was arrested --

14  withdrawn.  Mr. McCulley was ticketed for operating his

15  pickup truck on the Old Mountain Road, correct?

16      A.   That's correct.

17      Q.   It was May 22, 2005?

18      A.   I believe that's the date, yes.

19      Q.   Okay.  And what was the violation

20  (unintelligible)?

21      A.   It was a violation -- the violation was a

22  violation of 6 NYCRR Section 196.1, which, in essence, is

23  the operation of a motor vehicle on forest preserve.

24      Q.   What was the violation that he was issued for

25  operating a snowmobile on the Old Mountain Road in 2003?

1        A.   6 NYCRR Section 196.2, which is in the same area

2    of law, or regulations, I guess I should say, which is the

3    operation of a snowmobile on forest preserve.

4        Q.   Okay.  He was issued an ECAT, right, for the

5    May 22, 2005, event of operating a pickup truck on the Old

6    Mountain Road?

7        A.   That's correct.

8        Q.   Was that ECAT withdrawn?

9        A.   Yes, it was.

10       Q.   Whose decision was it to withdraw that?

11       A.   It was ultimately the person who went to Court and

12   who did that was me.

13       Q.   Okay.  What was the basis for withdrawing that

14   ECAT?

15       A.   The -- the basic reason was -- 'cause the basic

16   reason was it ultimately comes down to concern over burden

17   of proof.  And the issues with respect to -- the issues with

18   respect to, you know, the things that have been discussed

19   here with the road and at a criminal matter, or a Justice

20   Court matter, we would have a burden of proof of proof

21   beyond a reasonable doubt, whereas an administrative

22   hearing, a department 622, we would have the burden of proof

23   by preponderance by the evidence.

24       Q.   So your answer is -- when your answer is just --

25   you're explaining rescinding the ECAT and filing an

1  administrative court proceeding, correct?

2      A.   What I did was the return date on the ticket that

3  was issued to Mr. McCulley, okay, was June 13th.  Okay.  I

4  appeared in court that night with the ticket -- or for the

5  return date, and I had gotten authority from the DA to

6  represent him, and I appeared with the notice of hearing

7  complaint.  Mr. McCulley didn't appear.  So, at that time, I

8  advised the Court, I think it was Judge Dietrich (phonetic),

9  that I was going to do -- the People were withdrawing the

10  ticket and then the following day I requested Mr. McCulley

11  be served.

12      Q.   Did you have any discussions with anyone at the

13  department with respect to your decision to prosecute this

14  alleged violation administratively?

15      A.   Yes.

16      Q.   With who?

17      A.   I had discussions primarily with Ken Hamm, who is

18  the attorney for the Bureau of Forest Preserve here in

19  Albany.  Mike Lesser (phonetic), who is an attorney with our

20  Division of -- Office of Environmental Public Protection of

21  ECOs and our rangers.  I discussed the matter with Stu

22  Buchanan, the regional director for Region 5, and with Rob

23  Davies who is the Director of the Division of Lands and

24  Forest for the New York State Department of Environmental

25  Conservation.

1        Q.    Okay.  And what was the reason to have

2    administrative enforcement proceeding?  Is that because of

3    burden of proof?

4        A.    Yes.

5        Q.    Is that the only reason --

6        A.    Well --

7        Q.    -- discussed?

8        A.    -- that was the -- that was the primary reason.

9        Q.    Okay.  What were the nonprimary reasons?

10       A.    Well, one of the issues that we had was there had

11   been some confusion, we felt, in the public, with respect to

12   what exactly Judge Halloran's 27 page opinion had said.  It

13   was basically, from my reading of Judge Halloran's decision,

14   was he basically indicated was that the People did not prove

15   their case in this -- in the prior matter, beyond a

16   reasonable doubt, and our fear -- one concern we had was if

17   we did this in Town Justice Court, there may be some

18   confusion with respect to them thinking that the issue --

19   the ruling closed the road, all right.  And secondly, if we

20   prevail, we are going to end up with an appeal in front of

21   the Essex County Court.

22       Q.    What's wrong with that?

23       A.    Well, our concern was what was the best way of

24   going about it, and our feeling was if we went with an

25   administrative matter, there would -- we would --

1    administrative enforcement proceeding, under part 622 of our

2    regulations, that once that determination had been made, at

3    the end of the trial, and if Mr. McCulley -- that there

4    would always be the option, okay, if the -- we were able to

5    meet our burden of proof, the department staff were able to

6    meet their burden of proof, and establish that there was

7    a -- and establish that there was a violation of part 196.1,

8    that there would always be the option for Mr. McCulley to go

9    forward with an Article 78 proceeding against the

10   department.

11       Q.   Now, you --

12            MR. MUNRO:   I move to strike that response.

13            THE COURT:   Sustained.

14       Q.   You said --

15            THE COURT:   Mr. Norfolk, you've done this a

16   couple times.

17            MR. NORFOLK:   Okay.

18            THE COURT:   Please refrain from those kinds

19   of comments.

20            MR. NORFOLK:   Thanks, Judge.   I will.

21   BY MR. NORFOLK:

22       Q.   You said you didn't want to take it to County

23   Court.   Were you -- did you purposely commence

24   administrative hearing not to be in County Court on appeal?

25       A.   Well, I did it based upon -- I did it based upon

1    the evidence that was in front of me that Ranger LaPierre

2    had collected an appeal, recognizing what my various burdens

3    of proof were in a criminal and civil matter, and realizing

4    the higher degree of likelihood of prevailing in -- of

5    prevailing in establishing that there's been a violation of

6    part 196.1 was in an administrative action because of the

7    lower burden of proof.

8        Q.   So you had a better chance of winning in an

9    administrative proceeding than in the Town of North Elba

10   Court?

11       A.   I had a better -- lower standard of burden of

12   proof and given some of the issues with respect to this

13   road, that was the appropriate -- the appropriate forum to

14   handle the matter in.

15       Q.   Do you think that this case is quite similar, the

16   case we're talking about, ridin' the pickup truck on the Old

17   Mountain Road --

18       A.   Um-hum.

19       Q.   -- is quite similar to the case of Jim drivin' on

20   the Old Mountain Road with his snowmobile?

21       A.   There are some similarities, there are some

22   differences.

23       Q.   Did you think that -- going back to the same

24   count -- County Court, perhaps on appeal, your chances of

25   winning were slim 'cause -- compared to an administrative

1  proceeding?

2      A.   I had -- well, let's put it this way.  My primary

3  folk discuss, okay, was the burden of proof.  And I

4  expected, fully expected that many of the issues raised in

5  the first trial would be raised in -- frankly, raised in

6  this hearing, all right, would be raised again.  And the

7  proceeding -- the administrative proceeding would be the

8  better way to go.

9      Q.   It would favor your position?

10     A.   It would be a lower burden of proof.  It's

11 administrative as opposed to a criminal Justice Court

12 matter.

13     Q.   No, I understand that.  When you say "lower burden

14 of proof," that means it's easier for you, correct?

15     A.   It's a lower burden of proof, yes.

16     Q.   Okay.  Now, and I apologize for my remarks

17 (unintelligible).  While -- before the time you had your

18 conviction and then to the point where this appeal came out,

19 okay?

20     A.   Correct.

21     Q.   I want to talk about that time.  You had some

22 other ongoings, other matters besides the Old Mountain Road,

23 other than Mr. McCulley and his snowmobile (unintelligible)?

24     A.   That's correct.

25     Q.   Okay.

1            MR. NORFOLK:  I would like to offer into

2   evidence number (unintelligible.)  Plaintiff's Exhibit

3   Number 63, which is Plaintiff's Number 15, on the -- on

4   these two exhibits list (unintelligible.)

5            THE COURT:  Any objection?

6            MR. MUNRO:  No objection, your Honor.

7            THE COURT:  Plaintiff's Exhibit 63 is

8   received in evidence.

9            (Plaintiff's Exhibit 63 received.)

10  BY MR. NORFOLK:

11     Q.  Now, we had -- I am gonna ask you some questions

12  and unintelligible.

13          You had -- you had testified earlier that you

14  had argued that the Old Mountain Road was a user road,

15  correct?

16     A.  That's correct.

17     Q.  Now, can you tell me what I've given you is

18  Plaintiff's Exhibit Number 63?

19     A.  It's actually two exhibits, but they're certainly

20  related.  The cover is a letter dated December 22, 2004,

21  from me to Jim Brooks, who is the attorney -- who is the

22  attorney for Ken Jubin.  And attached to it is a five-page

23  proposed order on consent for the resolution of a

24  violation -- an alleged violation against Mr. Jubin.

25     Q.  Thank you.  Can I see that for a second?

1       A.   Sure.

2       Q.   I want to direct you to certain things.

3            I am gonna direct you to number 7 of page 2

4  of the order on consent, proposed order on consent, if you

5  will.  Ask you to take a minute and look at item number 7

6  and read that to the Court, if you will.

7       A.   Okay.  Number 7 says "the State of New York owns

8  lot 132, lot 140, 146, 148 of the Old Military Track, which

9  is located in the Town of North Elba."

10      Q.   Okay.  Now, on those lots, the Old Military Road,

11 which is referenced there, is that the first point nine or

12 after the point nine, if you know?

13      A.   This is the -- basically -- this is basically --

14 this case deals -- understand, I'm writing in the context --

15      Q.   That's not the question.

16           THE COURT:  That's not the question,

17 Mr. Lacombe.

18           THE WITNESS:  Okay.

19           THE COURT:  What does it refer to?  What

20 section --

21           THE WITNESS:  I can't -- I'm not certain of

22 that, but I suspect what it refers to is the first point

23 nine miles.

24      Q.   Okay.

25      A.   (Unintelligible).

1        Q.    Now point number 8 --

2        A.    Yeah.

3        Q.    -- can you read the first sentence and then what

4   I'll ask you to name the lots that are after.  You don't

5   have to go through the deed and book and page number, okay?

6   Does that clarify?

7        A.    Okay.  "The State of New York owns five lots by

8   virtue of the following deeds recorded in the Essex County

9   Clerk's Office."

10        Q.    Can you read the lots that follow that, please?

11        A.    Yes.  Lot 132, lot 140, 146, 153 and lot 154.

12        Q.    Did you or someone, a member of your staff, do

13   some homework on this to get these deeds and book numbers,

14   record numbers?  It appears so.  Is that true?

15        A.    I would have requested this information.  I would

16   have requested this information from Les Eggleton

17   (phonetic), who is our real property supervisor for Region

18   5, the department.

19        Q.    And would you have gotten that information -- I

20   mean documentation, these deeds?

21        A.    I think I did.  I'm not certain of that.

22        Q.    Okay.  Now, I ask you to read number 10, item

23   number 10, if you would?

24        A.    Okay.  "The Old Mountain Road, which is located in

25   the Town of North Elba, is a highway by use, which has been

1    in existence since the early part -- early part of the

2    1800s."

3        Q.   Okay.  At some point later in these proceedings,

4    with -- concerning Mr. Jubin, did you change your position

5    on that, that the Old Mountain Road wasn't a highway by use

6    but rather a statutory -- statutory created road?

7        A.   No.  However, there's been discussions about these

8    early 1800s statutes regarding the Old Mountain Road.

9        Q.   Okay.  Now, I would ask you to read number 11,

10   please, the -- of this order and consent.  The -- I'm sorry,

11   number 11, item number 11.

12       A.   Okay.  Number 11, "The Old Mountain Road, which is

13   located in the Town of North Elba, traverses the forest

14   preserve lands on lots 132, lot 140, lot 146, lot 153 and

15   lot 154 as described in paragraph 5."  It should be "8."

16       Q.   You heard testimony today of Mr. Jubin, correct?

17   Were you here when he --

18       A.   I heard it, yeah.

19       Q.   Now, do you know -- I may have asked this.  If

20   I've asked you this, forgive me and just tell me I've asked

21   ya.

22       A.   Okay.

23       Q.   You don't know, or do you, where -- which lot

24   Mr. McCulley operated his pickup truck on, do you, absent

25   from Ken -- hearing Ken today, but personally, from your own

1    (unintelligible)?

2        A.    I would have to -- I would have to do specific

3    research on that particular point.

4        Q.    Okay.  Fair enough.  Can I ask you to read number

5    12, please?

6        A.    "Since the Old Mountain Road constituted a highway

7    by use, prior to the State of New York's acquisitions of lot

8    132, lot 140, lot 146, lot 153 and lot 154, in the Town of

9    North Elba has -- (Pause) -- Elba, has the right to a public

10   highway past the forest preserve lands, up to a width of

11   three rods (unintelligible)."

12       Q.    Okay.  When was this dated?

13       A.    Well, I wrote the letter -- I wrote it in December

14   of 2000 -- December 22, 2004, so...

15       Q.    Okay.  Is there a date on the order and consent

16   (unintelligible)?  No, there's no date.

17       A.    No, no date.

18       Q.    Now, who was the proposed sign -- signatories of

19   this?  Who was gonna sign this?  Obviously, you have Ken

20   Jubin or his attorney, but from the DEC?

21       A.    I would send this on to Stu Buchanan.

22       Q.    Okay.  Can you refer to your last page?

23   There's -- who else -- here you have Erin Crotty, correct?

24       A.    Yeah.

25       Q.    But you may have had Stu sign for her?

1      A.    Typically, Stu, Stu Buchanan, as the regional

2    director, has the authority to execute documents on behalf

3    of the Commissioner with respect to matters which involve

4    clearly some point of consent order.

5      Q.    Okay.  Can you show you what's been marked as

6    Plaintiff's Exhibit number 90?  I'll take --

7      A.    Yep.

8      Q.    (Unintelligible).  Can you find on there, on this

9    map, great lot 153 in the Town of North Elba?

10      A.    Yeah.

11      Q.    Okay.  Now, is that great lot bordering the Town

12    of Keene boundry line?

13      A.    Yeah.  In this 1985 map, that would appear to be

14    the case.

15      Q.    Okay.  Now, just left of the 153 great lot, what

16    lot is that, if you can see?

17      A.    It would appear to me to be lot 146.

18      Q.    Okay.  And the Old Mountain Road, as on here,

19    don't look at the highlighted, from your own -- that's

20    someone else -- but the lot that's on this map, the road

21    that's on this map, the trail markers, if you will, do they

22    intersect 153 and 146?

23      A.    I'm not sure I understand the question.

24      Q.    Does Old Mountain Road traverse through great lot

25    146 and great lot 153?

1     A.   What appears on this 1985 map to be a road appears

2   to traverse lot 146 and lot 153.

3     Q.   Thank you.

4     A.   Yep.

5     Q.   Thanks.

6          (Pause in proceedings.)

7          MR. NORFOLK:  Excuse me, your Honor, I

8   apologize (unintelligible).  I offer into evidence number --

9   Plaintiff's Exhibit Number 62 which is marked as 46 on the

10  exhibits list.

11         THE COURT:  Any objection?

12         MR. MUNRO:  No, your Honor.

13         THE COURT:  Plaintiff's Exhibit 62 is

14  received in evidence.

15         (Plaintiff's Exhibit 62 received.)

16  BY MR. NORFOLK:

17     Q.   Mr. Lacombe, I ask you to take a look at this and

18  I will ask you some questions about it.  I apologize

19  (unintelligible).

20         (Pause in proceedings.)

21         THE COURT:  While he's reading that, do you

22  have 63?  The one he was just looking at.

23         MR. NORFOLK:  Yes.

24         THE COURT:  Thank you.

25     A.   Okay.

1      Q.   All set?

2      A.   Yeah.

3      Q.   Could you tell the Court what Plaintiff's Exhibit

4   Number -- I believe it's 62 is?

5      A.   It's a five-page document.  It's a letter I wrote,

6   dated November 5, 2004, from me to James Brooks, Esquire,

7   attorney for Ken Jubin.

8      Q.   And prior to you drafting that letter, is it true

9   that Mr. Brooks perhaps gave his opinion that the Old

10   Mountain Road is a road created by statute?

11      A.   Yes.

12      Q.   And that's reflected in that letter, correct?

13      A.   That -- I certainly responded to arguments that he

14   made with respect to that.

15      Q.   Right.  If you will, if you could read the last

16   sentence of the first paragraph and then number 1 -- I ask

17   you to read that and that would probably confirm what we're

18   talkin' about here.

19      A.   Yeah.  It says, "Mr. Brooks, the arguments that

20   you presented were as follows:  Number one, Old Mountain

21   Road was created by chapter, what is that, 196," this is

22   Roman numerals --

23      Q.   Yeah, I know?

24      A.   -- "of the laws of New York, 35th Session, 1812.

25   Thus, it is a road created by statute, not by use."

1      Q.   Okay.  Now, in response -- you respond to that in

2  this letter, correct?

3      A.   Yeah, I do.

4      Q.   Could you read the number -- if you could flip it

5  back, I apologize, read that paragraph just kind of leading

6  sentence and then if you could read number one in response

7  to that argument?

8      A.   Yeah.  I write, "It is likely that Chapter C of

9  the laws of New York, 31st session, 1808, created what is

10  now known as the Old Mountain Road, and that Chapter 196

11  further describes the location of the road and appropriates

12  funds for improvement of the road."

13      Q.   You argued something different, correct, in the

14  town court action against Mr. McCulley in 2003?

15      A.   Yeah.  This year -- this is written a year later

16  and I prefaced the comment by "likely."

17      Q.   Okay.  But you argued somethin' different,

18  correct, in the McCulley court?

19      A.   The context of these two cases is very different.

20  They are dealing with the same road, but the issue in the

21  two cases are somewhat different.

22      Q.   Okay.  So, are you saying that some of the road

23  was created by user use -- some of the road is created by

24  statute?

25      A.   I -- I have statutes in front of me that are not

1    entirely clear as to whether they created a road or not.

2    That's the issue.

3                   (Pause in proceedings.)

4    Q.    (Unintelligible.)  Plaintiff's Exhibit 98, which

5    was already admitted in this court, which is the notice of

6    hearing -- copy of notice of hearing and the complaint of

7    administrative proceeding.

8                   Do you state in here, if you will -- does it

9    state in there that the -- no motor vehicles are allowed in

10   the forest preserve, Sentinel Range Wilderness area?

11   A.    I cite -- in -- not those exact words, but I

12   basically say that.

13   Q.    Okay.  Can I see this?  Could you read Number 8?

14   Is that what you're referring to, Number 8?  And if so,

15   could you read that?

16   A.    No, that's not what the basis of my prior

17   response, but I'll read it.

18   Q.    Okay.

19   A.    "As a wilderness area in the Adirondack Park State

20   Master Plan, no motor vehicles are allowed in the Sentinel

21   Wilderness area."

22   Q.    But according to you -- I'll withdraw that.

23                   MR. NORFOLK:  I reserve for redirect.

24                   THE COURT:  All right.

25                   MR. NORFOLK:  Do you want me to put that

1  exhibit back (unintelligible).

2                    THE COURT:  Please.

3                    MR. MUNRO:  Can we take a five-minute break,

4  your Honor?

5                    THE COURT:  We are takin' a lot of five

6  minute breaks here.  What's goin' on?

7                    MR. NORFOLK:  I don't know.  I

8  (unintelligible).

9                    MR. MUNRO:  We deferred to his last break

10 request, so --

11                   THE COURT:  Well, you had one before that,

12 too.

13                   MR. NORFOLK:  Mine was a restroom break.

14                   THE COURT:  All right.  Five minutes.  We're

15 waiting right here, though.

16                   MR. MUNRO:  Okay, fine, your Honor.

17                   THE COURT:  We have to move this along.  We

18 can't take breaks every time we finish with a direct

19 examination or cross-examination.

20                   MR. MUNRO:  Five minutes.

21                   THE COURT:  We will wait right here.

22                   MR. MUNRO:  Thank you.

23                   (Pause in proceedings.)

24                            - - - - -

25

```
 1   CROSS-EXAMINATION

 2   BY MR. MUNRO:

 3       Q.   Mr. Lacombe, this has got to be every lawyers

 4   worst nightmare, being on the rope.

 5                 I want to talk a little bit about Judge

 6   Halloran's --

 7                 THE COURT:  But not necessarily a bad

 8   experience.

 9                 THE WITNESS:  You're right about that, Judge.

10                 THE COURT:  That's right.

11                 MR. MUNRO:  Easy for me to say.

12                 THE COURT:  I've been there.  It's not

13   comfortable --

14                 THE WITNESS:  Yeah.

15                 THE COURT:  -- but it's not a bad experience.

16   BY MR. MUNRO:

17       Q.   I want to talk a little bit about the Judge

18   Halloran decision.  What is your understanding as to what

19   the holding was of that decision?

20       A.   My understanding of the decision was first that he

21   indicated -- or the Court indicated, I should say, that the

22   People, in their case, did not prove their case beyond a

23   reasonable doubt, in the criminal matter.  And that we

24   hadn't -- there was reasonable doubt that existed with

25   respect to the issues of the abandonment of this road and,
```

1    therefore, that is why the conviction was reversed and

2    ultimately dismissed.  That, in a gist -- in a nutshell is

3    pretty much the -- what he said, in a 26-page opinion.

4         Q.    And what is your understanding as to what he said

5    about abandonment, whether the road had been abandoned?

6         A.    He -- he cited a lot of -- actually, he had a lot

7    of facts which, from my reading of the case law, seems to

8    support the concept of just abandonment by law, but he came

9    to a different conclusion as to whether there was abandon --

10   or whether there was abandonment or not.

11        Q.    And what conclusion had you and DEC arrived at, in

12   terms of whether the Jack Rabbit Trail, the Old Mountain

13   Road, had been abandoned?

14        A.    Yeah.  This 3.5 -- this 3.5 mile section of the

15   road, it was, from our observations, that the requirements

16   of Highway Law 205.1 had not been followed, but from reading

17   the case law, okay, that the procedural requirements had not

18   been followed.  However, from reading the case law, there

19   seemed to be, at least across the Appellate Divisions, there

20   seemed to be less concern with the so-called ministerial

21   acts involved in a highway abandonment, in that

22   substantively, all the things that were needed to be there

23   for abandonment existed.

24        Q.    You said that Judge Halloran made some findings of

25   fact that you believe supported abandonment.  Can you be

1   more specific?

2                   MR. NORFOLK:  Objection.

3                   THE COURT:  Overruled.

4        A.   Well, first -- you know, he cited to it in his

5   decision and I used it in the -- in the criminal trial, the

6   earlier trial, he said that the Essex County highway map

7   doesn't show this as a town road.  He cited it in his

8   decision and I put it on in evidence that the Supervisor

9   states that no monies -- Supervisor, Town of Keene, no

10  monies had been used by the town since 1988, when he was in

11  office, to maintain this road.  He cites in his decision and

12  he talks about the fact that there's -- this road, this

13  section of road is not on the town's inventory of road list,

14  which it gets federal and state money for.  Those were some

15  of the things.

16                  He talks about -- you know, he focuses on

17  that there's been private -- a private group has done the

18  maintenance and he talks about a few, a couple anecdotal

19  type of maintenance activities that the town -- excuse me,

20  that the town did in the late '80s and the early '90s, which

21  Mr. Reed sort of spoke about, but, for the most part, the

22  lion's share of all the work was done by the -- has been

23  done by this Adirondack Ski Trail (sic) Council.

24                  He talks about the condition of the road and

25  how -- in which again there were a number of pictures that

1   went into evidence on that, and the finding -- but he talks

2   about how the road -- the trail is narrow, that there's four

3   or five beaver ponds in the middle of this road, you know,

4   how grass and trees have come in, have closed in on the

5   road.

6            And he also talks about how -- whether

7   certainly there's been use of the road, but the majority of

8   the use has been by cross-country skiers and snow shoers and

9   hikers and those things and, yet, you know, what I could

10  find was -- or the way I looked at it was that there were --

11  we had, you know, two, three, four anecdotal situations

12  where somebody had gone up there, quite some time ago, with

13  a -- whether it be a bulldozer or backhoe or a car or

14  whatever it was.  And so he had all of these basically

15  findings in his ruling, which, from my mind, looking at the

16  Appellate Division case law across two, three, four of the

17  Appellate Divisions seemed to suggest those are the things

18  that Courts are looking at in whether there is abandonment.

19           The problem is is he came to -- the Court, in

20  that case, came to an opposite conclusion. But again, I had

21  the -- you know, in that case, I had the burden of proof or

22  the People had the burden of proof of proving the case

23  beyond a reasonable doubt.  And so that's why I -- you know,

24  that's sort of how I looked at the decision.

25           Q.   What is your understanding as to what needs to

1   happen for a road to be abandoned?

2                    THE COURT:  By use or by statute?

3                    MR. MUNRO:  By either.

4        A.   That there's got to be -- by statute, generally

5   speaking, there's got to be non-use for a period of, I

6   believe it's six years.  And then there's got to be a

7   certification, a resolution by the Town Board that that

8   needs to be done.  And when that occurs, under 205.1 of the

9   Highway Law, you have abandonment.

10                   And while it seems like the earlier case law,

11  and I'm talkin' back in the '40s and the '50s and '60s

12  seemed to focus on that, the more recent case law has said

13  we're not -- seems to say we're not lookin' at intent, we're

14  not lookin' at these ministerial actions, we're looking at

15  the substance, is this road really not being used?  And --

16  and I think the cases, you know -- I'm pretty -- I feel --

17  it's not like one or two cases that are like that.  There's

18  several cases that seem to have that same common thread or

19  pattern of reasoning.

20       Q.   Now, when you say "not being used," not being used

21  in what manner?

22       A.   Well, not being -- not being used regularly by

23  motor vehicle -- most of the cases were motor vehicle

24  traffic.  And even most of the cases I looked at, the Daishe

25  case (phonetic) and I think there's a Pless (phonetic) case

1    and Suffolk case, they talk about these anecdotal type of

2    incidents where you have a truck go up there or somethin',

3    but for the long and short of it, that these things -- these

4    are used by pedestrians or they may be used by -- by hunters

5    or fishermen or things of that nature.

6         Q.   Do you recall whether Judge Halloran stated how,

7    in his view, the state -- or what steps the state would have

8    to take to close this road?  And again I'm talking about the

9    three-and-a-half miles, the Jack Rabbit Trail.

10        A.   It seemed like he -- my read of that, it seemed

11   like he's indicated that really the only way that we could

12   close this road was by Highway Law 212, Section 212, which

13   is a statute which basically says that if you have a road

14   that goes through lands on both sides, goes through lands

15   owned by the state or any type of state agency, on both

16   sides, that the Commissioner of that particular agency has

17   the authority to close that road and what we call it in our

18   DEC lingo, we call it 212 order.

19             And he's -- basically what he said was that

20   that's the only way we can -- you can close a road and, you

21   know, we don't -- you know, there's nothing, in my mind,

22   reading the plain text of the statute, or plain meaning of

23   the statute, from the text, that indicates that that's the

24   case at all.

25        Q.   So, is it your position that if DEC can prove that

1    a road is abandoned as you've described it, that DEC does

2    not need to issue a Highway Law 212 closure order?

3        A.   That's correct.

4        Q.   Did you want to appeal Judge Halloran's decision,

5    you personally, Chris Lacombe?

6        A.   I believe that the Judge Halloran's decision was

7    incorrect and I was disappointed by it, but my job isn't

8    necessarily what my personal feelings are.  My job is to

9    provided legal representation for the department.  And

10   getting into the issue of an intermediate Appellate Court,

11   appealing to -- which was the Essex County Court, appealing

12   to the -- appealing to the Court of Appeals, I am not

13   well-versed in that topic, okay, and there were -- there

14   were fair -- and in that law.  And there were -- you know,

15   there was a fair number of people that were not happy with

16   that decision -- within the department that were not happy

17   or were disappointed by that decision.

18               And so, what we did, when we got that ruling

19   of Judge Halloran's, was that myself, Ken Hamm from the

20   central office, and we worked with attorneys from the

21   Environmental Protection Unit at the AG's office and from

22   the Criminal Appeals Unit at the AG's office to look at what

23   our options were, whether we could appeal it.

24       Q.   One second.

25       A.   Sure.

1      Q.    Is it true that the Criminal Appeals Bureau of the

2  Attorney General's office handled the appeal before Judge

3  Halloran?

4      A.    That's correct.

5      Q.    So, after his decision, there were discussions

6  within DEC and between DEC and the Attorney General's

7  office, is that correct?

8      A.    That's correct.

9      Q.    And tell us about those discussions.

10     A.    Well, while there was -- there was a belief that

11 Judge Halloran's decision was incorrect in the sense that

12 his conclusion that the road was -- road was not abandoned

13 and we could prove our case from a reasonable doubt

14 standpoint, the problem was was that under CPL Section

15 490.50, I believe it is, that section deals with how you get

16 your case into the Court of Appeals.

17              And at the end of Judge Halloran's decision,

18 what it says is is that this matter is reversed and the case

19 is dismissed on the facts, on the law and in the interest of

20 justice.  And this statutory section of the CPL basically

21 says -- says that all you can -- all you can appeal on are

22 issues of law.  And while there was some debate about the

23 whole fact -- the dismissing on the facts, the thing that

24 made it -- and the recommendation that we were provided that

25 made it really legally not possible to appeal this matter to

1    the Court of Appeals was that the case had been dismissed in

2    the interest of justice.  And because of that, that

3    recommendation from the criminal appeals unit, the

4    determination was made we're not going to appeal.  And it

5    was a fair amount of disappointment.  That was what the

6    result was, but that was what the law said.

7         Q.   And again, the recommendation was from the

8    Criminal Appeals Unit of the Attorney General's office?

9         A.   Correct.

10        Q.   Do you remember who personally was involved?

11        A.   Yes.  I only talked with these people on the

12   phone, but the -- I believe the -- Robin Forshoff (phonetic)

13   was the person who actually handled the appeal in County

14   Court, was one of their attorneys, and we had a man on it

15   boy the name of Peter Pope (phonetic), I believe is his

16   name, who I believe is the -- maybe the head of that unit,

17   the criminal unit for the Attorney General's office.  I

18   recall him saying, you know, when we were disappointed with

19   the recommendation, words to the effect, "Welcome.  This is

20   the world that we live in," in terms of doing criminal work,

21   criminal appeal work and stuff as a prosecutor.  And anyway,

22   to make a -- to make a long story short, that's who was

23   involved.

24        Q.   So, no appeal was filed, no motion for leave to

25   appeal, no legal proceedings at all in the criminal case

1   after Judge Halloran's decision, is that correct?

2       A.   That's correct.

3       Q.   Let's move to 2005 now, after Mr. McCulley has

4   driven his pickup truck on the three-and-a-half mile section

5   of the Jack Rabbit Trail.  You explained to Mr. Norfolk why

6   the criminal ticket that initially had been issued to

7   Mr. McCulley was withdrawn and that the decision was then

8   made to enforce administratively.  And you mentioned three

9   or four, as I recall, lawyers within DEC's central office.

10   Can you give me those names again?

11       A.   Yeah.  Ken Hamm, who is the attorney for the

12   Bureau of the forest preserve.  Mike Lesser, who is the

13   attorney with our Office of Public Protection, ECOs and

14   Rangers.  Rob Davies, interestingly enough, who is our

15   Division Head for Lands and Forest, also happens to be an

16   attorney.  And we actually had involved in those discussions

17   also attorneys from the AG's office.

18       Q.   Does that include myself?

19       A.   No.  I don't believe you were involved.  No.

20       Q.   And for what period of time, approximately, did

21   these internal discussions go on, both within the DEC's

22   office and then between DEC and AG?

23       A.   Well, the ticket was issued on March 23rd, I think

24   it was, and I appeared in court on June 13th.  That was the

25   return date of the ticket.  So it was about -- that's about

1    a six-week period of time, around six-, seven-week period of

2    time.  And I would say that probably the discussions took

3    place for -- you know, as to how to handle it, you know,

4    took place for about a five-week period of time, and then

5    finally the decision was -- we looked at a lot of options,

6    but finally the decision was made that let's handle the

7    matter administratively.

8        Q.   Okay.  Were others at DEC involved, for example

9    the General Counsel or the Commissioner -- the Commissioner

10   has been sued as a defendant.

11       A.   Yeah.

12       Q.   -- to your knowledge?

13       A.   Well, Stu Buchanan, our regional director, was

14   clearly involved.  Not as hands on as I was, but I would go

15   in and I would certainly make him aware of the situation.

16   If there was an important call, we would discuss -- he would

17   be part of it, but he was involved.  And while there were

18   some other names used, there -- I didn't deal directly with

19   these people, okay.  That's a question you have to ask Ken

20   Hamm, 'cause he was in Albany, I was in Raybrook.

21       Q.   When you say "these people," you mean others --

22       A.   Others in the department, yeah.

23       Q.   And could you give us just an approximate length

24   of time that these discussions took place?  You said five

25   weeks.  But was it a total of an hour, was it a total of

1   five hours, just approximately?

2        A.   I'll -- it probably was, you know, it was

3   probably -- let's say, I don't know -- I'd say total it

4   was -- a lot of communications by e-mail, okay, but the

5   discussions were probably, I don't know, five to ten hours,

6   maybe that.

7        Q.   Is it fair to say in your view that the decision

8   ultimately to proceed administratively was not met lightly?

9        A.   No.  No.

10        Q.   Mr. Norfolk asked you questions about why you

11   proceeded administratively as opposed to criminally.  Is it

12   your understanding that proceeding criminally to enforce

13   against the type of conduct that Mr. McCulley engaged in,

14   driving his pickup truck on a trail, is that the only

15   option, to proceed criminally?

16        A.   No.  I mean, quite often when -- the answer is no.

17   Administratively is -- probably 90 percent of the

18   enforcement matters that come to me are handled

19   administratively, okay.  And I probably -- you know, I

20   probably resolve about 70 to 80 administrative cases a year.

21   So, certainly that -- administratively is a very common way

22   that we deal with, you know, air pollution issue, water

23   pollution, whatever.  It's not as common, okay, it's not as

24   common as matters that come out of our Office of Public

25   Protection, which would be our forest rangers and ECOs,

1   'cause their officers, they write tickets.  And, you know,

2   98 percent of these things I never see, okay.  But there are

3   certain cases that come in, the officer knows that, you

4   know, I'm probably gonna end up in trial on it, or whatever,

5   it's just -- it's gonna, you know, be a tougher case, more

6   difficult case, and usually those are the types of cases I'm

7   gonna get a call on.

8        Q.   When you looked into whether to proceed in this

9   matter administratively, did you find any law or regulation

10  that said, no, we can't handle this type of enforcement

11  proceeding administratively?

12       A.   No.  In fact, you look at 622, part 622 of our

13  regulations, subsection one indicates, you know, sort of the

14  scope.  That's our enforcement mechanism, it's our

15  administrative enforcement proceeding.  Basically says that

16  we can conduct enforcements on any violations of our

17  statutes or our regulations, I'm paraphrasing, but that

18  occur under that enforcement mechanism and that's what we're

19  using here, part 622 of our Code of Rules and Regulations.

20  There is no prohibition that we do it this way.

21       Q.   You've already explained the regulation that DEC

22  staff is relying on in the administrative enforcement

23  proceeding, 196.1 of DEC regulations, is that correct?

24       A.   Correct.

25       Q.   What is the relief that's sought in the

1  administrative complaint?

2       A.   One, a determination that there's been a violation

3  of part 196.1.  Two, a civil penalty, albeit small, okay;

4  and three -- three, that an order that the respondent here,

5  Mr. McCulley, not do this anymore, not drive a motor vehicle

6  in a forest preserve.  That's what we're focusing on.  I

7  think it's what, $100 penalty.  I've got a hundred and a

8  five hundred.  I sort of pled in the alternative.  But, you

9  know, I think the Article 9 penalty provision allows for

10  civil penalty for that particular violation of up to $100.

11       Q.   Okay.  Can you explain briefly how the

12  administrative process works?  There's already been a

13  mention about DEC staff bringing the administrative

14  proceeding.  What does that mean?

15       A.   Well, bringing an enforcement proceeding, what I

16  do is I -- generally what I'll do is I will issue a notice

17  of hearing, sort of something similar to a summons in our

18  world, and a complaint.  At that point, I'll get an answer,

19  okay, and I've got that here.

20       Q.   In other words, Mr. McCulley has answered this

21  particular --

22       A.   That's right.  Okay.  Admit, deny, raise

23  affirmative defenses, et cetera.  And then you go through --

24  there's opportunity for discovery, there's opportunity for

25  motions before an administrative law judge.

1              When you get through that process, you file a

2    notice of readiness and you have an administrative -- the

3    judge will schedule an administrative hearing.  The

4    administrative hearing, more often than not, is usually held

5    in the town or the DEC office closest to where that

6    violation occurred.  And -- alleged violation occurred.  And

7    then you go to put on your case.

8              I have the burden of proof, I have to put on

9    my witnesses, right to cross-examination, defendant gets to

10   put his case on.  We make -- usually we make written

11   argument to the judge.  The judge will then issue a report

12   of findings, recommended report of findings, and that will

13   be then forwarded to the Commissioner.  And she, in this

14   case, would have the right to accept the recommendations of

15   the administrative law judge, not recommend them or modify

16   them in some way.  And once that's done, you can finalize

17   the action, and if the respondent didn't prevail, he or she

18   would have the right to file an Article 78.

19        Q.   If the DEC staff, and in this particular case you

20   and your staff, were not able to prove the allegations in

21   the administrative enforcement complaint, then the DEC

22   Commissioner could rule against you, is that correct?

23        A.   That's correct.

24        Q.   And presumably, there are instances when the DEC

25   Commissioner is not fully agreeing with the reports from the

1   administrative law judges; is that correct?

2       A.   I -- I don't get involved in that.  That's --

3   thankfully, that's never happened to me, okay, in one of my

4   cases.  But I'm sure that -- I suspect that there are some

5   circumstances like that.

6       Q.   Okay.  I wanted to switch for a minute to this

7   State Land Master Plan because there has been some

8   discussion about this, but I would like to get some exhibits

9   to offer them into evidence.

10             MR. MUNRO:  These are on my list, your Honor.

11   And Mr. Norfolk has been given a copy of these reports.

12             THE COURT:  What are the numbers?

13             MR. MUNRO:  They are numbers 7 through 10.

14   BY MR. MUNRO:

15       Q.   Chris, can you take a minute to just look through

16   each of these exhibits?

17             THE COURT:  Is there any objection?

18             MR. NORFOLK:  No, your Honor.

19             THE COURT:  Defendant's Exhibits 7, 8, 9 and

20   10 are received in evidence.

21             (Defendant's Exhibits 7 through 10 received.)

22             (Pause in proceedings.)

23       A.   Okay.

24       Q.   Can you tell us, first of all, what is the State

25   Land Master Plan?

```
 1          A.   Well, it's a plan that DEC is required -- was

 2   required to prepare, in consultation with the Adirondack

 3   Park Agency, and actually the two agencies are required to

 4   work together under Executive Law Section 816.  I believe

 5   back in the early '70s, when the first Master Plan was

 6   prepared, I think the law was Executive Law Section 807.

 7               But what it basically does is it requires

 8   that the directive -- the statute directed that a Master

 9   Plan be developed as a -- and, basically, it takes on the

10   court of law -- in the court of law, as to how the

11   development -- what will be the acceptable development on

12   state lands -- or not development, but uses on state land

13   within the Adirondack Park.

14          Q.   Okay.  Can you take a look at Exhibit 7, please --

15          A.   Yeah.

16          Q.   -- and tell us what that is?

17          A.   Exhibit 7 appears to be the first State Land

18   Master Plan, which was enacted in June 1st of 1972.

19          Q.   Okay.  And please keep explaining the documents to

20   the --

21          A.   And on the second page, there is a letter from

22   then Governor -- well, Governor Rockefeller, at that time,

23   dated July of '72, indicating that -- to the Chairman of the

24   Adirondack Park Agency, indicating that the Governor has

25   approved the State Land Master Plan pursuant to Executive
```

1    Law 807.

2              And, you know, obviously the third page of

3    Defendant's Exhibit 7, I believe it is, yeah, is a table of

4    contents.  And you know, within the State Land Master Plan

5    at that time, you know, there was a half a dozen or so

6    different classifications of property, of lands that the

7    state owns.  And those documents are listed in left-hand

8    column.  Basically wilderness, primitive, canoe, wild

9    forest, intents of use, wild, scenic and recreational rivers

10   and travel corridors.  Those were the different types of

11   classifications.  And if a property got designated within

12   that classification, there were certain requirements that

13   that property or that that state property had to meet and

14   limitations on the use of that property.

15             Going to the next page, which is page, I

16   guess -- well, it's the page with the 8 in the lower

17   left-hand corner, it has the definition of what the

18   wilderness -- what wilderness land is in the -- under the

19   Adirondack State Land Master Plan.  And this happens to be

20   the classification or the designation for the Sentinel

21   Mountain Wilderness area.

22        Q.   Within which the three-and-a-half mile portion of

23   the Jack Rabbit Trail/Old Mountain Road we're talking about

24   is in --

25        A.   That's correct.

1          Q.    -- is that correct?

2          A.    And if you go to the last page of People -- or

3    Defendant's Exhibit 7, you have the excerpt that addresses

4    the Sentinel Range Wilderness area.  And of course, this

5    was -- this particular document was prepared in 1972, and

6    under the Master Plan, there are certain things that --

7    certain things that were existing in those units at that

8    time, or those areas at that time, that were not conforming

9    with the Master -- yeah, with the requirements of the Master

10   Plan.  And because this is a wilderness area, motor vehicle

11   usage is prohibited -- is prohibited.

12               And if you look at the last page of

13   Defendant's Exhibit 7, you'll see that in the Sentinel

14   Range Wilderness, at -- in 1972, there was snow -- one of

15   the nonconforming uses was a snowmobile trail that was

16   3.5 miles.  And there was also a Jeep trail that was point

17   seven miles.  Those were nonconforming uses at that time.

18         Q.    And we don't know whether that reference to the

19   snowmobile trail of three-and-a-half miles is the

20   three-and-a-half mile trail we are talking about now, do we?

21         A.    No.  No, we don't.

22         Q.    But it could be?

23         A.    It could be.

24         Q.    Okay.  Let's move on to the other exhibits and you

25   can skip --

1        A.    Sure.

2        Q.    -- past the cover pages.

3        A.    Yeah.

4        Q.    Just give us the year and the references to the

5    three-and-a-half mile trail.

6        A.    Defendant's Exhibit 8 is the 1979 version of the

7    State Land Master Plan.  From time to time, the legislative

8    enactment indicated that this thing needs to be updated.

9    And the long -- as you go through here, and you get to the

10    fourth or fifth page, where it says "area descriptions and

11    delineations," you get into the wilderness areas again.  And

12    on the following page, or the next to last page of the

13    exhibit, with a 45 in the lower right-hand corner, we deal

14    with the Sentinel Range Wilderness area, okay.  And at that

15    point, you'll see that on the very last page, you'll see the

16    Sentinel -- in the lower left-hand corner, you'll see the

17    Sentinel Range area statistics, and you'll see nonconforming

18    uses, you'll see Jeep trail, 3.5 miles.  But above that --

19        Q.    What page are we talking about?

20        A.    We're -- it's on the last page.

21        Q.    Is there a page number?

22        A.    Of defendants' -- yeah, it's page 46 in the lower

23    left-hand corner, okay?  And in the paragraph above that,

24    okay, it's -- it states "the Jeep trail, which was seven --

25    point seven miles in length has been closed.  There are two

1   tent platforms that have been removed from the area, and the

2   only remaining nonconforming use includes the Old Military

3   Road, a former town road, 3.5 miles in length, which is not

4   generally passable to motorized vehicles but which has not

5   yet been appropriately barricaded as required by the

6   wilderness guidelines."

7       Q.   And is it your understanding that that reference

8   is to the three-and-a-half mile trail that's at issue in

9   this proceeding?

10      A.   Yeah.

11      Q.   Okay.  If we could then move on to the 1987

12  amendment and if you could just go to the page that --

13      A.   Sure.

14      Q.   -- addresses the trail.

15      A.   Yep.  On the fifth page of the document, it's got

16  a number 15 at the bottom.  Actually, I take -- I take that

17  back.  On the last page of the document.  It's got a number

18  51 at the bottom.  Again, we have a wilderness area, we go

19  to the Sentinel range, and in the 1970 -- or 1987 version of

20  this State Land Master Plan, again, we -- under

21  nonconforming uses, we have none.

22              And in the paragraph above that area, on that

23  last page, that says Sentinel Range area statistics, it says

24  "the Jeep trail, point zero seven miles in length, has been

25  closed and two platforms a have been removed from the area.

1    The Old Mountain Road, a former town road, 3.5 miles in

2    length, has been closed and the area now fully conforms to

3    the wilderness standards."

4        Q.    And again, it's your understanding that the

5    reference to the 3.5 mile road is the three-and-a-half mile

6    trail that we have been talking about here?

7        A.    That's correct.

8        Q.    And again, just to move this along, let's move to

9    the last document and a reference to the three-and-a-half

10   mile trail.

11       A.    Yeah.  And again, we -- Defendant's Exhibit 10, I

12   go to the next to last page, it's got 65 at the bottom, that

13   starts the area for the Sentinel Range Wilderness.  And if

14   you -- this is -- this is the Master Plan document for --

15   that was approved in 2001, okay.  And then, for the Sentinel

16   Range area statistics, the nonconforming use is none.  And

17   it basically reiterates, states the same thing in the

18   paragraph above that was in the 1987 Master Plan.

19       Q.    Okay.

20            MR. MUNRO:  Your Honor, I was not able to get

21   complete copies of the Master Plans prior to the 2001, which

22   is the current one.  The Adirondack Park Agency made me

23   copies of the pages that were in evidence, but if you would

24   like, we do have a complete copy of the 2001, the current

25   Master Plan, if you just wanted to see what an entire Master

1   Plan looks like.

2                      THE COURT:  If I need it, I'll let you know.

3                      MR. MUNRO:  Okay.

4                      THE COURT:  Thank you.

5                      MR. NORFOLK:  If I may, I would agree to have

6   it into evidence.  That was one of my things I would like to

7   have in evidence.  I have a copy, too.

8                      MR. MUNRO:  Yeah.

9                      MR. NORFOLK:  I offer it in.

10                     THE COURT:  It's up to you.

11                     MR. NORFOLK:  Okay.

12                     MR. MUNRO:  Well, I'll offer it in as

13  evidence.

14                     THE COURT:  What's the number?

15                     MR. MUNRO:  This will be Number 11,

16  Defendant's Number 11.

17                     THE COURT:  All right.  Received without

18  objection.

19                     (Defendant's Exhibit 11 received.)

20  BY MR. MUNRO:

21      Q.   I just have a few more questions.

22      A.   Okay.

23      Q.   Chris, do you believe that the DEC enforcement

24  process, as you've described it, will be biased against

25  Mr. McCulley?

1        A.    No.

2        Q.    In your view, did DEC decide to file an

3    administrative enforcement complaint against Mr. McCulley to

4    retaliate against him in any manner?

5        A.    No.

6        Q.    Did they decide to file an administrative

7    enforcement complaint to restrain his First Amendment right

8    of freedom of speech or expression?

9        A.    No.   No.

10       Q.    Did they do so to seek to harass him?

11       A.    No.

12       Q.    Did they file an administrative enforcement

13   complaint to seek to oppress or punish him?

14       A.    No.   I mean, certainly there's a penalty that we

15   are seeking, which has a punitive aspect to it in the

16   hearing, if we prove our case.   But the whole purpose of it

17   is not to punish him or retaliate against him.

18       Q.    Thanks for that clarification.

19       A.    Okay.

20       Q.    Do you believe that the regulation upon which

21   DEC's enforcement proceeding's based, 196.1, to be legally

22   valid?

23                  MR. NORFOLK:   Object.

24                  THE COURT:   Overruled.

25       A.    Yes.   I think that the -- it was properly

1    promulgated and, you know, the case law that I've reviewed

2    on it, the Court of Appeals level, I mean, I'm speaking

3    generally, is administrative regulations, promulgated by

4    agencies, that are consistent with the purpose of the

5    statute that authorizes the promulgation, are legal.

6              In this case, I mean, purposely, one of the

7    major purposes in Article 1 of the Environmental

8    Conservation Law is the protection of the forest preserves

9    and in Article 9 is protection of forest preserve and

10   clearly 196.1, dealing with motor vehicles, the purpose of

11   that regulation is to protect the forest preserve.  I think

12   there's a rational basis for that.

13        Q.   To your knowledge, did DEC commence its

14   administrative enforcement action based on the request or

15   the wishes of any environmental group?

16        A.   No.

17        Q.   Based on the requests or the wishes of the

18   Adirondack Ski Touring Council?

19        A.   No.

20        Q.   Any other outside group?

21        A.   No.

22        Q.   Do you believe that DEC is selectively prosecuting

23   its regulations against Mr. McCulley?

24        A.   No, it's not.

25        Q.   Do you believe that DEC is seeking to violate his

1   due process rights?

2        A.   No.

3        Q.   Do you believe that DEC is seeking to violate his

4   right to equal protection under the laws?

5        A.   No, I don't.

6                    MR. MUNRO:   Thank you.   I have nothing

7   further, your Honor.

8                    THE COURT:   Any redirect?

9                    MR. NORFOLK:   I do, Judge.   But do you have

10   to leave?

11                   THE COURT:   No.

12                   MR. NORFOLK:   Remember yesterday --

13                   THE COURT:   Go ahead.

14                   MR. NORFOLK:   Just go ahead?

15   REDIRECT-EXAMINATION

16   BY MR. NORFOLK:

17        Q.   You discussed, Mr. Lacombe, on cross-examination,

18   Highway Law 212?

19        A.   Yeah.

20        Q.   Has the DEC taken any steps to abandon the Old

21   Mountain Road in terms of Highway Law 212?

22        A.   No.  At this point, no.

23        Q.   Are you aware of any -- a letter which was put

24   into evidence from the DEC to one of the towns, either

25   Town of Keene or Town of North Elba, concerning Highway

1  Law 212?

2      A.   Let me see it.

3              MR. NORFOLK:  It's Plaintiff's Exhibit 2,

4  your Honor.  It was put into evidence.

5              MR. MUNRO:  Can you just describe what that

6  exhibit is?

7              THE WITNESS:  Want me to?

8              MR. MUNRO:  Yeah.

9              THE WITNESS:  Plaintiff's Exhibit 2 is a

10  letter dated March 1, 1978, from Phil Capone, Phillip

11  Capone, our acting regional forester, to Robert Purdy, who

12  was the Supervisor of the Town of Keene.

13  BY MR. NORFOLK:

14      Q.   And what's -- tell the Court what's on the back

15  (unintelligible).

16      A.   It's a two-page exhibit.  And the second page

17  is -- would appear to be some type of description that was

18  prepared and it's entitled -- it's entitled "Old Mountain

19  Road," and it appears to be a description of the road.

20              THE COURT:  What do you want to ask him about

21  this document?

22      Q.   Okay.  I ask you to read the last paragraph.  I am

23  gonna ask you if you agree with that statement, the last

24  paragraph.  You can read it outloud, I'm sorry.

25      A.   It states -- all right.  Presumably Mr. Capone

1    stated, "DEC requests" --

2        Q.   I'm sorry, the last -- second to the last.

3        A.   Okay.  Again, he requests "abandonment can be

4    accomplished by the town through Section 205 of the Highway

5    Law, or since the land on both sides of the road is state

6    land and the road terminates on state land, the state can

7    initiate abandonment pursuant to Section 212 of the Highway

8    Law."

9        Q.   Do you agree with that statement?

10       A.   That -- those would be certainly two options, yes.

11       Q.   Okay.  Again, DEC, they did not take any steps for

12   212 abandonment, correct?

13       A.   No.

14       Q.   To abandon the Old Mountain Road.

15            You also mentioned that a town road can be

16   closed by a town, you said you did some kind of

17   certification filing, is that correct, to close the road?

18       A.   Well, I mean, there's -- under 205, I mean,

19   there's a process that you can go through to close a road.

20       Q.   And you -- I think you testified on

21   cross-examination that part of that is filing some kind of

22   certificate?

23       A.   I mean -- my recollection, you gotta go through --

24   you've got to go through a resolution, public hearing notice

25   and so on and so forth, and I think probably at the end of

 1   that, some type of resolution or certification of

 2   abandonment.

 3        Q.   Does that have to be filed with the state or

 4   something?

 5        A.   I would have to --

 6        Q.   Your understanding?

 7        A.   My recollection -- I'd have to read the statute

 8   closely again.  But, generally speaking, that's the process,

 9   and I assume it probably has to be filed with somebody, but

10   I'm not sure who that is with.

11        Q.   Do you know if the Town of Keene and/or the Town

12   of North Elba have taken any steps to pass a resolution

13   certification to close the road and file it with the state

14   or any other agency?

15        A.   Well, I mean, I became aware, sometime in June of

16   this year, okay, June of this year, 2005, that apparently

17   the Town of Keene did a qualified abandonment of the Old

18   Mountain Road.

19        Q.   Within their read?

20        A.   Yeah, within their section.

21        Q.   And that was June of this year, 2005?

22        A.   I think that was it, yeah.

23        Q.   Okay.  You mentioned that -- in testimony on

24   cross-examination that you don't -- it's not as common that

25   you would do administrative proceedings for, I think you

1    mentioned enforcement type -- you used a special term,

2    enforcement type of allegations, maybe like motorized

3    vehicles in a forest preserve?  Is that one of these that

4    would fit into that category?

5         A.   I -- I don't know how to say -- it's not that

6    uncommon -- it's not that common for me to do administrative

7    enforcement cases or to represent our ECOs in law

8    enforcement -- in cases, okay.

9         Q.   Um-hum.

10        A.   The vast majority of my cases come from our

11   technical staff members, our engineers and our biologists.

12   However, I am a regional attorney for the entire region and

13   there are certain cases, okay, that do come in where the ECO

14   or the ranger has requested assistance and I'll go through

15   the process if I'm giving 'em that assistance.

16        Q.   Right.

17        A.   Okay.

18        Q.   I understand.  Okay.  You do a FOIL response -- I

19   say you, department generated some printouts of violations

20   regarding 196, part 196, and -- 196.1 and 196.2, which are

21   operating a snowmobile in the forest preserve, which I think

22   is 196.2, and operator a truck on the foster preserve which

23   is 196.1?

24        A.   Yep.

25        Q.   Now, this goes to something you were commenting on

1   on cross-examination.

2              MR. NORFOLK:  And I would ask that I have

3   these put into evidence, Plaintiff's Exhibit Number 85, they

4   are two different (unintelligible), 196.1 --

5              THE COURT:  What's the old number?

6              MR. NORFOLK:  I have 'em separately --

7   they're both 2 and 3, but I have 'em as one exhibit, 'cause

8   they're relatively the same, but Number 2 and 3 on the first

9   page of the exhibits list.

10             MR. MUNRO:  These are DEC records?

11             MR. NORFOLK:  That's correct.

12             THE COURT:  Any objection?

13             MR. MUNRO:  No, your Honor.

14             THE COURT:  Plaintiff's Exhibit 85 is

15   received in evidence.

16             (Plaintiff's Exhibit 85 received.)

17   BY MR. NORFOLK:

18       Q.   You've seen these before, correct?

19       A.   Yes, I have.

20       Q.   Okay.  How long have you been a regional attorney

21   at DEC?

22       A.   Since November --

23             THE COURT:  It's already in the record.

24       Q.   I know.  All right.  Okay.

25       A.   Nine years.

1        Q.    Thank you.  I -- the reason I --

2              THE COURT:  Don't give us -- just ask your

3    question.

4        Q.    Okay.  Now for nine years, how many times in your

5    nine years have you prosecuted a violation of part 196 in

6    administrative proceeding?

7        A.    Certainly at a hearing, my answer would be zero,

8    okay.  I -- I'm not sure -- I've done a few -- well, my

9    answer would be zero.  I've done a few -- I think I've done

10   a few administrative cases involving motor vehicles which

11   have resolved through a consent order.

12       Q.    Through part 196?

13       A.    Probably not --

14       Q.    Okay.

15       A.    -- okay.  But there's two or three different

16   regulations or statues that you can deal with motor vehicles

17   on, and -- on forest preserve and this would be -- I can't

18   say -- I haven't done any administrative enforcement

19   hearings under 196.1.

20       Q.    Okay.  Can I ask you to read to the Court what

21   this first page of Plaintiff's Exhibit Number 85 is?

22       A.    Okay.

23       Q.    (Unintelligible.)

24       A.    Okay.  This is a -- the first page of Plaintiff's

25   Exhibit 85 is a computer-generated document that I requested

1   from our Office of Public Protection in Albany.  It only

2   involves --

3                 THE COURT:  What's it say?

4                 THE WITNESS:  I'm sorry.  It's basically --

5   it states that -- it provides a statistical number of ECATs

6   issued for violations of 196.1 and how they were disposed,

7   okay.  And the number of ECATs issued for that violation --

8   let me back up.  And this is by our Environmental

9   Conservation Officers in Region 5, the eight county region

10  of Region 5.

11                THE COURT:  For what period of time?

12                THE WITNESS:  From 19 -- it's actually been

13  knocked out here with a hole punch, but I think it was

14  January 1, 1988, until November 30, 2005.  Okay?  And again,

15  this is only law enforcement, not our rangers.

16      Q.   So there could be more?

17      A.   Well, I gave you --

18                THE COURT:  What does it say?

19                THE WITNESS:  Okay.  All right.  It says

20  130 -- excuse me, a hundred sixty ECATs were issued, a

21  hundred thirty-seven of them were disposed of, a hundred and

22  twenty three of 'em resulted in convictions, one was

23  forwarded -- I'm not sure what that means.  Okay.  The

24  conviction rate was 90.51 percent and the amount of fines

25  that were covered was $5,225 and the jail sentences were

1    zero days.

2         Q.    How many (unintelligible) prosecuted

3    administratively?

4         A.    These -- none of these.  These would have been

5    done in Justice Court, I assume.

6         Q.    Okay.  (Unintelligible) of Plaintiff's Exhibit --

7         A.    Yeah.

8         Q.    Same thing if --

9         A.    Yeah.  The second page is for the same period of

10   time, for the same region, for violations of 196.2.  All

11   right?

12        Q.    Um-hum.

13        A.    And there have been 42 ECATs issued, 40 disposed

14   of, zero forwarded, 35 convictions, a conviction rate of

15   89.74 percent and $1,640 in fines or penalties and zero

16   sentenced days, jail sentence days.

17        Q.    (Unintelligible)?

18        A.    None, because this is criminal.

19              MR. NORFOLK:  I would like to offer into

20   evidence Plaintiff's Exhibit Number 65, which is Number 4 on

21   the exhibits list and what this is -- well.

22              MR. MUNRO:  It's another DEC document, right?

23              MR. NORFOLK:  Yeah.

24              THE COURT:  Any objection?

25              MR. MUNRO:  No, your Honor.

1                    THE COURT:  Plaintiff's Exhibit 65 is

2      received in evidence.

3                    (Plaintiff's Exhibit 65 received.)

4      BY MR. NORFOLK:

5           Q.   Now I want, just to clarify for the Court, I would

6      like to ask you one question and say what that is and I will

7      put it over here.

8           A.   This is -- this is the -- a more detailed

9      report that was generated in response to a FOIL request you

10     made for the tickets written from January 1, 1988, to

11     December 31, 2005, of all -- the tickets written in Region 5

12     for violations of 196.1, 196.2, by both our ECOs and our

13     forest rangers.  Okay?  All right.

14          Q.   That's all I (unintelligible).

15          A.   Okay.

16          Q.   On cross-examination, you testified that there was

17     certain individuals from the DEC who would discuss how to

18     proceed, whether administratively or not --

19          A.   Yeah.

20          Q.   -- with Mr. McCulley's latest charge in '05,

21     and -- is that correct?

22          A.   Yeah, that's true.

23          Q.   Okay.  And a question came from Commissioner

24     Crotty or Commissioner -- I think was, I believe, Sheehan in

25     '05, correct?

1       A.    Right now, we have Commissioner Sheehan.   We --

2   I'm not sure the exact date she left, but Commissioner

3   Crotty, I think, left sometime in the spring of 2005.   I'm

4   not sure of the exact date.   I never have had discussions

5   with either of them about this case.

6       Q.    Okay.   But is it safe to say they supervised and

7   overlooked yourself, Mr. Buchanan and Robert Davies?   Is it

8   Robert Davies?

9       A.    I report and I work for Stu Buchanan, the regional

10  director.   That is who I report to in our thing.   You could

11  say that maybe I -- well, the Commissioner is the

12  Commissioner.

13      Q.    Right.

14      A.    But in my chain of command, the person I report to

15  is Stu Buchanan.

16      Q.    Okay.   Does Stu Buchanan, does he report to the

17  Commissioners?

18      A.    Yes.

19      Q.    And answers to the Commissioners if and when

20  necessary?

21      A.    Yeah.

22      Q.    Okay.   Going to -- you discussed the process of

23  the administrative enforcement proceeding and what's

24  involved in it.   The administrative judge, how is he or she

25  picked?

1        A.    There is a separate office in the Department of

2   Environmental Conservation that is called our Office of

3   Hearings and Mediation, and there's probably 10

4   Administrative Law Judges in that office.  They are separate

5   and apart from our -- from our people -- or excuse me, the

6   department staff.  And they -- you know, we're not supposed

7   to have ex parte communications with 'em and they're a

8   separate thing.  They preside as the administrative judge in

9   the case.

10       Q.    Okay.  And are they DEC employees?

11       A.    Yes.

12       Q.    Are they paid by the state?

13       A.    Yes.

14       Q.    In the administrative proceeding, is it mandatory

15  or guaranteed that the defendant, or the respondent, will

16  have an opportunity to discovery under the rules?

17       A.    Yes.  In fact, the rules of the CPLR --CPLR apply.

18       Q.    Doesn't the respondent have to make a motion first

19  or request for discovery before discovery is allowed in an

20  administrative proceeding?

21       A.    I'd have to look at -- I don't think that's the

22  case, but I'd have to look specifically at the regulation.

23       Q.    Under the rules and regulations encompassing

24  your -- this administrative proceeding that's involved

25  here --

1      A.    Right.

2      Q.    -- (unintelligible), is Mr. McCulley to bring each

3    and every claim he has brought in this federal claim in that

4    administrative proceeding?

5      A.    The administrative proceeding would be an

6    administrative prosecution of a violation of 196.1 of the

7    Code of Rules and Regulations.  You have, in -- Mr. McCulley

8    has, in his answer, raised a number of affirmative defenses.

9    And in my mind, those are -- those would be fair game in an

10   administrative hearing.  I'm gonna have to deal with 'em.

11     Q.    But they're not claims, correct, causes of action;

12   they're defenses?

13     A.    That's correct.

14     Q.    Can Mr. McCulley or any respondent in this

15   administrative proceeding or anything like it now state --

16   seek injunctive relief, monetary relief, equitable relief in

17   this administrative proceeding, seek it -- but let me add on

18   to that, if you don't mind, and actually obtain it to some

19   kind of adjudication at this administrative proceeding?

20     A.    I suppose on a discovery type of issue, if he made

21   a motion to the judge, the judge could order us to do

22   certain things.

23     Q.    (Unintelligible)?

24     A.    Yeah.  I mean there's a lot of different types

25   of --

1      Q.   Relief.  Bad question.

2      A.   Okay.

3      Q.   Can he seek and obtain through adjudication at

4  this administrative proceeding exact same damages that he

5  has sought at this federal court proceeding?

6      A.   In the administrative proceeding -- damages, no,

7  he wouldn't be able to collect damages.

8      Q.   Damages, the relief he's requesting here?

9      A.   Well, I mean, penalties or attorneys fees, no, I

10  don't think he would be -- no, he wouldn't be able to get

11  that at an administrative proceeding.

12            MR. NORFOLK:  I have a copy, Judge, of what

13  was just entered into evidence, the State Master Plan.  I

14  would like to read off myself so that you could give

15  Mr. Lacombe the -- your exhibit.

16            MR. MUNRO:  The only other copy I have --

17            THE COURT:  Miss Mezoff has it.  It's in

18  evidence.

19            MR. NORFOLK:  Okay.  So, we'll do

20  (unintelligible).

21            MR. MUNRO:  Well, here, you can --

22      A.   Here, give me...

23            (Pause in proceedings.)

24      Q.   Now, if you could turn to the page of

25  wilderness -- Sentinel Range Wilderness area, I think that's

1   on page --

2                    MR. MUNRO:  68.

3                    MR. NORFOLK:  Thank you.

4                    MR. MUNRO:  Around there.

5                    MR. NORFOLK:  I have 65.

6        A.    Okay.  Sentinel Mountain Wilderness area.  Yep,

7   here we are.

8        Q.    You've already gone through --

9                    THE COURT:  What's your question?

10       Q.    The former road, town road, has been closed since

11  1987 according to the Master Plan?

12       A.    Yeah.  Yeah.

13       Q.    The Old Mountain Road has been closed, according

14  to the Master Plan --

15       A.    That's what the Master Plan states, yes.

16       Q.    Why did the DEC consider the road to be -- the Old

17  Mountain Road to be a town highway under the jurisdiction of

18  the town after '87?

19       A.    The first nine-tenths of a mile in North Elba is a

20  town highway.  It's the 3.5 miles from the turn-around to

21  the Rockin' River down in Keene that's not town road.

22       Q.    Okay.  But there is -- there's in evidence --

23  did you hear that there was letters been in evidence

24  regarding activities in the Town of Keene on the Old

25  Mountain Road?

 1          A.    I don't know if I understand the question.

 2                    (Pause in proceedings.)

 3     BY MR. NORFOLK:

 4          Q.    (Unintelligible).  According to the State Master

 5     Plan, the wilderness area is supposed to have no

 6     nonconforming uses, is that correct?

 7          A.    Yes.  But -- but, you know, that's what the goal

 8     is, okay.  That's what the law says.  But -- and I can't

 9     tell you about every wilderness area, but I would imagine

10     there may still be some wilderness areas --

11                    THE COURT:  I think you've answered the

12     question.

13                    THE WITNESS:  Okay.  All right.

14     BY MR. NORFOLK:

15          Q.    You know the Bartlett Road?

16          A.    I have never heard of it.

17                    THE COURT:  What does the Bartlett Road have

18     to do with this case?

19                    MR. NORFOLK:  It's nonconforming use in the

20     Sentinel Wilderness area.

21                    THE COURT:  Is it somehow connected to the

22     Old Mountain Road?

23                    MR. NORFOLK:  It's not connected physically.

24                    THE COURT:  Move on.

25     BY MR. NORFOLK:

1        Q.    Can you go to page 18, please?  I direct you to

2   number 29.

3        A.    Yeah.

4        Q.    And I just ask if you could read that to the Court

5   (unintelligible) and then I will have one question for you.

6        A.    Yeah.  Under the definition sections, of the plan,

7   I guess, the -- number 29 defines what a road is.  And --

8   the (unintelligible) definition.  But "road, an improved or

9   partially improved way designed for travel by automobiles

10  and which may be also used by other types of motor vehicles,

11  except snowmobiles, unless the way is designated -- is a

12  designated snow trail and is, one, either maintained by

13  state agency or local Government and open to the general

14  public; two, maintained by private persons or corporations,

15  primarily for private use but which may also be open to the

16  general public for all or a segment thereof; or, three,

17  maintained by Department of Environmental Conservation or

18  other state agency and open to the public on a discretionary

19  basis."

20       Q.    Thanks.  In the definition of wilderness, as you

21  understand it, is there -- are roads allowed to be included

22  in that area?

23       A.    I think -- I think it occurs, but I'm not sure I

24  know the answer to that question.

25       Q.    (Unintelligible).  The -- you were referring to --

1    I think you referred to CPL 490.50?

2        A.   I think that's the section.

3        Q.   Yeah.

4        A.   Yeah.

5        Q.   It's correctly stated CPL 450.90 --

6        A.   Okay, all right.

7        Q.   -- that refers to (unintelligible) appeal to the

8    Court of Appeals as an intermediate Appellate Court?

9        A.   Yeah.

10       Q.   Did you ever take the chance to read that section?

11       A.   Yeah, I have.

12       Q.   Okay.  In that section, does it state that the

13   would be appellant must make the decision or that the Court

14   of Appeals of the State of New York makes the determination

15   of whether to accept an appeal or not?

16       A.   Well, I think the way -- I think -- I'd have to

17   read it again.

18       Q.   Okay.

19       A.   Okay?

20       Q.   Now, I asked -- did you do any research with

21   respect to any court case law or -- that would interpret

22   450.90?

23       A.   I -- no, I didn't.  I relied upon the advice of

24   the criminal unit of the AG's office.

25                    MR. NORFOLK:  Okay.  I would just ask if I

1    could have the Court take judicial notice of CPL 450.90.

2                    THE COURT:  Yes.

3                    MR. NORFOLK:  In particular, 2, sub A.

4    BY MR. NORFOLK:

5        Q.   Are you aware of any case law which states that a

6    Court of Appeals case may look beyond the forum of an

7    Appellate decision of an intermediate area court to

8    determine whether or not to accept an appeal?

9        A.   Yeah.  I'm not aware of any case law either way.

10       Q.   So you wouldn't -- okay.

11                   MR. NORFOLK:  I don't have any further

12   questions.

13                   THE COURT:  Any recross?

14                   MR. MUNRO:  No, your Honor.

15                   THE COURT:  Mr. Lacombe, I have a couple

16   questions.

17                   THE WITNESS:  Sure.

18                   THE COURT:  Is your position in the

19   administrative hearing that the Old Mountain Road, the

20   section in question here, was created by statute or by use?

21                   THE WITNESS:  It will be a use.  Do you want

22   any more than that?

23                   THE COURT:  No.

24                   THE WITNESS:  Okay.

25                   THE COURT:  When was -- when do you say the

1   section of the Old Mountain Road in the Town of Keene was

2   abandoned?

3                   THE WITNESS:  In -- in the '70s or '80s.  I

4   mean, it was a progressive thing because of just the lack of

5   maintenance and use, so on.  But, clearly, the '87 Master

6   Plan, you know, indicates that it was closed at that point.

7   And that has the effect of law.

8                   THE COURT:  Prior to 1987 then or in 1987?

9                   THE WITNESS:  Yeah.

10                  THE COURT:  And with respect to the Town of

11  North Elba, same answer?

12                  THE WITNESS:  Yeah.

13                  (Pause in proceedings.)

14                  THE COURT:  Is the administrative proceeding

15  on the record?

16                  THE WITNESS:  Yes.

17                  THE COURT:  And finally, how many proceedings

18  in Town Court for the prosecution of tickets have you

19  handled?

20                  THE WITNESS:  In my position with DEC?

21                  THE COURT:  Yes.

22                  THE WITNESS:  Full trials or pleas or --

23                  THE COURT:  Anything.

24                  THE WITNESS:  Probably ten to twenty.

25                  THE COURT:  Thank you.  You may step down.

1                    THE WITNESS:  Yep.

2                    THE COURT:  We stand in recess until 2:30.

3                    MR. NORFOLK:  Thank you, your Honor.

4                    MR. MUNRO:  Thank you, your Honor.

5                    (Witness was excused.)

6                    (Lunch recess taken at 1:00 PM.)

7                    (Court reconvened at 2:48 PM.)

8                    THE COURT:  Call your next witness, please.

9                    MR. NORFOLK:  (Unintelligible).

10                   THE COURT:  Plaintiff rests?

11                   MR. NORFOLK:  Before I rest, just a couple

12   housekeeping matters.  I was gonna call Gabrielle Dunn, who

13   is Gabrielle Demarco, I understand today, but there won't

14   be -- will be no need to call her.  It's my understanding

15   from talking to Mr. Munro that the defendants stipulate to

16   the first statements made in that article which was received

17   as Plaintiff's Exhibit 69 as being true and accurate.

18                   THE COURT:  Is that in evidence?

19                   MR. NORFOLK:  Yes, it is.

20                   THE COURT:  Okay.

21                   MR. MUNRO:  That's right, your Honor.  She's

22   a DEC press officer.

23                   MR. NORFOLK:  So, with that, I am gonna put

24   this over here.  The only other housekeeping matter I have

25   is I was straightening up the mess here for the other people

1  to come in and I'm missing -- we are missing, the Court is

2  missing Plaintiff's Exhibit Number 85, which was those

3  copies of the printouts of ECATs, how many were prosecuted

4  and how many were --

5              THE COURT:  Right.

6              MR. NORFOLK:  And such.  I have a copy.  I

7  think someone probably just inadvertently walked off with

8  'em.

9              THE COURT:  Well, Mr. Lacombe is probably the

10  chief suspect here.

11             MR. MUNRO:  Could be, and I understand he

12  will be back.

13             THE COURT:  Okay.

14             MR. NORFOLK:  Okay.  Do you want to wait?

15  And if not, I have copies here.

16             THE COURT:  I don't want to delay anything

17  here.  We can get -- we will find 'em.

18             MR. NORFOLK:  Okay.  With that, the people --

19  plaintiff rests its case.

20             THE COURT:  All right.

21             MR. MUNRO:  Your Honor, at this point, I'd

22  like to make a motion for judgment as a matter of law.  I

23  don't believe that the plaintiff has met his burden under

24  the controlling case law to establish bad faith or

25  harassment or other extraordinary circumstances.

```
 1                   THE COURT:  All right.  I'm not sure, in a
 2      hearing like this, if a motion like that is appropriate.
 3      I'll take the motion so that you preserve the record for
 4      whatever you need to do, but I'll deny the motion at this
 5      time.
 6                   All right.  Case is now with the defense.
 7                   MR. MUNRO:  We have two witnesses, your
 8      Honor.
 9                   THE COURT:  All right.
10                   MR. MUNRO:  The first is Kenneth Hamm.
11                   THE COURT:  Please come forward.
12                   THE CLERK:  Sir, if you'll step right up
13      here.  Can I have your name, please?
14                   THE WITNESS:  Kenneth Hamm, H-A-M-M.
15                   THE CLERK:  And what's your middle initial?
16                   THE WITNESS:  R.
17                   THE CLERK:  Raise your right hand.
18                   (Witness duly sworn.)
19                   THE CLERK:  This is Kenneth Hamm, H-A-M-M.
20                          - - - - -
21
22
23
24
25
```

1                 K E N N E T H    R.        H A M M,

2    having been called as a witness, being duly sworn,

3    testified as follows:

4    DIRECT EXAMINATION

5    BY MR. MUNRO:

6         Q.   Mr. Hamm, could you tell us who you are?  I know

7    your a lawyer with DEC, but beyond that.

8         A.   I am an associate attorney with the Department of

9    Environmental Conservation in the Division of Legal Affairs.

10        Q.   And what are your responsibilities in that

11   position?

12        A.   Currently, I'm a bureau chief.  I supervise four

13   attorneys.  We have responsibilities for real property,

14   lands and forests, solid waste and contracts, and I'm also

15   the program attorney for the Division of Solid Waste.  I

16   work specifically on forest preserve issues.

17             MR. NORFOLK:  Excuse me, Judge, I'm sorry --

18   I think there's a witness that's not on the witness list for

19   the defendants (unintelligible).

20             MR. MUNRO:  Oh, I'm sorry.  That's right.

21   I'm sorry.  No problem.  Very sorry about that.

22             THE COURT:  All right.  Thank you.  You may

23   proceed.

24   BY MR. MUNRO:

25        Q.   And prior to -- how long have you had that

1   position?

2        A.    I began work with the Department of Environmental

3   Conservation in July of 1990, initially began as a solid

4   waste attorney, worked in that position for approximately

5   three years, then began working as a program attorney to the

6   Division of Lands and Forests.  Did that for a couple years

7   and then started to work on legal issues related to

8   implementation of the 1996 Clean Air Clean Water Bond Act.

9   Worked in that position for a couple years.  When legal

10  issues related to the Bond Act started to wind down, I went

11  back and worked again for the Division of Legal Affairs and

12  for the last three years, in addition to my supervisory

13  responsibilities, I've worked almost exclusively on forest

14  preserve issues.

15       Q.    And when were you admitted to practice law in the

16  State of New York?

17       A.    I was admitted in 1976.

18       Q.    And can you describe what it means to be legal

19  counsel to the division of lands and forests?  What are your

20  day-to-day responsibilities?

21       A.    I respond to day-to-day legal questions that arise

22  from the management of state forest preserve land.  The

23  questions come in from staff members of the division of

24  lands and forests, the division director, the Governor's

25  office, the Commissioner, the General Counsel, and also some

1    inquiries that come in from the public.

2        Q.   Let's go to 2005.  You're aware that Mr. McCulley

3    drove a pickup truck on the -- what the state refers to as

4    the Jack Rabbit Trail, plaintiffs refer to as the Old

5    Mountain Road.  You're aware that occurred?

6        A.   Yes, I am.

7        Q.   And at some point, a criminal ticket that had been

8    issued was withdrawn by DEC; is that correct?

9        A.   Yes, that's correct.

10        Q.   And were you involved in that decision to withdraw

11    the criminal ticket?

12        A.   Yes, I was.

13        Q.   And tell us about your involvement in that

14    decision?

15        A.   Well, as the program attorney for the Division of

16    Lands and Forests, I knew that this issue was going on in

17    the region.  And this was a significant issue for Lands and

18    Forests because there are innumerable old town highways that

19    cross forest preserve land.  And if the earlier case, the

20    earlier McCulley case regarding his use of a snowmobile

21    trip -- snowmobile on the Jack Rabbit Trail were to be seen

22    as precedent by other people around the state, that would

23    have a very significant impact on the department's

24    administration of forest preserve land.

25               So, the regional staff was in touch with me,

1    they told me that the ticket had been issued.  I did not

2    know the ticket was going to be issued ahead of time, the

3    criminal ticket.  After the ticket was issued, there was a

4    significant amount of discussion in the central office with

5    the region about how best to pursue the issue of whether the

6    Old Mountain Road remained a town highway or not.

7                   I had discussions with a number of attorneys,

8    both in the central office and an attorney in the Attorney

9    General's office.  We discussed the variety of options on

10    what the best way to proceed was, and we decided at that

11    point that we needed to get this issue in a civil court and

12    have a determination on whether this road, this old road was

13    abandoned or not.

14        Q.   And what was the specific reason for deciding not

15    to continue criminally?

16        A.   We decided that if we had pursued it criminally,

17    if he were convicted again in Justice Court, the case would

18    probably be appealed to the same County Court who had

19    earlier ruled against us.

20        Q.   So the option then was to proceed

21    administratively, is that correct?

22        A.   That's correct.

23        Q.   And who was involved in that decision, besides

24    yourself?

25        A.   I had discussions with regional attorney Chris

1   Lacombe, the regional director Stu Buchanan, Rob Davies, the

2   director of the Division of Lands and Forests, Jim Ferrara

3   (phonetic) the General Counsel for the department, Mike

4   Lesser, another attorney in the department, in the Division

5   of Environmental Enforcement.

6        Q.   And just approximately, over how many hours did

7   these various discussions take?  Was it one hour, five

8   hours, ten hours?

9        A.   It's somewhat difficult to quantify because the

10  discussions took place over a number of weeks.  I would

11  guess that I spent probably 15 hours on the matter.

12       Q.   Now, let's move backwards in time for a minute.

13  You're aware that Judge Halloran had issued a decision, you

14  mentioned that, is that correct?

15       A.   Yes.

16       Q.   And that decision was adverse to the People of the

17  State of New York?

18       A.   Yes.

19       Q.   What is your understanding as to what -- how he

20  ruled in that case?

21       A.   Well, his -- what he actually ordered was that the

22  criminal ticket was dismissed on the law, on the facts, and

23  in the interest of justice.

24       Q.   And we understand that the state did not appeal

25  from that decision.  Were you involved in the decision to

1    not appeal Judge Halloran's decision?

2         A.    Yes, I was.  We had conversations with the

3    criminal division in the Attorney General's office which

4    would represent the department in an appeal.  The department

5    wanted very much to appeal the case, but we were told by two

6    attorneys in the criminal division at the Attorney General's

7    office that because of the way the decision was crafted by

8    the County Court, we were not able to appeal it.

9         Q.    And so no appeal was taken?

10        A.    And so no appeal was taken, yes.

11        Q.    Let's talk some more about Judge Halloran's

12   decision.  Am I correct in saying you thought that decision

13   was erroneous?

14        A.    Yes.

15        Q.    Could you tell us why?

16        A.    He found, basically, that the Old Mountain Road,

17   which we refer to as the Jack Rabbit Trail, was not

18   abandoned as a matter of law.  And I believed, in reading

19   the decision, looking at the cases that he cited, and also

20   applying my own knowledge on road abandonment, that he was

21   mistaken in finding that the existence of some pedestrians

22   and cross-country skiers on that trail preserved it as a

23   town highway and prevented abandonment from occurring.

24        Q.    And what is your understanding as to what the case

25   law says?

1      A.   My understanding of the case law is that the --

2   for a road to be abandoned, it must not be traveled as a

3   public highway for six or more years.

4      Q.   Did Judge Halloran address the issue of creation

5   of a road by statute as opposed to road by use?

6              MR. NORFOLK:   I'm gonna object.   My specific

7   objection, the case law (unintelligible).

8              THE COURT:   Overruled.

9      Q.   Do you want me to repeat the question?

10     A.   Yes, repeat the question, please.

11     Q.   Did Judge Halloran address the issue of the

12   difference between a road created by -- this particular road

13   created by statute as opposed to by use?

14     A.   Yes.   Judge Halloran found that the road was

15   created by statute.

16     Q.   And what is your understanding as to how he

17   reached that conclusion?

18     A.   He looked at three old statutes at the beginning

19   of -- in the early 1800s, which appropriated monies for

20   improvements to the road, and found that based upon those

21   statutes, that the road was created by statute and not by

22   use.

23     Q.   And what's your understanding as to where he went

24   from there, once he made that conclusion?

25     A.   I'm not sure that he -- he made that conclusion,

1    but I'm not sure it was consequential to the rest of the

2    decision.  He didn't make a finding as to whether the fee

3    had been acquired for highway purposes or whether just the

4    right-of-way had been acquired for highway purposes.

5        Q.   And what is the significance, in your view, of

6    that?

7        A.   Well, if -- if a -- if the fee was not acquired,

8    then, clearly, there can be abandonment of the highway under

9    Section 205 of the Highway Law, if there's a six-year period

10   of no use as a public highway.

11            If the fee was acquired, I've never actually

12   researched that issue to see whether a road on a fee highway

13   can be abandoned or not.

14       Q.   Now, when you talk about the fee being acquired,

15   you're talking about the two municipalities, North Elba and

16   the Town of Keene, presumably?

17       A.   Yes, talking about the municipalities.

18       Q.   Do you recall what Judge Halloran said about, in

19   his view, the proper way for the state to close a road?

20       A.   Judge Halloran said that the only way for the

21   state to close a public highway was by exercising a 212

22   closure order, issuing a 212 closure order, that's Section

23   212 of the Highway Law, which authorizes the Commissioner of

24   the department to close a public highway that's basically

25   totally surrounded by state land.

1      Q.    And you do you agree with that determination or

2    conclusion that he reached?

3      A.    No, I disagree with that conclusion.  I believe

4    that a highway, even though it's on state forest preserve

5    land, can be abandoned under Section 205 of the Highway Law.

6      Q.    Let's come back to 2005 and the decision to

7    enforce against Mr. McCulley administratively.  Do you know

8    of any law, any statute or regulation that would require DEC

9    to enforce against Mr. McCulley criminally?

10     A.    No.

11     Q.    Was is it your position that DEC was on firm legal

12   ground in commencing administrative enforcement proceeding

13   against Mr. McCulley?

14     A.    Yes.  It's my understanding that the department

15   has a variety of options it may pursue in deciding whether

16   to prosecute somebody.  And the department can exercise its

17   discretion as to which option it selects.

18     Q.    And explain to us, just for a minute, about the

19   grounds for the administrative enforcement proceeding as

20   well as the relief sought.  What was the basis for the

21   administrative enforcement complaint that was served on

22   Mr. McCulley?

23     A.    That Mr. McCulley had violated a section of our

24   regulations that prohibited the operation of a motor vehicle

25   in an area that wasn't designated for motor vehicle use.

1  Section 196.1, I believe it is.

2      Q.   And what is the relief that is sought in that

3  administrative complaint?

4      A.   I'm not the attorney who's working on the

5  administrative complaint.  I believe that they're seeking a

6  penalty and an injunction to prevent him from riding on that

7  road in the future.

8      Q.   As counsel to the Division of Lands and Forests,

9  is the -- what I'll refer to as the McCulley matter, does it

10  raise important issues for the Division of Lands and Forests

11  and for DEC in general?

12      A.   It raises extremely important issues.  The

13  department owns approximately -- the State of New York owns

14  land managed by the department that totals in guess of 15

15  percent of the land mass of the State of New York.  And as

16  you would expect, on a land mass of that size, there are

17  considerable numbers of old trails and town highways and

18  county highways that cross the land.  Therefore, a decision

19  that finds that foot traffic and cross-country ski traffic

20  on one of these old roads prevents the road from being

21  abandoned and, therefore, the public has a right to use

22  motor vehicles on it has a very considerable impact on the

23  management of those lands by the department.

24      Q.   And isn't it your position that the Jack Rabbit

25  Trail, the three-and-a-half mile section that has been at

1    issue in this proceeding, has been abandoned?

2         A.   Yes.  That's my belief.

3         Q.   And can you state the basis for that belief and

4    when you believe that the former road was abandoned?

5         A.   In order to give an opinion on precisely when the

6    road was abandoned, I would have to be presented with

7    evidence as to when it was last used as a public highway

8    and, thus far, I haven't seen any evidence that it's been

9    used as a public highway by motor vehicles since at least

10   1972, when the Master Plan -- the Adirondack Park State Land

11   Master Plan was first adopted.

12        Q.   Do you know whether this former road has ever been

13   used by motor vehicles?

14        A.   I have no knowledge of that.

15        Q.   Okay.

16        A.   Other than Mr. McCulley on two occasions.

17        Q.   Do you believe that the DEC enforcement process

18   will be biased against Mr. McCulley?

19        A.   No.  Mr. McCulley has a right to counsel in that

20   process, he can -- ultimately, the decision will be made by

21   the Commissioner, he can appeal a decision of the

22   Commissioner to Supreme Court, and then to the Appellate

23   Division and the Court of Appeals, if need be.

24        Q.   Speaking -- just focusing on your own involvement,

25   did DEC decide to filed administrative enforcement complaint

1   against Mr. McCulley to retaliate against him in any manner?

2       A.   Absolutely not.

3       Q.   When did you first meet Mr. McCulley?

4       A.   I don't believe I've ever met Mr. McCulley.

5       Q.   In your view again, did DEC decide to file

6   administrative enforcement complaint against Mr. McCulley to

7   restrain his First Amendment right to freedom of speech or

8   freedom of expression?

9       A.   No.  The department is often criticized by just

10  about every interest group in the public, whether it's a

11  private citizen, an environmental group, a snowmobile group,

12  a municipality, we expect public criticism and public

13  criticism helps make our decisions better.

14      Q.   And to make your job harder, right?

15      A.   And make my job harder, yes.

16      Q.   Was the administrative enforcement proceeding

17  initiated in order to harass Mr. McCulley?

18      A.   No.

19      Q.   Do you believe that the regulation on which DEC's

20  enforcement proceeding is based, which you testified is

21  196.1, to be legally valid?

22      A.   Yes.  I believe it was adopted by complying with

23  the State Administrative Procedures Act.

24      Q.   To your knowledge, did DEC commence the

25  enforcement proceeding against Mr. McCulley based on the

1   request or on the wishes of environmental groups?

2       A.   As far as I know, the environmental groups have

3   never discussed the issue with us.

4       Q.   How about based on requests or the wishes of the

5   Adirondack Ski Touring Council?

6       A.   Not to my knowledge.

7       Q.   Based on the request or wishes of any other group?

8       A.   The decision was solely the department's decision.

9       Q.   Do you believe that DEC is selectively prosecuting

10   its regulations against Mr. McCulley?

11       A.   No, I don't.

12       Q.   Do you believe that DEC is seeking to violate his

13   due process rights?

14       A.   No.

15       Q.   Do you believe that DEC is seeking to violate his

16   right to equal protection under the laws?

17       A.   No.

18              MR. MUNRO:  I have no further questions.

19              THE COURT:  Mr. Norfolk.

20              MR. NORFOLK:  Yes, your Honor

21   (unintelligible).

22   CROSS-EXAMINATION

23   BY MR. NORFOLK:

24       Q.   Mr. Hamm, I'm Mr. Norfolk.  We met last time you

25   were in court on this matter.

1                So, it's the DEC's position that the decision

2    handed down from Essex County Court would be a big precedent

3    in the forest preserve land.  Is that what you're testifying

4    to today?

5        A.   Some people may interpret it that way.

6        Q.   How about the DEC's position?  Is it a big issue

7    that it could have an affect on the roads and trails as you

8    testified --

9        A.   It is potentially -- yes, it is potentially a big

10   issue.

11       Q.   And that's been the DEC's position since the

12   Halloran decision came out?

13       A.   I'm not sure I can speak for DEC on that.  I can

14   give you my personal opinion.

15       Q.   Okay.  When you were testifying earlier, answering

16   Mr. Munro's questions, were you speaking on your own

17   personal opinion, belief, or on what the DEC's position was

18   with respect to this could have quite a precedent on the

19   forest preserve lands?

20       A.   I was speaking on DEC's behalf.  But at that

21   point, I wasn't speaking about DEC's position at the moment

22   the decision was issued.

23       Q.   Okay.  But today, as we speak today, the DEC's

24   position on the Halloran decision is that it has -- could

25   have a large affect, a precedent on the forest preserve

1   lands and the trails there and how they're deemed to be a

2   road or not?

3        A.   It could be interpreted that way.

4        Q.   I would like to offer you Plaintiff's Exhibit 69.

5   May I approach, Mr. Hamm?

6             I ask you to just take a look at it and see

7   what it is and I'm gonna ask you some questions about it.

8        A.   (Witness complies.)

9             THE COURT:  For the record, Mr. Norfolk, what

10  is Plaintiff's Exhibit 69?

11            MR. NORFOLK:  Plaintiff's Exhibit 69 is a

12  Press Republican news article, "The DEC let's stand opening

13  of wilderness road."

14            THE COURT:  Okay.

15  BY MR. NORFOLK:

16       Q.   I am going to refer you to this paragraph and ask

17  that you read this to the Court, from this point right there

18  (indicating).

19       A.   You would like me to read it?

20       Q.   Read it outloud.

21       A.   Okay.  "Dunn (phonetic) would not confirm that DEC

22  is considering closing the road, but she did say Halloran's

23  ruling, quote, does not set any precedent for any other

24  roads in the forest preserve, unquote."

25       Q.   Who's Dunn or Donn?

1        A.    She works in our press office.

2        Q.    She works for the DEC?

3        A.    Works for the DEC in our press office.

4        Q.    And she has authority to make public statements to

5    news media, reporters?

6        A.    Yes, she does.

7        Q.    Doesn't that statement contradict what you are

8    testifying here today, sir?

9        A.    I'd like to see the statement again, please.

10        Q.    Oh, sure, I'm sorry.

11        A.    No, I don't think it contradicts what I just

12    stated, because I just stated that the current belief of the

13    department is that this could have significant precedent.

14    That was not the belief of the department at the moment the

15    decision was issued.

16        Q.    So the DEC decision has changed, since the ruling

17    on the -- Mr. McCulley's conviction, reversal?

18        A.    I wouldn't say that it changed.  What I've said is

19    that the decision could be interpreted as setting

20    significant precedent.  I didn't say that it is significant

21    precedent.

22        Q.    Okay.  So I'm gonna ask you:  Does the DEC

23    consider this case a case of precedent or not?

24                MR. MUNRO:  Objection.  Can we clarify when

25    we say "this case"?

1                    THE COURT:  Sustained.

2    BY MR. NORFOLK:

3        Q.   Does the DEC consider the Court -- the Essex

4    County Court of Appeal decision, reversing Mr. McCulley's

5    conviction for operating a snowmobile on the Old Mountain

6    Road, does the DEC consider that decision having precedent

7    on the forest preserve lands or not?

8        A.   The DEC believes that there are those who will say

9    that it is precedent.

10       Q.   Well, what -- does the DEC believe it, yes or no?

11       A.   I think the department currently believes that it

12   will be interpreted that way.

13       Q.   Now, correct me if I'm wrong, but in response to

14   Mr. Munro's direct examination, you testified

15   (unintelligible) of the Essex County Court on Appeal could

16   cause a precedent, that would be, quote, a big problem, end

17   quote.  Is that my correct understanding of your testimony?

18       A.   Yes, I said it could.  I didn't say it would.

19       Q.   How could it have a big precedent that would be a

20   big problem if it went to Essex County Court of Appeals?

21       A.   Well, we don't know how Courts will interpret the

22   decision in the future.

23       Q.   Aren't you really sayin' that if Essex County

24   Court gets this case on appeal, you're gonna lose?

25       A.   No.  Because I think there are a number of other

1   decisions out there that hold differently than the Halloran

2   decision holds.  And if another case winds its way through

3   the courts with similar facts, the reviewing court would

4   look not just at the Halloran decision, but at the other

5   decisions as well.

6        Q.   But what do you think the Essex County Court would

7   have done?

8        A.   Oh, the Essex County Court, I assume that Judge

9   Halloran would have ruled the same way.

10       Q.   And what would that be?

11       A.   He would have thrown the ticket out in the

12   interest of justice.

13       Q.   He also did it on the law and the facts, correct?

14       A.   On the law and the facts, yes.

15       Q.   Okay.  Are you familiar with New York State CPL

16   450.90?

17       A.   Not off the top of my head.

18       Q.   It's the statute that -- in the Criminal Procedure

19   Law that refers to when an intermediate Appellate Court can

20   appeal or not.  Does that refresh your memory of the

21   section?

22       A.   Yes, um-hum.

23       Q.   Have you done any research on that section?

24       A.   I looked at the section and reviewed a couple of

25   the cases, I believe.

1        Q.    So you know of subsection 2,sub A, what it states

2   then, correct?

3        A.    I would need to look at it and --

4              MR. NORFOLK:  May I approach?

5              THE COURT:  Yes.

6        Q.    This here is (unintelligible).  2, sub A.

7              (Pause in proceedings.)

8        A.    Okay.

9        Q.    Does Section 450.90, 2, sub A, state that an

10  appeal to the Court of Appeals from an intermediate

11  Appellate Court should -- may be taken if the Department of

12  Environmental Conservation deems it so?

13       A.    I don't understand the question.  I'm sorry.

14       Q.    Does 450.90, sub 2, A, state that the Court of --

15  an appeal can be taken to the Court of Appeals from an order

16  of an intermediate Appellate Court if the Department of

17  Environmental Conservation determines it?

18       A.    It does not mention the Department of

19  Environmental Conservation in the provision.

20       Q.    What does that section, 2, sub A, of 450.90 of the

21  CPL state, which body determines whether or not appeal can

22  be taken?

23       A.    I'll read the section.  "The Court of appeals

24  determines that the intermediate Appellate Court" -- let me

25  backtrack.

1            Section 2 of 450.90.  "An appeal to the Court

2    of Appeals from an order of an intermediate Appellate Court

3    reversing or modifying a judgment, sentence or order of a

4    criminal court may be taken only if, A, the Court of Appeals

5    determines that the intermediate Appellate Court's

6    determination of reversal or modification was on the law

7    alone or upon the law and such facts which but for the

8    determination of law would not have led to reversal or

9    modification."

10       Q.   Okay.  Thank you.  So, the Department of

11   Environmental Conservation, at least pursuant to 450.90,

12   isn't given any kind of statutory authority to make that

13   determination, correct?  To make the determination whether

14   an appeal should be gone -- should be taken to the Court of

15   appeals or an intermediate Appellate Court, correct?

16       A.   That's correct.

17       Q.   Are you familiar with the case of People versus

18   Diaz, 81 NY 2d 106, 1993?

19       A.   I would need to see the case, but I don't remember

20   it off the top of my head.

21       Q.   Perhaps I can refresh your memory.  In that

22   case -- in that case, the Court of Appeals ruled that its

23   proper for the Court of Appeals to look beyond the forum of

24   an Appellate decision to determine whether indeed it was

25   made on the law, the facts or something else.  Does that

```
 1   refresh your memory of that case?

 2        A.   No.

 3                    (Pause in proceedings.)

 4                    MR. NORFOLK:  That's it, your Honor.  Thank

 5   you, Mr. Hamm.

 6                    THE COURT:  Any redirect?

 7                    MR. MUNRO:  Nothing further, your Honor.

 8                    THE COURT:  Thank you.  You may step down,

 9   Mr. Hamm.

10                    (Witness was excused.)

11                    THE COURT:  Call your next witness, please.

12                    MR. MUNRO:  Yes.  Can Mr. Hamm stay now that

13   he's testified?

14                    THE COURT:  Any objection?

15                    MR. NORFOLK:  I have no objection.

16                    THE COURT:  Yes.

17                    MR. MUNRO:  Okay.  And if you could get Rob,

18   or someone --

19                    THE COURT:  I am sorry.  Mr. Hamm?  Mr. Hamm?

20                    THE WITNESS:  Yes.

21                    THE COURT:  I'm sorry, I had a couple

22   questions.

23                    THE WITNESS:  Okay.

24                    THE COURT:  You were almost out.

25                    THE WITNESS:  Wasn't fast enough.
```

1                    THE COURT:  Two steps, you were there.  I'm

2    sorry.

3                    (Witness resumed the stand.)

4                    THE COURT:  Is it your view that the road in

5    question here, the Old Mountain Road and the section we're

6    talking about was created by use or by statute?

7                    THE WITNESS:  I believe in looking at the

8    three statutes, based upon what I know about the factual

9    history, that it was created by use.

10                    THE COURT:  All right.  Now, what

11    obligations, if any, under Section 205 of the Highway Law,

12    does DEC have for abandonment?

13                    THE WITNESS:  I'm not sure I understand the

14    question, your Honor.

15                    THE COURT:  Well, you said Section 205

16    authorizes abandonment of a road.  What obligations, if any,

17    does DEC have, if it asserts that a road has been abandoned?

18                    THE WITNESS:  If a road has been abandoned

19    under Section 205 of the Highway Law, the department doesn't

20    have to take any further action to close the road.  The road

21    is abandoned as a matter of law if there hasn't been the use

22    of the road for the six-year period.

23                    THE COURT:  All right.  And again the use you

24    talk about is the use by motor vehicles, correct?

25                    THE WITNESS:  Use as a public highway.

```
 1                    THE COURT:  Are you aware of a decision in
 2      case of People versus Paul Smiths?  I'm not, so...  But it
 3      came up here today.  Are you aware of it?
 4                    THE WITNESS:  No, I'm not.
 5                    THE COURT:  So -- the contention has been
 6      that this case held that the road in question here was
 7      created by statute and not by use in the 1950s.  You're not
 8      aware of it?
 9                    THE WITNESS:  I don't recall the case off the
10      top of my head.
11                    THE COURT:  Get outta here quick.
12                    THE WITNESS:  Thank you, your Honor.
13                    THE COURT:  Thank you.
14                    (Witness was excused.)
15                    THE CLERK:  Can I have your name, please?
16                    THE WITNESS:  Robert Davies.
17                    THE CLERK:  Spell your last name.
18                    THE WITNESS:  D-A-V-I-E-S.
19                    THE CLERK:  Your middle initial?
20                    THE WITNESS:  K.
21                    THE CLERK:  Raise your right hand.
22                    (Witness duly sworn.)
23                    THE CLERK:  This is Robert K Davies,
24      D-A-V-I-E-S.
25                    THE COURT:  Mr. Munro.
```

```
 1              R O B E R T    K.      D A V I E S,

 2   having been called as a witness, being duly sworn,

 3   testified as follows:

 4   DIRECT EXAMINATION

 5   BY MR. MUNRO:

 6        Q.   Good afternoon, Mr. Davies.  Can I call you Rob,

 7   if that's all right?

 8        A.   That's fine.

 9        Q.   Rob, how long have you been employed at DEC?

10        A.   Since 1990.

11        Q.   And what was your first employment there?

12        A.   I was program counsel for the Division of

13   Hazardous Waste Remediation.

14        Q.   And you held that position until when?

15        A.   I believe I held that position to around 1994,

16   where I then became counsel for the Onondaga Remediation

17   Project, Onondaga Lake Remediation Project.

18        Q.   Okay.  And how long did you do that?

19        A.   Until ninety -- 1998.

20        Q.   At which point you had some different

21   responsibilities?

22        A.   I then became the counsel for the Real Property

23   Office of -- at the DEC.

24        Q.   Okay.  And you had that position until when?

25        A.   Until September 12, 2001.
```

1     Q.    And you were admitted to practice in the State of

2   New York when?

3     A.    In 1990.

4     Q.    And during your time in law school, you clerked in

5   the Attorney General's Environmental Protection Bureau, is

6   that correct?

7     A.    Yes, I did.

8     Q.    And who was your supervisor then?

9     A.    You.

10              (Laughter.)

11              THE COURT:  Have you recovered?

12              THE WITNESS:  Yes, I have.  He was a good

13  teacher.

14  BY MR. MUNRO:

15     Q.    Tell the Court about your current responsibilities

16  at DEC.

17     A.    I am currently, as I said, starting in September

18  2001, Director of Lands and Forests at the DEC, which is --

19  that division is responsible for the management of over four

20  million acres of state-owned land across all nine regions of

21  the state.

22     Q.    And do you function as a lawyer in that position?

23     A.    No.

24     Q.    Do you function as a policy person?

25     A.    Policy manager, right.

1      Q.    And who is the lawyer in your view to that

2    division within DEC?

3      A.    The attorney that we deal with mostly is Ken Hamm.

4      Q.    Let's focus now on the issues that are involved in

5    this proceeding, and I want to start with 2005.  You're

6    aware that Mr. McCulley drove his pickup truck on the --

7    what the state refers to as the Jack Rabbit Trail,

8    Mr. McCulley refers to as the Old Mountain Road, you're

9    aware that that occurred?

10     A.    Yes, I am.

11     Q.    And you're aware that at some point a criminal

12   ticket that had been issued was withdrawn by DEC; is that

13   correct?

14     A.    That's correct.

15     Q.    And were you involved in that decision to withdraw

16   the criminal ticket?

17     A.    Yes, I was part of those discussions.

18     Q.    And tell me who else was involved?

19     A.    Ken Hamm, Stu Buchanan and the regional attorney

20   for Region 5, Chris Lacombe, and also the Assistant Attorney

21   General, Lisa Burianik (phonetic) was quite involved in

22   those discussions as well.

23     Q.    Anybody else within DEC?

24     A.    Mike Lesser, also from the counsel's office.  Mike

25   focuses on the criminal side of things.

1     Q.    And what is your understanding as to why DEC made

2     a decision to withdraw the criminal ticket?

3     A.    I believe that the department felt as though the

4     matter would end up before the same tribunal that the

5     previous action occurred in, and the factual record would

6     not be developed to make a determination as to the real

7     facts of the matter.

8     Q.    And so a determination was made to instead proceed

9     administratively, is that correct?

10    A.    It was felt as though going administratively we

11    would develop a factual record to make a determination on.

12    Q.    And were you involved in that decision, to proceed

13    administratively?

14    A.    Yes.

15    Q.    And was that the same people in that decision as

16    well that you just named?

17    A.    Right.  And I -- I think I failed to mention Jim

18    Ferrara, who is also the General Counsel at DEC.  He,

19    obviously, was part of that discussion as well.

20    Q.    Did you talk to Jim Ferrara directly yourself?

21    A.    Yes.

22    Q.    And what is DEC alleging, as you understand it, in

23    the 2005 administrative enforcement proceeding?

24    A.    That Mr. McCulley drove a motor vehicle on forest

25    preserve land which is classified wilderness and, under

1   196.1 of 6 NYCRR, that's a violation of our regulations.

2        Q.   Let's go back in time a little bit to the decision

3   of Judge Halloran in Essex County Court.

4        A.   Um-hum.

5        Q.   Are you familiar with that decision?

6        A.   Yeah, I'm familiar with it.

7        Q.   Can you tell us what that decision held, first of

8   all?

9        A.   I -- my understanding is is that Judge Halloran's

10  decision was to rescind the ticket that was issued by the

11  department in the interest of justice.

12       Q.   And beyond that, did he reach other conclusions

13  with regard to the legal status of the Jack Rabbit Trail/Old

14  Mountain Road?

15       A.   There was certainly --

16                 MR. NORFOLK:  Objection, Judge.

17                 THE COURT:  Overruled.

18       A.   There was certainly discussions and opinion, I

19  think, expressed by the judge in that decision.  But I think

20  that the holding was narrowly defined as rescinding the

21  ticket in the interest of justice.

22       Q.   Let's talk for a minute about some of what you

23  refer to as opinions in the decision.

24                 Do you remember what Judge Halloran said

25  beyond his holding with regard to the status of this

1   road/trail?

2        A.   Yeah.  I believe that the Judge found that the

3   Jack Rabbit Trail was not officially abandoned as an old

4   town road.

5        Q.   And as a result of that, he concluded what?

6        A.   He concluded that Mr. McCulley had still the

7   right, as a town road, to drive a motor vehicle on it.

8        Q.   And do you recall Judge Halloran reaching any

9   opinion with regard to his view as to how -- what DEC would

10  have to do to close a road?

11       A.   I believe Judge Halloran felt that the department

12  should issue a 212 order under the Highway Law if they

13  wanted to actually close the road.

14       Q.   And did you agree with the opinions of Judge

15  Halloran and his decision?

16       A.   No, I did not.

17       Q.   And did you discuss those opinions with others

18  within DEC?

19       A.   Yes, I did.

20       Q.   And would that be the same people you've mentioned

21  earlier?

22       A.   Yes, it would.

23       Q.   Were you involved in discussions with regard to

24  appealing Judge Halloran's decision and whether an appeal

25  could be taken?

1        A.    Yes, I was.

2        Q.    And could you just describe for us what those

3   discussions involved?

4        A.    Well, I think there was a consensus among the

5   people that I mentioned that Judge Halloran's decision was

6   in error and that we felt very strongly that we should

7   appeal it, but the Criminal Bureau at the Attorney General's

8   office felt that it was, for some very complicated issues

9   involved with the decision, it was not appealable to the

10  Court of Appeals.

11       Q.    Is it fair to say that you, at least personally,

12  were disappointed with their conclusion?

13       A.    I would say that that would be a very fair

14  statement.

15       Q.    Is that true of others at DEC, to your knowledge,

16  that --

17       A.    Yes.

18       Q.    Is the administrative enforcement case against

19  Mr. McCulley that's presently pending, in your view, does

20  that raise important issues for your Division of Lands and

21  Forests?

22       A.    I think it raises some very important issues for

23  our division.

24       Q.    Can you explain why?

25       A.    Well, the -- there's millions of acres of forest

449

1   preserve and four million acres or more of state-owned land

2   across the state where there are literally hundreds of miles

3   of these ancient roadways that have long been abandoned and

4   cease to be used nor maintained for motor vehicle use that

5   are now either not a road at all and serve as a recreational

6   trail or have just disappeared completely.

7           And if we were -- the department was required

8   to go out and take some type of affirmative steps to

9   officially close these already previously abandoned and long

10   forgotten roads, that would be a tremendous burden on the

11   department.

12     Q.   Now, when you use the word "abandoned" and you use

13   "motor vehicles," are we talking about abandoned meaning no

14   longer being used by motor vehicles?

15     A.   When I say "abandoned," I mean no longer -- under

16   the Highway Law, there's, as I understand it, a principle of

17   abandonment, where if a town ceases to maintain for six

18   years or more, the motor vehicle use is no longer being used

19   legally on those roadways, there are official maps that do

20   not depict those old roadways as official town roads, then

21   those roads are abandoned.  And that's kinda the end of the

22   story for that road.

23     Q.   And what is your position on whether the Jack

24   Rabbit Trail/Old Mountain Road, the three-and-a-half miles

25   that's at issue in this proceeding, whether that's been

1    abandoned?

2        A.   I understand, and my belief is, is that that

3    three-and-a-half miles of the Jack Rabbit Trail was long ago

4    abandoned, has not been maintained by any town for the

5    purposes of motor vehicle use and it has been long

6    recognized and designated as a recreational trail for hiking

7    and cross-country skiing.

8        Q.   Now, there's been testimony that the Adirondack

9    Ski Touring Council and Tony Goodwin have done some

10   maintenance on the Jack Rabbit Trail with the permission of

11   the DEC.  Are you familiar with that?

12       A.   Yes, I am.

13       Q.   And what is the authorization that DEC provided to

14   Mr. Goodwin and that group?

15       A.   The initial authorization was through a temporary

16   revokable permit which permitted that entity to take certain

17   maintenance measures to keep that trail in a safe and

18   protective condition and after that, and in more recent

19   years, it was under an Adopted Natural Resource agreement,

20   or an AANR agreement.

21       Q.   And is it your understanding that when we talk

22   about maintenance by that group we're not talking about

23   maintenance for use by a motor vehicle?

24       A.   At -- no.

25       Q.   What type of maintenance are we talking about?

1       A.    Maintenance, keeping the trail brushed, keeping

2    the trail unobstructed by trees.  Trees are often falling

3    across all sorts of trails.  Keeping washouts cleaned out

4    and culverts clean so that the trail doesn't get washed out

5    in storm events.  Typical maintenance of the trail.

6       Q.    And this is for what uses?

7       A.    For cross-country skiing and hiking.

8       Q.    Okay.  But not for any motor vehicles?

9       A.    No motor vehicle use.

10       Q.    Not for any snowmobile use?

11       A.    No snowmobile use.

12       Q.    Do you believe that the DEC enforcement process

13    that's been initiated against Mr. McCulley will be biased in

14    any way?

15       A.    No, I do not.

16       Q.    In your view, did DEC file the administrative

17    enforcement complaint against Mr. McCulley to retaliate

18    against him in any manner?

19       A.    No.

20       Q.    Have you met Mr. McCulley before?

21       A.    Yes, we have met.

22       Q.    And under what circumstances have you met?

23       A.    In -- most times, at public hearing events for

24    when the DEC's out at public meetings for -- we have an ATV

25    policy, a draft ATV policy, Mr. McCulley has been there,

1    I've been there, we've had discussions.  There was -- we

2    were out with a recent snowmobile plan for the Adirondacks.

3    We went across the state with those hearings, and I've seen

4    Mr. McCulley and spoken to him at those, too.

5         Q.   And you have been representing DEC at those

6    hearings, is that correct?

7         A.   Yes, I do.

8         Q.   In your view, did DEC decide to file the

9    administrative enforcement complaint against Mr. McCulley to

10   restrain his First Amendment rights to either freedom of

11   speech or expression?

12        A.   Absolutely not.

13        Q.   And in your experience, Mr. McCulley has exercised

14   those First Amendment rights, is that correct?

15        A.   He does a very good job of that.

16        Q.   Has DEC initiated the administrative enforcement

17   proceeding against Mr. McCulley in order to harass him, in

18   your view?

19        A.   No.

20        Q.   Do you believe that the regulation that DEC is

21   seeking to enforce administratively, 196.1, to be legally

22   valid?

23        A.   Yes.

24        Q.   To your understanding, did DEC commence the

25   administrative enforcement proceeding against Mr. McCulley

1   based on the request or the wishes of any environmental

2   groups?

3       A.   No.

4       Q.   Based on the request or wishes of the Adirondack

5   Ski Touring Council?

6       A.   No.

7       Q.   Any other group or individual?

8       A.   No.

9       Q.   This is DEC's decision?

10      A.   The consensus decision with the people that I

11  mentioned.

12      Q.   Do you believe that DEC is selectively prosecuting

13  its regulations against Mr. McCulley?

14      A.   No, I do not.

15      Q.   Do you believe that DEC is seeking to violate his

16  due process rights?

17      A.   No.

18      Q.   How about his rights to equal protection under the

19  law?

20      A.   No.

21              MR. MUNRO:  I don't have any further

22  questions.

23              THE COURT:  Mr. Norfolk.

24                      - - - - -

25

1    CROSS-EXAMINATION

2    BY MR. NORFOLK:

3        Q.   Hi, Mr. Davies, I'm Matt Norfolk, Jim McCulley's

4    attorney.

5             You're an attorney.  Are you today admitted

6    as an attorney?

7        A.   Yes, I am.

8        Q.   Do you keep current on your continuing legal

9    education?

10       A.   Yes, I do.

11       Q.   You gave testimony that the DEC is always getting

12   involved (unintelligible) of the Adirondack Ski Touring

13   Council to maintain Jack Rabbit Trail or what we refer to --

14   have been referring to as the Old Mountain Road.  Is that

15   your testimony today, that they always receive authorization

16   for them to maintain it?

17       A.   For as long as I've known or the records show that

18   they have been maintaining that trail, they've done it

19   pursuant to a permit or this AANR.

20       Q.   What records are you lookin' at?

21       A.   The records at the department that we held.

22       Q.   At the Division of Lands -- (unintelligible) or

23   the department in its entirety hold?

24       A.   Within the division, our records.

25       Q.   Is it possible that DEC Region 5 records are

1   completely different from your records?

2       A.   Well, I consider the Region 5 records to be our

3   records.

4       Q.   If I told you today there's a stack full of

5   evidence over here that shows that the department had

6   basically said, hey, we don't have jurisdiction over the Old

7   Mountain Road in the 1990s and Adirondack Ski Touring

8   Council, go do what you gotta do, go to the town, would that

9   be in your record?

10               MR. MUNRO:   Objection.   I object to the

11   phrase "stack of records."   I don't know what that means.

12               THE COURT:   Overruled.   You may answer the

13   question.

14       A.   Can I hear the question again?

15       Q.   If I told you that there's evidence here,

16   documentation admitted into evidence, records that had

17   stated -- show that the Department of Environmental

18   Conservation, in the mid '90s, told the Adirondack Ski

19   Touring Council, hey, we don't have any jurisdiction over

20   the Old Mountain Road, don't come to us for authorization of

21   maintenance, go to the towns, would those records that I'm

22   referring to be with your records?

23       A.   If they're in the regional records, they would be

24   within our records, yes.

25       Q.   Have you done a search of your records before you

1    came here today to discuss this, to give testimony on this?

2         A.    I -- did I personally go and search through all

3    the records?

4         Q.    Yes.

5         A.    No, I did not.

6         Q.    When making this decision and spending hours, I

7    would assume, deciding whether to bring Mr. McCulley into

8    administrative proceeding or take him into a Town Court, did

9    you do any research on these -- in your own records

10   maintained by your office?

11        A.    Yeah, we did research, I did research and I rely

12   heavily on the opinions of our legal staff.

13        Q.    Okay.  Did you go -- when you looked at these

14   records, did you look at any records in the 1990s?

15        A.    Yes.

16        Q.    Now, you testified that the department, and the

17   people you mentioned, had made discussions and your concern

18   was that this matter would go back to the same tribunal?

19        A.    Right.

20        Q.    What tribunal were you referring to?

21        A.    Judge Halloran's -- the County Court.

22        Q.    Okay.  Now, you know that a County Court -- Court

23   of Appeals, not the Court of Appeals, but Appellate Court,

24   doesn't make or establish a record at that level, correct?

25        A.    Yes.

457

1      Q.   So -- but, you testified you didn't want it to go
2   back to the same tribunal and not make a determination on an
3   improper record of facts.  That doesn't make sense, does it?
4   The Appellate Court doesn't establish a record of facts?
5      A.   No.  I want to establish a record.
6      Q.   In the Appellate Court proceeding?
7      A.   In an adjudicatory proceeding, which an
8   administrative proceeding would do.
9      Q.   Wouldn't the Town of North Elba or Town of Keene
10  criminal proceeding establish a record?
11     A.   I believe that there was a record established in
12  the Town of Keene, but then that was appealed to the County
13  Court.
14     Q.   I understand that.
15     A.   Okay.
16     Q.   But you testified today that the decision was made
17  to get it out of that same tribunal and bring it into the
18  DEC administrative proceeding because you were concerned
19  that proper record of facts would not be established and
20  you've said the same tribunal that Mr. McCulley was tried in
21  earlier for the snowmobile.  So, are you saying that the
22  record that would be established in a town court proceeding
23  would have been deficient as opposed to an administrative
24  proceeding?
25     A.   No.  I was saying that the process that we went

1    through before did not establish a clear record of facts and

2    we wanted to try to develop a good record of facts that

3    could then be adjudicated.

4        Q.    Okay.  Did you know that the Keene Court trial

5    took over four hours?  Did you know that?

6        A.    No, I didn't.

7        Q.    Did you know that Mr. McCulley only had one

8    objection granted -- or sustained during that whole four

9    hours of trial?  Did you know that?

10       A.    No, I did not.

11       Q.    Did you know that essentially -- withdrawn.

12             Did you know that Christopher Lacombe and the

13   DEC regional attorney had four hours to present everything

14   and anything he wanted to to the Keene trial court.  Did you

15   know that?

16       A.    No, I didn't know about the four hours.

17       Q.    Okay.  But you and your colleagues at the DEC made

18   a base -- made your decision to bring Mr. McCulley into the

19   administrative enforcement proceeding because you were

20   afraid that the tribunal that had tried that earlier, Town

21   of Keene or Town of North Elba, local Town Court, would not

22   be able to have the facts established to have a good record,

23   is that correct?

24       A.    We were not afraid.  We made a determination that

25   it was the best avenue to take to develop a factual record

1   to be adjudicated on.

2                    (Pause in proceedings.)

3        Q.   Is Mr. Lacombe gonna have a better opportunity to

4   get more facts in, establish the record better in the

5   administrative enforcement proceeding than he would in the

6   North Elba Town Court or Keene Town Court?

7        A.   I can't answer that.

8        Q.   Why not?  You're an attorney.

9        A.   Yeah, I'm --

10                   THE COURT:  Don't argue with the witness,

11   Mr. Norfolk.

12                   MR. NORFOLK:  I apologize.

13       Q.   But why not?

14       A.   'Cause I don't know what that proceeding will be.

15   I mean, that proceeding has not occurred.

16       Q.   But you were one of the representatives of the DEC

17   who made this decision to go and commence an enforcement

18   proceeding against Mr. McCulley and withdraw the criminal

19   court action?

20       A.   Yes.

21                   MR. NORFOLK:  No further questions.

22                   THE COURT:  Any redirect?

23                   MR. MUNRO:  No, your Honor.

24                   THE COURT:  You may step down.  Thank you.

25                   THE WITNESS:  Thank you.

1                    (Witness was excused.)

2                    THE COURT:  Any further witnesses?

3                    MR. MUNRO:  No, your Honor.

4                    THE COURT:  Defense rests?

5                    MR. MUNRO:  Yes, your Honor.

6                    THE COURT:  Any rebuttal?

7                    MR. NORFOLK:  No, your Honor.

8                    THE COURT:  Take a break and hear closing

9    arguments.  I've got 3:45.  Make it 4 o'clock.

10                   (Short recess taken at 3:45 PM.)

11                   (Court reconvened at 4:00 PM.)

12                   MR. NORFOLK:  Your Honor.

13                   THE COURT:  Mr. Norfolk.

14                   MR. NORFOLK:  Yes.  I would like to make my

15   closing (unintelligible) Plaintiff's Exhibit 85 original.

16                   THE COURT:  What is 85?

17                   MR. NORFOLK:  The New York State Department

18   printouts about the ECATs we discussed.

19                   THE COURT:  You never found 'em?

20                   MR. NORFOLK:  No.  But we have several copies

21   which I think, I'm hopin' they are stipulated.

22                   MR. MUNRO:  We can produce another original

23   if you want one or we'll stipulate.

24                   THE COURT:  That's fine.  You guys can work

25   it out and give me whatever you agree on.

1          MR. NORFOLK:  Okay.  All right.  I am just

2    gonna put this in right now, it's just a copy.

3          THE COURT:  All right.

4          MR. NORFOLK:  Okay.  Your Honor, this

5    evidentiary hearing was ordered by Judge Kahn for plaintiff

6    to address the alleged excessive (unintelligible) abstention

7    in this case and to address the Younger-Pullman Doctrine of

8    Abstention.  At this hearing, the evidence that's been

9    presented by plaintiff is that the defendants' personal

10   animus against Mr. McCulley motivated the commencement of

11   the DEC administrative proceeding.  The defendants -- that

12   the defendants are prosecuting Mr. McCulley in bad faith and

13   that the commencement of the DEC administrative proceeding

14   was a result of a well-planned scheme orchestrated to

15   challenge Mr. McCulley after winning the appeal reversing

16   his conviction for riding a snowmobile on the Old Mountain

17   Road.

18          We've also shown that the commencement of the

19   criminal action in the Town of North Elba local court and

20   the DEC administrative proceeding were brought by the

21   defendants without hope of obtaining a valid conviction,

22   with no reasonable expectation of obtaining a favorable

23   outcome and I say this with the decision of Halloran

24   presented and the facts that we've established concerning

25   the status of the Old Mountain Road and what the DEC has in

1   the past admitted and agreed with us in certain aspects

2   about the status of the Old Mountain Road.  We've also shown

3   that the administrative enforcement proceeding is only one

4   of a multiple of filings charged against Mr. McCulley for

5   violations or alleged violations of using motor vehicles on

6   the Old Mountain Road.

7              We believe we've presented testimony and

8   evidence today to show that the DEC administrative

9   proceeding and even the local court actions, the ones -- the

10  one found in 2005 right before the administrative proceeding

11  and arguably even the one in 2003 were brought to deter or

12  discourage Mr. McCulley's constitutionally protected speech.

13             THE COURT:  Is it your view, Mr. Norfolk,

14  that if the plaintiff has demonstrated that the defendants

15  have no reasonable expectation of prevailing on the

16  administrative proceeding, that you -- that that, by itself,

17  satisfies your burden of demonstrating bad faith?

18             MR. NORFOLK:  Yes, under the relevant case

19  law in the Second Circuit, that's one of the exceptions to

20  the Abstention Doctrine, having -- that's under

21  extraordinary circumstances, but sometimes referring to

22  where they had no -- yes, they have no hope of obtaining a

23  valid conviction or no reasonable expectation of obtaining

24  an available -- of obtaining a favorable outcome.

25             Shall I continue?

```
 1                    THE COURT:  Yes.

 2                    MR. NORFOLK:  Okay.  We've also shown that,

 3    through evidence and testimony, that the DEC brought the

 4    administrative proceeding, it followed its normal course of

 5    conduct in opposing Mr. McCulley for bein' a proponent of

 6    snowmobilin' on the Old Mount Road and favoring

 7    Mr. McCulley's -- I'll call 'em political enemies or special

 8    interest groups that are in favor of alternative

 9    recreation -- outdoor recreational activities such as

10    cross-country skiing and hiking.  In fact, I pose to the

11    Court that we proved extraordinary circumstances warranting

12    intervention of the DEC --

13                    THE COURT:  What's DEC supposed to do?  If

14    they favor Mr. McCulley, then they're gonna get a lawsuit

15    from Mr. Goodwin, presumably.

16                    MR. NORFOLK:  If they favor Mr. -- well, I

17    don't think they need to favor either.  I think they

18    should --

19                    THE COURT:  Well, if they allow Mr. McCulley

20    to operate his snowmobile and motor vehicle on the road,

21    then presumably the Adirondack Ski Touring Council is going

22    to claim that they're favoring Mr. McCulley.

23                    MR. NORFOLK:  And I understand that.  But the

24    Adirondack Ski Touring Council has operated bulldozers and

25    other vehicles on the Old Mountain Road with no recourse of
```

1    the DEC.  In fact, the DEC said it's not our problem.  But

2    now, with Mr. McCulley, after he made it known to the DEC in

3    2002, early 2002, that --

4                THE COURT:  But I think the case law, the

5    issue is whether or not Mr. McCulley's political opponents

6    instituted the charges here.  What evidence is there to

7    support your claim that they instituted anything here?

8                MR. NORFOLK:  We've submitted as evidence

9    letters from the Adirondack Ski Touring Council, I believe

10   it's in evidence, there's a lot there, showing its

11   favoritism -- showing its position on the Old Mountain Road.

12   We've had testimony from Mr. Goodwin that he made it clear

13   to the DEC that they opposed snowmobiles on the Old Mountain

14   Road.

15               THE COURT:  But the institution of the

16   charges here, what evidence is there to show that any of his

17   opponents did anything to institute charges here?  Filed a

18   complaint?  Had a conversation?  Sent a letter?  Anything.

19               MR. NORFOLK:  The -- I believe that the

20   evidence and the testimony was that the DEC were informed by

21   Adirondack Ski Touring Council -- by the Adirondack Council

22   that the -- you must stop Mr. McCulley, and Mr. Goodwin is

23   quoted to say I'm sure the DEC would appeal in a public news

24   article.  They would appeal if they had lost.  There was --

25   the special interest groups, the Adirondack Ski Touring

1   Council in particular, were making it public knowledge that

2   they want -- that they wanted this road to be their road and

3   they made it publicly known to the DEC, for the DEC to know,

4   that they wanted whatever they could do to stop this.  And

5   they said sure, we'll do appeal.  But there was no appeal.

6   And there's newspaper articles I asked the Court to review

7   and I'm sure you will that Mr. Goodwin is quoted in almost

8   everyone that Mr. McCulley is quoted in.  I'm sure they're

9   gonna appeal, they have to do somethin', and what they

10  didn't appeal, they brought it in administratively.

11             THE COURT:  Well, Mr. Goodwin said he was

12  sure they'd appeal and they didn't, doesn't that disprove

13  your case?

14             MR. NORFOLK:  No.  Well, it shows that

15  they -- that was just one of my quotes, but there's more in

16  there.  It shows that they're publicly tellin' the DEC that

17  they believe they should take some kind of legal action to

18  prevent Mr. McCulley from takin' on this legal -- this legal

19  venture.

20             Now, I cannot say that Mr. Goodwin and the

21  Adirondack Ski Touring Council came up with this civil

22  administrative proceeding idea.  The DEC did that.  We heard

23  that today from Mr. Davies.  Mr. Davies, frankly, I think

24  didn't give us a reason or one that made sense.  So, I

25  cannot say that the public enemies, if you will, the

1    opposition (unintelligible) of Mr. McCulley came up with the

2    DEC administrative proceeding idea.

3              Continuing on, but I -- if you look at all

4    the facts, all the circumstances of this road and of the

5    contentious personal conflict between the department,

6    specific defendants, specific DEC employees were named

7    defendants herein, you'll find extraordinary circumstances

8    are warranting here that intervention in the DEC

9    administrative proceeding in that by reason of bias against

10   Jim, Mr. McCulley, the DEC is an incompetent state to

11   adjudicate -- state agency to adjudicate the issues pending

12   before it in the administrative proceeding against

13   Mr. McCulley.

14             Despite the erroneous assertion in

15   defendant's prehearing memorandum, it's pretty clear today

16   all the defendants, except for the Commissioners, who we

17   didn't ask to come and they weren't here, know Mr. McCulley,

18   they know Mr. McCulley very well.  There were times when

19   they just had uneventful public hearings, but there were

20   several times we've heard where they had confrontations and

21   they were not commenced or instigated, how you look at it,

22   by Mr. McCulley.

23             We've established proof of verbal assaults

24   and public confrontations.  Mr. Messenger, The Smokehouse,

25   after the public hearing.

1                  THE COURT:  Wasn't that after Mr. McCulley

2      referred to the Commissioner as a loon?

3                  MR. NORFOLK:  I think he referred to him --

4      she won the number one loon award.

5                  MR. MCCULLEY:  I said she won --

6                  THE COURT:  All right.  Let your lawyer

7      speak, Mr. McCulley.  You gotta stay out of this one.

8                  MR. NORFOLK:  (Unintelligible).

9                  THE COURT:  I thought I'd help you.

10                  MR. NORFOLK:  Thank you.  You could even

11     concede, yes, he spoke out against public officials, but he

12     didn't do it in a confrontational -- confrontational,

13     threatening manner.  He did it in a public forum, which that

14     was the whole point of that meeting was.  And it was free

15     speech, First Amendment protected speech.  And as you look

16     at the speech -- the speeches that were -- his,

17     Mr. McCulley's statements and speeches admitted into

18     evidence, you're gonna see that that's protected First

19     Amendment speech.

20                  THE COURT:  No question.  Why isn't

21     Mr. Messenger's response simply a response in kind?

22                  MR. NORFOLK:  A response -- not when he comes

23     and invades his personal space, uses profanity and attacks

24     him --

25                  THE COURT:  Mr. McCulley himself testified he

1    didn't feel threatened.

2              MR. NORFOLK:  But -- well, he didn't feel --

3    maybe Mr. Messenger's intent, I think we can interpret from

4    this, you go up and scream and yell and use profanity, say

5    stuff that was testified today, that there is an intent to

6    threaten or to lash out, in the course of his employment, as

7    a DEC rep, and to Mr. McCulley.

8              Now, Mr. McCulley didn't raise his voice and

9    shoot -- holler and then get into his personal space, and

10   then Mr. McCulley didn't proclaim policy decisions on his

11   First Amendment speech.  Mr. Messenger says you're gonna get

12   nothin' from us for snowmobile trails.  That's not how the

13   DEC, I understand, or any state Government is supposed to

14   make policy decisions.  Sounds to me, if you listen to the

15   evidence and testimony, that position was you're not getting

16   anything, you just pissed me off, excuse me -- excuse my

17   language, but you just upset me, you just -- I don't agree

18   with what you said in a public hearing, which he has every

19   right to do, and you're gonna get nothin' from the DEC.

20             There were also evidence, testimony of

21   threats of arrest.  I heard -- you heard it from

22   Mr. McCulley.  Ranger LaPierre said, well, I'm not sure it

23   was a threat.  But I advised that he could be arrested and I

24   contend for no legitimate purpose.  If they were actually

25   violating something in hiking in the High Peaks, and this is

1    after he had -- he had won on appeal, he had won on appeal

2    and had talked to the press, they're watchin' him.  He was

3    up in the Adirondacks High Peaks taking photographs and

4    measuring.  Then he was confronted by Forest Ranger

5    LaPierre.  Mr. McCulley testified that I -- he threatened me

6    twice to arrest me for doing that.  But nothing came of it.

7    In fact, you can see there's e-mail in there, independence's

8    it's kinda -- frankly, I don't understand it, from Dave

9    Winchell from the DEC, says, well, they could have been

10   surveying, it's not defined, but there's possibly a

11   violation there.  Well, I think a law enforcement agent,

12   officer, law enforcement officer, I know, should behave

13   differently when approaching citizens and going making

14   threats.  Why are they making these threats?  Because the

15   truth tells the matter.  The photos and the measuring were

16   to speak out against hikers, cross-country skiers and those

17   advocates which had earlier said, hey, look at the

18   snowmobilers, they make a mess, and they were showin' the

19   hikers make a mess.  There is huge erosion and problems with

20   hiking trails, with these unmotorized recreational

21   activities, and the DEC knew that they were makin' a -- they

22   were probably gonna make a big stink about this and counter

23   what happened when the political enemies had presented to

24   the DEC with respect to the ATVs and snowmobiles.

25                   Indeed, I think the evidence and testimony

1   which was -- frankly, was uncontroverted, uncontradicted,

2   from Mr. McCulley, there's a past history of criminal

3   conflict between Mr. McCulley, the department as a whole,

4   but also Tom Martin, Stu Buchanan and Forest Ranger

5   LaPierre.

6              MR. MUNRO:  Your Honor, I'll object.

7   Criminal conduct?

8              MR. NORFOLK:  I didn't say -- did I say

9   criminal?

10              THE COURT:  This is argument.  I'll hear him.

11              MR. MCCULLEY:  You did say criminal.

12              MR. NORFOLK:  I didn't mean criminal conduct.

13              THE COURT:  You said it.

14              MR. NORFOLK:  I meant to say personal

15   conflict.  Sorry.  Personal conflict between Mr. McCulley

16   and the defendants I just mentioned.

17              And you gotta remember, while defendants

18   claim Mr. McCulley invited Forest Ranger LaPierre to ticket

19   him, invited the DEC Attorney Lacombe to prosecute

20   Mr. McCulley for operating the truck on his Old -- on the

21   Old Mountain Road, that's not what happened.  They called

22   Mr. McCulley and he testified the last thing he wanted to do

23   in May of 2005 was get ticketed again, arrested or sued by

24   the defendants.

25              Now, I know what you may be thinking, Judge,

1    and so was I when I -- when Mr. McCulley came and explained

2    this case to me.  Why did you go?  Why did you go then?  Why

3    did you agree to drive your truck on the Old Mountain Road

4    in front of this forest ranger the next day?  Well, he -- as

5    he testified, Mr. McCulley spent thousands and thousands of

6    dollars in legal fees, hundreds of his hours of his own man

7    time to discover that the Old Mountain Road, that's

8    according to the DEC's own FOIL request response, was still

9    a town highway, still a town right-of-way.  So, why did he

10   show up?  He's standin' up for what he believed in.

11               Now, earlier, opposing counsel said, well,

12   ask Mr. McCulley if -- well, has your First Amendment speech

13   been chilled?  You still talkin'?  Well, the issue here, I

14   think, is is the DEC tryin' to deter -- one of the issues

15   here is tryin' to deter his First Amendment speech and I

16   think the other issues here, they're upset with vindictive

17   and illegitimate motives against Mr. McCulley because he's

18   standin' up for what he believes in.  He won't stop.  I

19   commend him.

20               So, you also have to remember he endured

21   verbal confrontations and threatening encounters,

22   encounterings before this.  We talked about 'em.  The

23   stopping and asking him if he operated a backhoe on the Old

24   Mountain Road.  He lives seven miles away, he testified.  I

25   don't know why he would bring a backhoe up there.  No

1    investigation was made after that, but they asked him if he

2    did it.  And Mr. McCulley testified, well, forest ranger

3    said everyone at Raybrook and Tom Martin believes if

4    something goes on that you're at fault on the Old Mountain

5    Road.

6                   THE COURT:  Well, in fairness, Mr. LaPierre's

7    testimony was not to that affect.

8                   MR. NORFOLK:  Correct.  Specifically said "I

9    didn't say Tom Martin."

10                  THE COURT:  No.  He specifically said they

11   asked him if something goes on up there, Mr. McCulley would

12   probably know about it.  That's a little different.

13                  MR. NORFOLK:  Okay.  I -- I was under the

14   impression that I think he actually responded twice, and as

15   a lawyer, it's probably my fault, the first time he

16   responded he said I didn't say Tom Martin, I didn't include

17   Tom Martin.

18                  THE COURT:  Right.

19                  MR. NORFOLK:  I asked him again and he did

20   state that, I concede that.

21                  Now, after dedicating substantial money and

22   time, as I was talking earlier, and successfully beating the

23   charge against him and fighting with all his heart for what

24   he believed in, Mr. McCulley was challenged.  He was dared.

25   Is it a subjective point of view from him whether he's

1   harassed or not?  But I believe you can objectively look

2   back as a trier of fact and say he was antagonized by the

3   DEC with that phone call without solicitation.  I "hear

4   you're gonna ride on the Old Mountain Road.  Let's get it

5   done."  So, I contest that that right there is proof of

6   illegitimate motivation to commence -- to get the ball

7   rolling to commence an action against the guy by a DEC

8   official, a law enforcement officer.

9              And it was only months after he had just won

10  his appeal and it was on the same road, same set of

11  circumstances, except for he didn't ride into -- drive all

12  the way into the Town of Keene; instead of a snowmobile, he

13  had a truck.  But this is what I -- and I think the Court

14  noticed this.  You gotta look at all these facts, Joe

15  LaPierre's testimony as established, called up Mr. McCulley

16  the day before he arranged to meet with him.  Forest Ranger

17  LaPierre admitted that he went that day before Mr. McCulley

18  and put up signs, put up no motor vehicle signs.  Yes, you

19  can say it's part of policy to put 'em up.  I tend to --

20             THE COURT:  Well, wait a minute.  As to what

21  Mr. LaPierre testified to, according to him the sign that

22  was up already, which is underneath -- that's a whole

23  another question -- but, it's underneath the sign that he

24  put up that morning.  The sign that was up already is the

25  sign that contained the statement no motor vehicles.

1           MR. NORFOLK:  I respectfully -- I

2 respectfully ask you to review that.  That is not the

3 testimony.  And that -- it was not the testimony of Ken

4 Jubin and I respectfully ask the Court to review that,

5 because I am in complete disagreement with you on that.

6           THE COURT:  All right.  I'm holding up

7 Defendant's -- part of Defendant's Exhibit -- this looks

8 like 3.

9           MR. NORFOLK:  Yes, I understand.

10           THE COURT:  You have that picture?

11           MR. NORFOLK:  Yes, I do.

12           THE COURT:  I'm gonna point here.

13           MR. NORFOLK:  Okay.

14           THE COURT:  As I understood Mr. LaPierre's

15 testimony -- I'm not sayin' whether it's credible for not

16 because it's in some conflict with Mr. Jubin, whether it's

17 credible or not, just so I understand what you think his

18 testimony was, there's three signs on that pole, correct?

19           MR. NORFOLK:  Yes, your Honor.

20 (unintelligible).

21           THE COURT:  My recollection of his testimony

22 is that Mr. LaPierre put up the top sign, which covered part

23 of the sign underneath it, which had already been there.

24           MR. NORFOLK:  Right.

25           THE COURT:  He put up the bottom sign about

1    the bikes.

2                    MR. NORFOLK:  Right.

3                    THE COURT:  The sign that had already been

4    there underneath the first sign he put on is the part that

5    contains the statement about no bikes --

6                    MR. NORFOLK:  Okay.

7                    THE COURT:  -- or no motor vehicles.

8                    MR. NORFOLK:  I disagree with you, your

9    Honor.

10                   THE COURT:  What's your recollection?

11                   MR. NORFOLK:  With that -- I'd like -- I

12   specifically asked Mr. Jubin about that on the record.  I

13   asked him I think more than once.  This is my recollection

14   and complete understanding is if you look closely, there are

15   actually four signs on the tree.  You see the lip of the

16   yellow sign, if I may.

17                   THE COURT:  Oh, yes, I do.

18                   MR. NORFOLK:  And I asked him specifically

19   what sign was there?  He said a forest preserve sign and I

20   asked him specifically, 'cause I thought that was an issue,

21   and I think it was on the record, I pointed out, I asked him

22   and read whether no motorized equipment, no motorized

23   vehicles, et cetera, were on that sign that was there.  He

24   says no, it was just a forest preserve sign, an old rusty

25   forest preserve sign.

```
 1                    THE COURT:  All right.

 2                    MR. NORFOLK:  And I'm -- the record, I'm

 3       sure, will reflect that.

 4                    THE COURT:  No, I understand.

 5                    MR. NORFOLK:  So, with that said, I -- when I

 6       discovered this, I -- frankly I could not find -- I could

 7       not think of any better evidence which establishes and

 8       indicates singling out motive here, a singling out of Jim

 9       McCulley.  Call him up, go over, put the signs up, have him

10       drive on the road, give him the ticket, haul him into the

11       DEC administrative proceeding.  That does not sound right.

12       I contest to you that is in bad faith, that is a

13       harassment -- or retaliatory grounds and it shows a personal

14       conflict or at least some sort of bias on the part of the

15       defendant, the agency, against Mr. McCulley.  It shows an

16       illegitimate motive.  They're going -- they're going to set

17       the scenario, call him up, put the signs up, get him to

18       drive through it.  Singling him out.  Why didn't they do

19       someone else?  I don't know.  I never asked that question.

20                    THE COURT:  Well, maybe because

21       Mr. McCulley's the one who voluntarily showed up on

22       May 21st.

23                    MR. NORFOLK:  Perhaps.  Evidence we presented

24       also exposed the defendants' inconsistent position on the

25       status of the Old Mountain Road.  I think -- and how it
```

1  deemed the Old Mountain Road to be a public highway or a

2  town road or at some time something else.  But all the way

3  up into 2002, the record established that they considered

4  the Old Mountain Road to be the Town of Keene, Town of North

5  Elba's jurisdiction.

6             THE COURT:  When you say "they," you're

7  referring to DEC?

8             MR. NORFOLK:  The DEC.

9             THE COURT:  All right.

10            MR. NORFOLK:  Okay?  2002 comes around,

11  Mr. McCulley, after talking to Jim Jennings, the snowmobile

12  association president, learning that it could possibly be a

13  connecter route, there's evidence here that because he went

14  to Tom Martin and asked, "Hey, let's open this up," months

15  later, coincidentally, they started sayin' -- they started

16  callin' into question the Old Mountain Road.  They start --

17  they did, there's letters in there sayin' there's an issue

18  of the Old Mountain Road, and every year, decades since,

19  back to the '70s, they state it's a town road.

20            THE COURT:  What is the state of the record

21  as to the latest date on which anyone from DEC referred to

22  the road, the Old Mountain Road, as a town road?

23            MR. NORFOLK:  November 2004.

24            THE COURT:  Where's that?

25            MR. NORFOLK:  Christopher Lacombe, order on

1      consent, that he sent to Ken Jubin's attorney.  You recall

2      Mr. Jubin spoke, was very familiar with the Old Mountain

3      Road --

4                    THE COURT:  I thought that was an

5      acknowledgement that the road was likely created by statute,

6      not that it was a town road.

7                    MR. NORFOLK:  That was another letter that

8      was in evidence.  I think it was prior to the order on

9      consent, LaPierre concedes that probably --

10                   MR. MCCULLEY:  Lacombe.

11                   MR. NORFOLK:  Lacombe conceded to Jim Brooks,

12     Ken Jubin's attorney, it appears possibly, I think he used

13     that kind of language, the Old Mountain Road was created by

14     statute, this 1805, 1812 statute.  The order on consent is

15     attached to a different letter, and it's there, there's a

16     lot there, but I know this in and out, that order on consent

17     states the Old Mountain Road is a road, town road -- I think

18     it says by use, town road by use, allowing motor vehicle

19     passageway, to pass through.  It also states the Old

20     Mountain Road traverses through great lots, and it names

21     'em.  What's important about great lot 146 and 153, those

22     are right next to the town borders -- borderline between

23     Keene and North Elba.  I asked Mr. Lacombe specifically to

24     point out on the DEC map where the Old Mountain Road goes

25     through and he says 146, 147.

1                     If you recall, Ken Jubin is there and saw

2      Mr. McCulley where he operated his pickup truck and I asked

3      him what great lot it was and he said 146.  The order on

4      consent of November of 2004 that Mr. Lacombe sent to Ken

5      Jubin's attorney states the Old Mountain Road is the Town of

6      North Elba highway, says it's open to motor vehicle use only

7      and then it proceeds to say the Old Mountain Road crosses

8      130 -- 143, 146, 153.  So, they are -- November of 2004,

9      months before they commence a criminal action and

10     enforcement proceeding against Mr. McCulley, and a year or

11     so after they prosecuted him in criminal court for

12     snowmobile riding, they're now saying in that document that

13     went out to another attorney that the Old Mountain Road is a

14     north -- Town of North Elba right-of-way, open to motor

15     use -- motor vehicle use passage and specifically said that

16     on great lot 146 where we know that that's where he was

17     operating his vehicle.

18                     THE COURT:  Okay.

19                     MR. NORFOLK:  And I should note that he also

20     said 153, which goes beyond where Mr. McCulley operated his

21     vehicle.  So, there's no question of whether he was on a

22     paved road or not or Mr. Lacombe was only talking about the

23     point nine or not.  He discussed all the way to the town

24     line, which is great lot 153, that it's the Old Mountain

25     Road, and he said motor vehicle use is not prohibited.

1              We established that the defendants knew

2    that -- knew or perhaps turned a blind eye to the Adirondack

3    Ski Touring Council's installation of bridges, culverts and

4    other water and drainage devices, the cutting down of brush

5    and trees and other vegetation, manipulation of beaver dams,

6    use of chain saws.  Mr. Goodwin testified he's usin' chain

7    saws all through the year presently.  There's no recourse --

8    I asked him whether he was being prosecuted or been

9    questioned by the DEC?  No, he has not.

10             We also showed that the Adirondack Ski

11   Touring Council is using bulldozers on the Old Mountain

12   Road.

13             THE COURT:  What do you contend that evidence

14   proves?

15             MR. NORFOLK:  It proves, one, that the Old

16   Mountain Road is -- the entire Old Mountain Road is a town

17   road or town highway right-of-way, because they, in their

18   papers, on several occasions -- "they" meaning the DEC,

19   they -- when confronted with that about complaints --

20             THE COURT:  I understand that point.

21             MR. NORFOLK:  Okay.

22             THE COURT:  But you have other --

23             MR. NORFOLK:  And the other point is -- so

24   that establishes that.  Well, they know it's a town highway

25   road, they always have.  So why aren't they prosecuting

1    them?  They have no -- they have no -- they have no hope to

2    obtain a victory.  They didn't win it in County Court.  They

3    knew -- they testified today they -- well, we'll lose --

4    Mr. Hamm said well, we'll probably lose in the same court.

5    And they -- the other thing that it points out is they're

6    allowing some people, members of the public, to operate

7    motorized vehicles, like say the bulldozer.  I think the

8    bulldozer is worse than a pickup truck or a snowmobile.  I'm

9    not an expert in environmental damage, you know, whether a

10   big truck is --

11              THE COURT:  Well, it's not exactly motor

12   vehicle traffic.  It's on a single day for purposes of

13   maintenance.

14              MR. NORFOLK:  Without a permit.  So --

15              THE COURT:  True.

16              MR. NORFOLK:  So --

17              (Pause in proceedings.)

18              MR. NORFOLK:  I'm just gonna wrap it up.  I

19   think -- I had -- have answered a lot of the questions we

20   have here.  But, you know, I think where this really opened

21   up is when Mr. McCulley stumbled upon the fact that the Old

22   Mountain Road is a town road and the DEC deemed it as such

23   in the '90s.  And maybe there's a personal conflict between

24   Tom Martin and Mr. McCulley, but I think I should point out,

25   in my opinion, Mr. Martin didn't answer anything.  And it's

1   surprising that he had no recollection of events that we

2   then showed him that he was involved with.  I think that the

3   Court should consider that and Mr. Martin's, in my opinion,

4   lack of cooperation and dishonesty on the stand.

5           (Pause in proceedings.)

6           MR. NORFOLK:  So, in closing, I think there's

7   enough here, or more than enough here, of evidence of

8   personal animus between the defendants, named defendants,

9   including the department as a whole, there's proofs of --

10  proof of illegitimate motives here, bringin' Mr. McCulley

11  into the civil administrative proceeding, but also to even

12  file the action against him in the town court in '05, the

13  way he went about it, that's evidence of we're gonna go

14  after him, shootin' his mouth off, he won -- he's won, he

15  won in the County Court appeal, he's talkin' -- shootin' his

16  mouth off apparently, and in the newspapers, we're gonna

17  bring him in house and he's not gonna win.  Why weren't you

18  gonna go in the Town of North Elba, Town of Keene?  Well,

19  we're gonna lose at the County Court.  Those -- that right

20  there, that's a reason, an exception to the abstention

21  doctrine, which, frankly, I don't think apply here in the

22  first instance.  We had testimony about state interests.

23  According to Gabrielle Dunn, who is now Gabrielle DeMarco

24  that was put in, public statement to the Press Republican,

25  we don't see this decision as having any precedent in the

1    forest preserve.  Okay.  I -- that, to me, is an admission

2    that this isn't really that state important interest.  It

3    deals with one road and one individual at the time.

4                   Well, now they've changed that, changed that

5    position.  The DEC has also testified -- excuse me, we've

6    also had testimony today that the DEC accepts public

7    comments from all over the nation, not just New York State,

8    in making their land use policy and forest preserve

9    policies, including the Sentinel Range Wilderness area.

10   That's important.  It's not just -- if any important.  It's

11   not just -- if any kind of interest that this has, of

12   magnitude, it's not just state interest, it's a national

13   interest.

14                   And while I'll rest on my memorandums of law

15   that I've submitted to Judge Kahn, I'm sure you have --

16                   THE COURT:  Yes.

17                   MR. NORFOLK:  -- with respect to the other

18   reasons why and under Pullman abstention doctrines do not

19   apply, and apart -- when I say law, I know the

20   administrative proceeding.  Mr. McCulley is not going to be

21   able to bring his claims, each and every claim that he has

22   here, in that administrative enforcement proceeding.  Now

23   you can say well they're gonna be heard on affirmative

24   defenses.  I say -- I venture not to agree with that.  And

25   will they be adjudicated?  Will his claims here be

1    adjudicated in the state administrative enforcement

2    proceeding?  No.  He's not gonna get the relief requested,

3    he's not gonna get any kind of monetary damages awarded in

4    the administrative proceeding.  On appeal, assuming he will

5    lose in the administrative proceeding, because he cannot

6    bring those claims in that administrative proceeding,

7    they're not gonna be preserved for the record on Article 78.

8    And there's case law out there which I cited to in my memos

9    of law where he cannot get the claims adjudicated and the

10   damages he's requestin', we don't have the three prongs of

11   the Younger abstention, Younger abstention doctrine.

12               THE COURT:  Is it your understanding that

13   that part of the case is before me on the referral order

14   from Judge Kahn?

15               MR. NORFOLK:  If I need to pull that out, I

16   will pull that out.

17               THE COURT:  My understanding of the order is

18   he referred it to me for a hearing and a report and

19   recommendation on the issue of the bad faith exception.

20               MR. NORFOLK:  If you would give me a

21   second --

22               THE COURT:  Well, you can look at it in a

23   minute when Mr. Munro speaks.  My other question is what's

24   the status of the administrative proceeding?  Is there a

25   hearing date set?

1            MR. NORFOLK:  No.  I -- when the -- when he

2    was served on the summons -- notice of hearing and the

3    complaint, he came to me, I came to the federal court and

4    asked for a preliminary injunction, okay.  The preliminary

5    injunction I asked for was in the meantime, until that's

6    decided, that the administrative hearing be stayed.  Judge

7    Kahn did not order that part of my relief.  So, I had to put

8    in, I was compelled (unintelligible) to put in an answer to

9    the administrative enforcement proceeding.  Since then,

10   shortly thereafter, the DEC and the -- the DEC agreed to

11   stay that proceeding pending the outcome of this proceeding.

12            There is case law out there that could

13   stay -- that favors the plaintiff.  However, I have not

14   raised those because I think it was a gratuitous move on

15   their part to attack that -- well, I guess I kinda have just

16   now.

17            THE COURT:  All right.

18            MR. NORFOLK:  So I think there's a lot been

19   said here and I think just looking at it, there are

20   exceptions to the Younger and Pullman doctrines, bad faith,

21   no likelihood of obtaining or reasonable expectation of

22   obtaining success in the criminal courts, I am gonna say

23   also in the administrative proceedings, and I will not give

24   my personal opinions on his likely -- his chances there.

25   But, in the alternative, I will say there's an extraordinary

1   circumstance here, there is one, if Younger and Pullman

2   apply, because the DEC, by reasons of bias, as evidenced

3   through the proof here, similar to -- if you look at Cullin,

4   I don't have the cite.  There is a Cullin case in the Second

5   Circuit, it's something that they show personal conflict,

6   history of personal conflict, and personal animus, there's

7   grounds there.  And I believe we have it here.

8            THE COURT:  All right.  Thank you.

9            MR. NORFOLK:  Do you want me to look at the

10  Judge Kahn order?

11           THE COURT:  You can if you want.  I will hear

12  from you on rebuttal if you have anything to say, but I want

13  to hear from Mr. Munro.

14           Mr. Munro.

15           MR. MUNRO:  Thank you, your Honor.  The

16  underlying dispute between the parties is the legal status

17  of what DEC refers to as the Jack Rabbit Trail and what

18  Mr. McCulley refers to as the Old Mountain Road.  The

19  resolution of that question, the legal status, will

20  determine whether Mr. McCulley and the public in general can

21  legally use snowmobiles and motor vehicles on the trail.

22           DEC believes that dispute should be decided

23  in the pending DEC administrative enforcement proceeding.

24  And as you know, we need to dismiss the federal action on

25  the grounds of abstention so that the DEC proceeding can

1    continue.

2                    THE COURT:  And --

3                    MR. MUNRO:  Mr. Norfolk noted, we have agreed

4    to stay that pending the ruling by the federal court.

5                    The underlying dispute is not before your

6    Honor, in our view.  Instead, what Judge Kahn has asked you

7    to do is examine a much narrower question, and that question

8    is whether the so-called bad faith or other exceptions to

9    abstention are supported by the facts here.

10                    More specifically, and let me run through

11   three different components to these exceptions, first,

12   Mr. McCulley has to show that DEC has no reasonable

13   expectation of obtaining a favorable outcome in its June '05

14   administrative enforcement proceeding.

15                    He has to show that the proceeding was

16   initiated with and is animated by retaliatory, harassing or

17   other illegitimate motive.  Or he has to show that there are

18   other extraordinary circumstances, as that phrase has been

19   described by the Supreme Court.  If I could go through each

20   of them.

21                    THE COURT:  Do you agree that if I and Judge

22   Kahn conclude that the plaintiff has shown that the

23   defendants have no reasonable expectation of prevailing in

24   the administrative proceeding, bad faith is established?

25                    MR. MUNRO:  I think bad faith is broader than

1   that, your Honor.  If you look at the current --

2                  THE COURT:  What's the answer to the

3   question?

4                  MR. MUNRO:  The answer is no, you need to

5   conclude more than that.

6                  THE COURT:  What else?

7                  MR. MUNRO:  You need to also conclude

8   personal animus and harassment.  I think the Kern v. Park

9   (phonetic) decision makes that clear.

10                  THE COURT:  All right.  Is animus inferable

11   from a proceeding commenced without any reasonable

12   expectation of prevailing?

13                  MR. MUNRO:  I do not think it is.  And I

14   think -- we cited the Schlager (phonetic) decision, the

15   Second Circuit decision in our prehearing memo.  In

16   Schlager, the District Court found that the criminal statute

17   that was being prosecuted by the DA was unconstitutional.

18   It found there was no personal animus, in terms of the

19   prosecution, but that because the statute was

20   unconstitutional, that constituted bad faith as a matter of

21   law.

22                  The Second Circuit reversed and it said two

23   things:  You've got to show animus either way.  But beyond

24   that, the fact -- they criticized the District Court because

25   the District Court had relied on one single state court

1    decision, a New York Appellate Division decision which had

2    determined that the criminal statute was unconstitutional.

3    The Second Circuit said absent a controlling decision by the

4    New York Court of Appeals, or the U.S. Supreme Court, then

5    there's no bad faith.  I am relying on a more particular

6    decision, but there has to be personal animus as well.

7                    THE COURT:  Well, I mean, it's possible that

8    someone else might not read that holding as broadly as you

9    do.  That's an issue of constitutionality.  This is an

10   issue -- the issue presented here is whether or not there's

11   a likelihood of prevailing.  And right now, you have two

12   court decisions against you.

13                   MR. MUNRO:  Well, we have --

14                   THE COURT:  On the record in this case.

15                   MR. MUNRO:  Well, we have one Court decision

16   in a criminal case, the Judge Halloran decision.

17                   THE COURT:  Correct.

18                   MR. MUNRO:  I don't know about the second --

19                   THE COURT:  I thought there was the 1950s

20   case from Paul Smith that said it's a creation by statute

21   which is contrary to your position?

22                   MR. MUNRO:  Well, that may be.  I'm not

23   familiar with that decision.  Judge Halloran I do not

24   believe relied on that decision in his decision --

25                   THE COURT:  Correct.

```
 1                    MR. MUNRO:  -- the decision from 1953.

 2                    If I could go through each of these grounds?

 3                    THE COURT:  Yes.  But I want to spend some

 4       time on reasonable expectation of prevailing.

 5                    MR. MUNRO:  Well, that's where I'll start.

 6       As I understand the Diamond Deed (phonetic) decision and the

 7       other Second Circuit controlling case law, Mr. McCulley has

 8       to show that DEC has no reasonable expectation of obtaining

 9       favorable outcome in its June -- the administrative hearing

10       that was initiated June '05.  You don't have to decide that

11       DEC will win or lose.  As I understand the case law, you

12       have to determine that DEC was a colorable claim, a

13       nonfrivolous claim really.

14                    Now, we have heard that there are great

15       complicated issues here of New York real property law, roads

16       created by statute, roads created by use, what abandonment

17       means, et cetera.  This was not in the testimony, but I

18       don't think the other side would deny the fact that when

19       Judge Halloran issued his decision, a lot of his reasoning

20       about statutes created in 1810 and 1812, neither side had

21       briefed those issues.  Judge Halloran went off on his own.

22                    THE COURT:  Tell me what the proof will be at

23       the administrative hearing that this violation occurred on

24       state land.

25                    MR. MUNRO:  DEC will prove that Mr. McCulley
```

1    drove his pickup truck on state land.

2                    THE COURT:  On the road.

3                    MR. MUNRO:  On the trail.

4                    THE COURT:  On the trail which another Court

5    has previously found was town -- a town road, correct?

6                    MR. MUNRO:  Are we talking about the Judge

7    Halloran decision?

8                    THE COURT:  Yes.

9                    MR. MUNRO:  Well, again, Judge Halloran -- I

10   don't know how much -- he did find that, yes.  I don't know

11   how much --

12                   THE COURT:  Well, how are you gonna prove it

13   in this proceeding?  It's an issue.  The defendant -- the

14   defendant.  Mr. McCulley has raised it in the administrative

15   proceeding.  How are you gonna prove it?

16                   MR. MUNRO:  That this is state land or --

17                   THE COURT:  Yes.

18                   MR. MUNRO:  -- that it's a road?

19                   THE COURT:  That it's state land.  I assume

20   you're -- your contention is that it's abandoned and became

21   state land.

22                   MR. MUNRO:  That's right.

23                   THE COURT:  Under what theory was it

24   abandoned?

25                   MR. MUNRO:  The state land issue is separate

1    from the abandonment issue.  I mean, the proof at the

2    hearing, I believe -- I won't be doing it, but the proof at

3    the hearing will be that whatever the status of this road

4    was in the 1970s or the 1980s or the 1990s, that it was

5    abandoned because it was not maintained as a public highway

6    by anybody.

7                    Now a related issue to that is who owns the

8    fee here?  And I think that relates to the issue is this

9    creation of a road by statute or use.

10                   THE COURT:  If it's a town road, you have no

11   case in the administrative proceeding, do you agree?

12                   MR. MUNRO:  If it's a town road that has not

13   been abandoned?

14                   THE COURT:  Yes.

15                   MR. MUNRO:  I think that's right.

16                   THE COURT:  If DEC took the position after

17   1972 or 1987, or whatever DEC's position is today on when it

18   was abandoned, how can you prove abandonment?  DEC was

19   taking the position in the '90s certainly and probably into

20   the 2000s that these were town roads.

21                   MR. MUNRO:  I don't concede in the 2000s,

22   Judge.  There is a 1995 letter from a regional forester --

23                   THE COURT:  Okay.

24                   MR. MUNRO:  -- 1996 letter from a regional

25   forester, that was 10 years ago.

1                   THE COURT:  We've heard testimony from both

2    towns, or at least the Town of Keene and from Mr. Jubin,

3    who doesn't represent the Town of North Elba, but he sounded

4    as if he did, that neither town had maintained this road

5    slash trail since at least 1995.  Are you -- does the DEC

6    contend that abandonment occurred in accordance with Highway

7    Law 205?

8                   MR. MUNRO:  I'm not familiar with all the

9    ministerial requirements of directive 205, but DEC does

10   contend that because there's been no maintenance of this

11   road for at least six years, that this road has been

12   abandoned as a matter of fact and law.

13                  THE COURT:  Do you agree that Mr. Lacombe

14   testifies that he believes abandonment occurred in

15   accordance with Section 205?

16                  MR. MUNRO:  I believe he did, your Honor.

17                  THE COURT:  All right.  Section 205(1)

18   requires, among other things, a resolution by the town board

19   for there to be an abandonment of the town road.  There is

20   no such resolution in the record here from either Keene or

21   North Elba, correct?

22                  MR. MUNRO:  I believe that's right, your

23   Honor.

24                  THE COURT:  Is that what you consider a

25   ministerial act?

```
 1                     MR. MUNRO:  Well, again, this goes back to
 2    who owns the fee.  If the towns own the fee --
 3                     THE COURT:  Mr. Munro, is it a -- is that the
 4    ministerial act to which Mr. Lacombe refers?
 5                     MR. MUNRO:  I'm not certain, your Honor.
 6                     THE COURT:  All right.  I mean, if you
 7    consider that a ministerial act, you have to agree with the
 8    proposition that if I accept -- if you accept the
 9    contentions of Mr. Lacombe and Mr. Hamm that this road was
10    abandoned in 1972 or 1987, and that all acts since then,
11    including acts within the Statute of Limitations, by anyone
12    on a motor vehicle, violated those state law provisions,
13    even with no notice to anybody, with no action by the town,
14    with no action of any kind.  Simply, today, you take the
15    position that back then it was abandoned.  You agree?
16                     MR. MUNRO:  I think I do, your Honor.
17                     THE COURT:  And you believe DEC has that
18    power, notwithstanding the provisions of the statutes?
19                     MR. MUNRO:  Well, again, ultimately, I'll let
20    DEC decide that, but I think they do.
21                     THE COURT:  Frankly, somebody may well hold
22    that some day, but to me.  It's a startling proposition.
23                     MR. MUNRO:  Well, there's a lot of history
24    here, Judge, as to who owns the road, who owns the fee, what
25    its use has been.
```

1                    THE COURT:  And a lot of the conflict is all

2    within DEC.  It's a strange record here.

3                    MR. MUNRO:  Well, there are also no town

4    officials here testifying as to what their position was.

5    There's a town highway person, but no one else.

6                    THE COURT:  I understand, all right.  Please

7    continue.

8                    MR. MUNRO:  I think that covers reasonable

9    expectation.

10                   THE COURT:  All right.

11                   MR. MUNRO:  In terms of whether the

12   proceeding was initiated with or animated by retaliatory,

13   harassing or other illegitimate motive, I don't think that's

14   been established whatsoever.  I believe that the evidence is

15   clear that Mr. McCulley invited these prosecutions.  Until

16   yesterday, there had been no argument at all about what

17   sounded almost like entrapment today.  There was no argument

18   before Judge Kahn or the papers before Judge Kahn that

19   somehow DEC enticed Mr. McCulley to come to the trail and

20   drive his pickup truck.  We think just the opposite.  He's a

21   zealous advocate and he's trying to test the law.

22                   THE COURT:  Well, what's your recollection of

23   the record on the -- I believe it's May 21, 2005, incident?

24   First phone call came from Ranger LaPierre, didn't it?

25                   MR. MUNRO:  Yes.

```
 1                    THE COURT:  And --

 2                    MR. MUNRO:  And he testified that he had

 3  gotten a phone call from another ranger who had been on that

 4  day and he told him he had heard, through the grapevine,

 5  that Mr. McCulley and others were going to show up at the

 6  trail and Mr. Jubin testified to that as well.

 7                    THE COURT:  Right.

 8                    MR. MUNRO:  So Mr. LaPierre simply called him

 9  up and said, "What's going on?"

10                    THE COURT:  Well, how did we get -- how

11  did -- according to Mr. LaPierre's testimony, how did the

12  conversation get from "what's going on" to "I'll see you

13  tomorrow morning at 10 o'clock"?

14                    MR. MUNRO:  Mr. McCulley said he was going to

15  go to the trail the next day, as I recall.  And Mr. --

16                    THE COURT:  Just -- and according to Ranger

17  LaPierre's testimony, Mr. McCulley simply volunteered that

18  information?

19                    MR. MUNRO:  I believe he did.

20                    THE COURT:  Okay.

21                    MR. MUNRO:  So he showed up and he drove his

22  pickup truck.

23                    There has been some testimony about a

24  Mr. Messenger and a conflict in a restaurant.  I don't know

25  who Mr. Messenger is, he's not a witness here.  He was not
```

1   at all involved with the decision in 2005 to bring an

2   administrative enforcement proceeding against Mr. McCulley,

3   and so any alleged conflict between those two individuals I

4   think is irrelevant.  Certainly has nothing to it with

5   animus or harassment.

6              In terms of extraordinary circumstances, the

7   Supreme Court case law says that the plaintiff must show

8   that the facts, according to the Kubler case (phonetic), the

9   facts must create an extraordinarily pressing need for

10  immediate federal equitable relief.  And the Trainer versus

11  Hernandez (phonetic) Supreme Court decision says plaintiff

12  must show that he will suffer, quote, great and immediate

13  harm if the federal court does not intervene.

14             Now, as we understand Mr. McCulley's federal

15  court complaint is primarily based on his First Amendment

16  claim that the DEC enforcement proceeding is -- has impacted

17  his First Amendment rights, is restraining his right to

18  speak out freely.  And yet, he conceded that he continues to

19  do so, as is, of course, his right, and, in fact, he spoke

20  at a property rights conference in Albany this past October.

21  The DEC obviously has no bone to pick with regard to his

22  exercising his First Amendment rights.  We just want him to

23  obey the law, as we understand the law to be, and we believe

24  that that issue as to what the law is ought to be determined

25  at DEC's administrative enforcement proceeding.

1                    THE COURT:  All right.  Thank you.

2                    MR. NORFOLK:  I just have a very brief

3    rebuttal.

4                    THE COURT:  Yes.

5                    MR. NORFOLK:  Mr. Munro stated that this

6    was -- the scope of this hearing should have been just about

7    bad faith and whether or not there was illegitimate motives.

8    However I have the case of Kern versus Park, United States

9    District Court, Western District of New York case, that

10   supports our whole presentation of evidence here.  You have

11   to get somewhat to the underlying issue here about the Old

12   Mountain Road and the status.  And just to rebut that, the

13   Western District of New York court, Kern v. Park, stated the

14   party bearing the burden of proof failed to introduce

15   detailed evidence concerning the underlying facts and

16   ultimate dispositions in many of the cases prosecuted by

17   defendants.  There was multiple cases there.  Here there's a

18   couple.  As such, this Court cannot adequately evaluate the

19   merits of those cases to determine whether the defendants

20   had a reasonable expectation of achieving a favorable

21   outcome.  This is why we've spent two days here going a lot

22   over the Old Mountain Road and the status and the history of

23   it.

24                   THE COURT:  I understand.  I thought the

25   question that I had for you before was whether or not I can

1    reach the question of the relief available.  That's a

2    question for whether the abstention doctrine applies in any

3    event, before you even reach bad faith.

4                    MR. NORFOLK:  Okay.  I have Judge Kahn's

5    order --

6                    THE COURT:  Yes.

7                    MR. NORFOLK:  -- and it directs an

8    evidentiary hearing, and, page 2, in the second paragraph

9    down, I quote, the Court hereby orders that an evidentiary

10   hearing be held addressing bad faith and other exceptions to

11   abstention.  Parties should be prepared to address the

12   Younger and Pullman doctrines and any exceptions thereto.  I

13   see that as addressing the Younger and Pullman abstention.

14   Hence, that's why I have admitted evidence of Gabrielle Dunn

15   going to the second prong whether it's a state interest or

16   not, I understand that has no precedents.  That's why I

17   questioned -- I think it was Tom Martin, I think I

18   actually -- I think he responded and said that public

19   comment is accepted from the state and out of state to show

20   the Court it's not -- if anything it's not just a state

21   interest, it's a national interest.  It bases its land

22   policy -- the DEC bases its land policy decision making on

23   both in state and out of state members of the public and

24   associations.

25                    The only other thing I think I would like to

1    address in -- and to rebut is our complaint has stated all

2    along that the scenario about getting the phone call up and

3    having dared or challenged to go drive his pickup truck on

4    the Old Mountain Road was -- we've alleged that in our

5    complaint since day one that it was wrong, done in bad faith

6    and illegitimate motives.  To be honest with you, we just

7    found out not too long ago that Joe LaPierre hadn't put up

8    the -- as the testimony was given, hadn't put up the signs

9    that prohibit motor vehicles 'til that morning.  So that's

10   why we brought it up here.  I think it's very important to

11   the issues.

12              And lastly, I just want to -- Mr. Munro's, I

13   believe, understanding is that bad faith, you must do --

14   show bad faith and not have a reasonable outcome, and I

15   don't see the case law like that.  And I'm quoting from

16   Lamdon v. Construction (phonetic) Federal Courts should

17   still afford injunctive relief to plaintiff upon showing of

18   bad faith, harassment or any other exceptional circumstance

19   that would call for equitable relief.

20              And you know, I think I'm just gonna rest on

21   the case law that's there and ask that -- you to consider

22   our memos.

23              THE COURT:  Thank you.  Mr. Munro, anything

24   further?

25              MR. MUNRO:  Just very briefly, your Honor.

1   Judge Kahn's order says what it says, obviously, but we took

2   the position in our pretrial brief that the threshold

3   question of abstention, whether the three prong test has

4   been met, pending state proceeding, according state interest

5   and adequately protect the defendant's rights in a state

6   proceeding.  That's a question of law.  We cited some case

7   law on that.  And we believe that was fully briefed before

8   Judge Kahn and what is before you is only the factual issue

9   regarding the abstention.

10          THE COURT:  I'm not aware -- I'll give

11  Mr. Norfolk a chance to respond, but I'm not aware of any

12  factual issues with respect to the application of the

13  abstention doctrine.  It's only with respect to the

14  exceptions to the doctrine that we're here for.

15          MR. MUNRO:  That's right and I think

16  (unintelligible).

17          THE COURT:  All right.  Did you have

18  something else?

19          MR. NORFOLK:  No.

20          THE COURT:  Let me ask your recollection of

21  Ranger LaPierre's testimony with respect to the signs that

22  he put up on May 21, 2005?

23          MR. MUNRO:  Well, I -- first of all, I would

24  suggest that probably what he said is the best recollection.

25  But as I remember it is that when he got there that morning,

1   the only sign up on the tree was the one that is now covered

2   by the new sign on the top.

3                THE COURT:  All right.

4                MR. MUNRO:  But he also said that in the

5   past, there had been a second sign, similar to that middle

6   one, which said no motor vehicle use of this trail and that

7   that sign had been taken down.  And I specifically said to

8   him, "Are signs sometimes removed?"  And he said "yes."  So

9   I think he testified that only the one sign was there that

10  day.

11               THE COURT:  All right.  Thank you.

12  Mr. Norfolk, anything else?

13               MR. NORFOLK:  No.  To be honest with you, I

14  didn't understand when you said I can ask Mr. Norfolk the

15  issue, you're talking about actual --

16               THE COURT:  Yeah, there are no factual

17  questions with respect to the application of the abstention

18  doctrine itself, are there?

19               MR. NORFOLK:  Well --

20               THE COURT:  Simply there are factual

21  questions with respect to the exemption for bad faith.

22               MR. NORFOLK:  Well, I contend and I'm lookin'

23  at this Judge's order again, where he ordered in bold

24  that -- he couldn't possibly -- I know that's a legal

25  question, whether abstention applies or not, but yet with

1    any legal question, you have to apply the facts.

2                    THE COURT:  Well, what facts are in dispute

3    with respect to that?  You have been presenting evidence

4    about the relief available.  That's not in dispute, is it?

5                    MR. NORFOLK:  No.  No.  I -- no.  I guess

6    what I was lookin' at is the state important interest, state

7    important interest prong, and I have been contending,

8    submitting evidence here that the state itself admitted it

9    didn't have much of a precedent.  That's what I was --

10   that's my approach.

11                   THE COURT:  All right.

12                   MR. NORFOLK:  And the public comments from

13   out of state.  And so it's not just a state interest.  If

14   anything it's a national interest, or no interest at all.

15                   THE COURT:  All right.  Thank you.

16                   MR. NORFOLK:  Thank you.

17                   THE COURT:  Thank you.  Decision is reserved.

18                   MR. NORFOLK:  Thank you, your Honor.

19                   MR. MUNRO:  Thank you, your Honor.

20                   THE COURT:  Thank you.

21                   (This matter adjourned at 4:57 PM.)

22                              - - - - -

23

24

25

1                        CERTIFICATION:

2

3

4                    I, THERESA J. CASAL, RPR, CRR, Official Court

5    Reporter in and for the United States District Court, Northern

6    District of New York, do hereby certify that I transcribed

7    the digitally-recorded hearing held in the heading hereof;

8    and that the foregoing is a true and correct transcript of

9    the same and the whole thereof, to the best of my ability.

10

11

12

13                                    _____

14                                    THERESA J. CASAL, RPR, CRR

15                                    Official Court Reporter

16

17

18

19   DATE:

20

21

22

23

24

25